NON-CONFIDENTIAL

2014-1251

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

HOME MERIDIAN INTERNATIONAL, INC., DBA Samuel Lawrence Furniture Co., DBA Pulaski Furniture Company, GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., and DALIAN HUAFENG FURNITURE GROUP CO., LTD.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellee,

v.

AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,

Defendants-Appellants.

_____

Appeal from the United States Court of International Trade in consolidated case no. 11-00325, Judge Jane A. Restani.

_____

**BRIEF OF DEFENDANTS-APPELLANTS AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE AND VAUGHAN-BASSETT FURNITURE COMPANY, INC.**

_____

Joseph W. Dorn
J. Michael Taylor
Mark T. Wasden
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 737-0500

*Counsel for American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc.*

March 24, 2014

22691558

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## HOME MERIDIAN INTERNATIONAL V. US
## 2014-1251

### Amended Certificate of Interest

Counsel for Defendants-Appellants, American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc., certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

American Furniture Manufacturers Committee for Legal Trade (see attached) and Vaughan-Bassett Furniture Company, Inc.

2.      The name of the real party in interest  (if the party named in the caption is not the real party in interest) represented by me is:

Same

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

 See attached.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

King & Spalding - Joseph W. Dorn, J. Michael Taylor, Daniel L. Schneiderman, P. Lee Smith, and Mark T. Wasden.  Sarah K. Davis (formerly of King & Spalding) also appeared at the Court of International Trade.

March 24, 2014                                   */s/ Joseph W. Dorn*
Date                                                     Joseph W. Dorn

**American Furniture Manufacturers Committee for Legal Trade**

Carolina Furniture Works, Inc.

Century Furniture Industries (owned by CV Industries, Inc.)

Harden Furniture, Inc.

Higdon Furniture Co., Inc.

Johnston/TomBigbee Furniture Manufacturing (owned by Lounoura Industries, Inc.)

Kincaid Furniture Co., Inc. (owned by La-Z-Boy, Inc., a public company)

L. & J.G. Stickley, Inc.

Lea Industries (owned by La-Z-Boy, Inc., a public company)

Michels & Company

MJ Wood Products, Inc.

Mobel, Inc.

Perdues, Inc.

Sandberg Furniture Mfg. Co., Inc.

Stanley Furniture Company, Inc. (public company)

T. Copeland & Sons

Tom Seely Furniture (TSF LLC) (owned by Caperton Furniture Works LLC)

Vaughan-Bassett Furniture Company Inc.

Vermont Tubbs (owned by Vermont Quality Wood Products LLC)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………..........iii

STATEMENT OF RELATED CASES ..................................................................1

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES...........................................................................2

INTRODUCTION ..................................................................................................2

STATEMENT OF THE CASE...............................................................................5

STATEMENT OF THE FACTS ............................................................................7

SUMMARY OF ARGUMENT ............................................................................14

ARGUMENT ........................................................................................................16

I.      STANDARD OF REVIEW ........................................................................16

II.     COMMERCE'S SELECTION OF CONTEMPORANEOUS
        SURROGATE VALUES OVER NON-CONTEMPORANEOUS ME
        PURCHASE PRICES IS SUPPORTED BY SUBSTANTIAL
        EVIDENCE AND IS IN ACCORDANCE WITH LAW .............................19

        A.      Commerce Reasonably Interpreted Its Regulations As Not
                Providing For The Use of ME Purchase Prices To Value
                Huafeng's Wood Inputs ....................................................................19

                1.      The exception for using ME purchase prices, rather than
                        surrogate values, to value FOPs is a narrow exception
                        that applies only to purchases during the period under
                        consideration ..........................................................................22

                2.      Commerce's interpretation of its regulation is consistent
                        with its longstanding practice of using ME purchase
                        prices contemporaneous with the POR ....................................27

        B.      Commerce's Selection Of Surrogate Values Over ME Purchase
                Prices Is Supported By Substantial Evidence .....................................33

C.      Commerce's Finding That Huafeng Did Not Demonstrate That
        It Only Used ME Wood Inputs Is Supported By Substantial
        Evidence ................................................................................................37

CONCLUSION ..................................................................................................45

**CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rule 28(d)(1)(B), confidential business proprietary information has been deleted from this brief. The redacted information was designated as confidential business proprietary information by Dalian Huafeng Furniture Group Co., Ltd. in submissions to the U.S. Department of Commerce and the Court of International Trade. The confidential business proprietary information that has been redacted on pages 7, 15, 35-36, and 41 concerns information relating to Huafeng's production process.

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Auer v. Robbins,*
519 U.S. 452 (1997)................................................ 20, 21, 24, 26, 27, 33

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,*
400 F.3d 1352 (Fed. Cir. 2005) ..................................................18, 33

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984)..................................................................17, 20

*Consol. Edison Co. of NY v. NLRB,*
305 U.S. 197 (1938)........................................................................18

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966)........................................................................18

*Daido Corp. v. United States*
869 F. Supp. 967 (Ct. Int'l Trade 1994)............................................18

*Decker v. Nw. Envtl. Def. Ctr.,*
133 S. Ct. 1326 (2013)....................................................................20

*Essar Steel Ltd. v. United States,*
678 F.3d 1268 (Fed. Cir. 2012) .......................................................16

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States,*
276 F. Supp. 2d 1371 (Ct. Int'l Trade 2003).......................................39

*Globe Metallurgical, Inc. v. United States,*
33 CIT 435 (2009) ..........................................................................29

*Gose v. U.S. Postal Serv.,*
451 F.3d 831 (Fed. Cir. 2006) .........................................................17

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,*
28 CIT 1185 (2004) ........................................................................29

*Home Meridian Int'l, Inc. v. United States,*
865 F. Supp. 2d 1311 (Ct. Int'l Trade 2012).......................5, 10, 35, 36

*Home Meridian Int'l, Inc. v. United States*,
   922 F. Supp. 2d 1366 (Ct. Int'l Trade 2013)................................................*passim*

*Home Meridian Int'l, Inc. v. United States*,
   925 F. Supp. 2d 1377 (Ct. Int'l Trade 2013).............................................6, 13, 44

*Home Meridian Int'l, Inc. v. United States*,
   No. 11-00325, 2013 Ct. Intl. Trade LEXIS 144 (Ct. Int'l Trade
   Nov. 14, 2013) ...............................................................................7, 14

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992)...........................................................................19

*Koyo Seiko Co. v. United States*,
   36 F.3d 1565 (Fed. Cir. 1994) .............................................................17

*Magnola Metallurgy, Inc. v. United States*,
   508 F.3d 1349 (Fed. Cir. 2007) .........................................................17

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ...........................................................18

*Mittal Steel USA, Inc. v. United States*,
   31 CIT 1395 (2007) ..........................................................................20

*Nucor Corp. v. United States*,
   612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009)...........................................18

*Pesquera Mares Australes Ltda. v. United States*,
   266 F.3d 1372 (Fed. Cir. 2001) .........................................................17

*Price v. Panetta*,
   674 F.3d 1335 (Fed. Cir. 2012) .........................................................21

*QVD Food Co. v. United States*,
   721 F. Supp. 2d 1311 (Ct. Int'l Trade 2010),
   *aff'd*, 658 F.3d 1318 (Fed. Cir. 2011) ...............................................31

*Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v.
   United States*, 30 CIT 1173 (2006),
   *aff'd*, 228 Fed. App'x 1001 (Fed. Cir. 2007)........................................25, 29, 38

*Since Hardware (Guangzhou) Co. v. United States*,
 No. 09-00123, 2010 Ct. Intl. Trade LEXIS 119 (Ct. Int'l Trade
 Sept. 27, 2010) ................................................................................27

*Thomas Jefferson Univ. v. Shalala*,
 512 U.S. 504 (1994)..........................................................................21

*Timken Co. v. United States*,
 699 F. Supp. 300 (Ct. Int'l Trade 1988),
 *aff'd*, 894 F.2d 385 (Fed. Cir. 1990) ................................................18

*Torrington Co. v. United States*,
 156 F.3d 1361 (Fed. Cir. 1998) ........................................................21

*United States v. Eurodif S.A.*,
 555 U.S. 305 (2009)..........................................................................17

*United States v. Mead Corp.*,
 533 U.S. 218 (2001)..........................................................................20

*Wheatland Tube Co. v. United States*,
 495 F.3d 1355 (Fed. Cir. 2007) ...................................................20, 27

*Zhejiang Dunan Hetian Metal Co. v. United States*,
 652 F.3d 1333 (Fed. Cir. 2011) ........................................................19

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................16

19 U.S.C. § 1677b(c) .............................................................................24

19 U.S.C. § 1677b(c)(1)............................................................................3

28 U.S.C. § 1295(a)(5)..............................................................................1

**Agency Regulations and Determinations**

19 C.F.R. § 351.408(c)(1) ...................................................................3, 22

19 C.F.R. § 351.414(f)(2) ......................................................................31

19 C.F.R. § 351.414(f)(3) ......................................................................31

CASE PARTICIPANTS ONLY

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*,
71 Fed. Reg. 61716 (Dep't of Commerce Oct. 19, 2006) ...........9, 22, 26, 27, 37

*Certain Automotive Replacement Glass Windshields from the People's Republic of China*,
67 Fed. Reg. 6482 (Dep't of Commerce Feb. 12, 2002)..............................28, 30

*Certain Steel Threaded Rod From the People's Republic of China*,
76 Fed. Reg. 68400 (Dep't of Commerce Nov. 4, 2011)....................................31

*Diamond Sawblades and Parts Thereof from the People's Republic of China*,
71 Fed. Reg. 29303 (Dep't of Commerce May 22, 2006) ............................27, 30

*Use of Market Economy Input Prices in Nonmarket Economy Proceedings*,
78 Fed. Reg. 46799 (Dep't of Commerce Aug. 2, 2013) ....................................9

*Wooden Bedroom Furniture From the People's Republic of China*,
76 Fed. Reg. 7534 (Dep't of Commerce Feb. 10, 2011) .....................................3

*Wooden Bedroom Furniture from the People's Republic of China*,
76 Fed. Reg. 49733 (Dep't of Commerce Aug. 11, 2011).............................4, 30

*Wooden Bedroom Furniture from the People's Republic of China*,
76 Fed. Reg. 57713 (Dep't of Commerce Sept. 16, 2011)...................................4

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for the American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc. (collectively the "AFMC") states that no other appeal in or from this civil action in the lower court was previously before this or any other appellate court, and no case known to counsel is pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This appeal is from a final judgment of the U.S. Court of International Trade ("Trade Court") entered on November 14, 2013, regarding the valuation of certain pine, poplar, birch, elm, oak veneer, and plywood ("wood inputs")[1] by the Department of Commerce ("Commerce") in its calculation of the dumping margin of Dalian Huafeng Furniture Group Co., Ltd. ("Huafeng") in the fifth administrative review of the antidumping duty order on wooden bedroom furniture from the People's Republic of China ("China"). The AFMC timely filed in the Trade Court a notice of appeal on January 13, 2014 (JA1001168-69). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(5).

---

[1] Commerce valued two other wood inputs, poplar veneer and particle board, using Huafeng's market economy ("ME") purchase prices because those purchases were made during the period of review ("POR"). Those two wood inputs are not the subject of this appeal.

## STATEMENT OF THE ISSUES

Whether Commerce's selection of contemporaneous surrogate values over non-contemporaneous ME purchase prices to value Huafeng's wood inputs in calculating Huafeng's dumping margin is supported by substantial evidence and otherwise in accordance with law, specifically, (1) whether Commerce reasonably interpreted its regulations as not providing for the use of ME purchase prices to value Huafeng's wood inputs, (2) whether substantial evidence supports Commerce's selection of surrogate values over ME purchase prices to value Huafeng's wood inputs, and (3) whether substantial evidence supports Commerce's finding that Huafeng did not demonstrate that it consumed only ME wood inputs during the POR.

## INTRODUCTION

In antidumping proceedings involving imports from China, a non-market economy, Commerce calculates normal value by constructing the cost of producing the subject merchandise in a surrogate country that has a level of economic development comparable to China and that is a significant producer of the subject merchandise. Commerce asks the Chinese producers to provide their consumption of the factors of production ("FOPs") used to produce each model of subject merchandise exported to the United States and then values those FOPs using publicly available data from the chosen surrogate country. Commerce calculates

the "normal value" for the subject merchandise on the basis of the value of the

FOPs utilized in producing the subject merchandise, plus amounts for direct labor,

overhead, selling, general and administrative expenses, packing, and profit. 19

U.S.C. § 1677b(c)(1). Commerce compares the normal value with the export price

of the subject merchandise exported to the United States. The amount by which

the normal value exceeds the export price is the dumping margin.

The Department's regulations provide an exception to this practice by

allowing the use of the actual price paid by the non-market economy producer for

inputs purchased from ME suppliers in an ME currency to value these inputs in

accordance with 19 C.F.R. § 351.408(c)(1). The Department interprets this

regulatory exception to be limited in scope and not applicable to ME purchases

made outside the POR. In addition, the exception for using ME purchase prices to

value inputs focuses on POR purchases rather than POR consumption. In other

words, when ME purchases are made outside the POR, the exception does not

apply, even if ME purchases made prior to the POR are consumed during the POR.

In the fifth administrative review of the antidumping order on wooden

bedroom furniture from China, Commerce selected the Philippines as the surrogate

country. In *Wooden Bedroom Furniture From the People's Republic of China,* 76

Fed. Reg. 7534 (Dep't of Commerce Feb. 10, 2011) ("*Preliminary Results*")

(JA1000776-88), *Wooden Bedroom Furniture from the People's Republic of*

*China*, 76 Fed. Reg. 49733 (Dep't of Commerce Aug. 11, 2011) ("*Final Results*")

(JA1000921-27), *as amended,* 76 Fed. Reg. 57713 (Dep't of Commerce Sept. 16,

2011) (JA1000928-29), and *Issues & Decision Memorandum for the Final Results*

("*IDM*") (JA1000908-12), Commerce declined to apply an exception to its normal

practice of valuing Huafeng's wood FOPs based on surrogate values from the

Philippines, because Huafeng did not meet the criteria provided for in the

regulation for using ME purchase prices. In fact, Huafeng admitted that it did not

make any ME purchases of the wood inputs at issue during 2009, the POR for the

fifth review. Commerce further explained why it selected surrogate values over

ME purchase prices as the best available information for valuing Huafeng's wood

inputs.

In *Final Results of Redetermination Pursuant to Remand* (Feb. 26, 2013)

(*"First Redetermination"*), Commerce provided further explanation for not

applying the exception and for selecting surrogate values over ME purchase prices

as the best available information for valuing Huafeng's wood inputs. Because

Commerce's *First Redetermination* is supported by substantial evidence and is

otherwise in accordance with law, the Trade Court erred by directing Commerce to

use ME purchase prices, which Commerce did "under protest" in the *Final Results*

*of Redetermination Pursuant to Second Remand* (August 26, 2013) ("*Second*

*Redetermination*"). This Court should reverse the Trade Court's judgment and

direct Commerce to reinstate it *First Redetermination*, in which Commerce followed its normal practice of valuing Huafeng's wood inputs based on publicly available information from the surrogate country during the POR.

## STATEMENT OF THE CASE

The AFMC appeals Commerce's *Final Results*, which covered entries made during calendar year 2009. In the *Final Results*, pursuant to its normal practice, Commerce used surrogate values contemporaneous with the POR to value Huafeng's FOPs for certain wood inputs. Commerce's regulations provide an exception to this practice by allowing the use of the actual price paid by the non-market economy producer to value these inputs, provided that the inputs were purchased from ME suppliers in an ME currency, and the total volume of the input purchased from all market economy sources during the period of investigation or review exceeds 33 percent of the total volume of the input purchased from all sources during the period. Commerce did not apply the exception here because Huafeng had no ME purchases during the POR.

In *Home Meridian Int'l, Inc. v. United States*, 865 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) ("*Home Meridian I*"), the Trade Court remanded the wood input valuation issue to Commerce. The Trade Court found that Commerce's reliance on contemporaneity "to the exclusion of all other factors" and Commerce's failure to

review Huafeng's non-contemporaneous ME purchases of wood inputs prior to 2009 were not in accordance with law. *Id*. at 1320 (JA000050).

On remand, Commerce re-examined Huafeng's ME purchases. On February 26, 2013, Commerce issued its *First Redetermination* in which it again concluded that surrogate values in 2009 were the best available information for valuing Huafeng's wood inputs. On June 25, 2013, the Trade Court again remanded this issue to Commerce. Placing itself in the role of Commerce, the Trade Court cited the disparity between the surrogate values in 2009 and Huafeng's ME purchase prices for wood inputs prior to 2009 and concluded that Commerce had failed to provide a reasonable explanation for its preference for surrogate values. The Trade Court then directed Commerce to "use Huafeng's actual ME wood input purchases to calculate normal value" unless Commerce first obtained leave from the Trade Court by July 15, 2013 to reopen the record. *Home Meridian Int'l, Inc. v. United States*, 922 F. Supp. 2d 1366, 1382 (Ct. Int'l Trade 2013) ("*Home Meridian II*") (JA000018).

On July 15, 2013, the AFMC filed a motion for reconsideration or, in the alternative, for an order directing Commerce to reopen the record on remand. The Trade Court denied that motion on August 7, 2013. *Home Meridian Int'l, Inc. v. United States*, 925 F. Supp. 2d 1377, 1381 (Ct. Int'l Trade 2013) ("*Home Meridian III*") (JA000007. On August 26, 2013, Commerce complied "under protest" with

the Trade Court's order to change its decision and issued its *Second Redetermination* in which it valued Huafeng's wood inputs using Huafeng's non-contemporaneous ME purchase prices. On November 14, 2013, the Trade Court affirmed the revised valuation of Huafeng's wood inputs.. *Home Meridian Int'l, Inc. v. United States*, No. 11-00325, 2013 Ct. Intl. Trade LEXIS 144 at *5 (Ct. Int'l Trade Nov. 14, 2013) ("*Home Meridian IV*") (JA000004). The Trade Court's final judgment was entered on November 14, 2013 (JA000001-2).

## STATEMENT OF THE FACTS

Commerce's antidumping questionnaire asked Huafeng to "{l}ist the inputs that your company purchased from a market economy supplier and paid for in a market economy currency <u>during the POR</u>" (emphasis added). In response, Huafeng stated the following:

> Please see Exhibit D-4.1 & 4.2 for the Dalian Huafeng's Market Economy Purchase spreadsheet ("MEP Spreadsheet") during the POR and [      ]. For some of the materials, Dalian Huafeng did not make any purchase (both market economy or domestic) during the POR, however, made {sic} some purchase during [      ]. Dalian Huafeng purchased various materials used in the production of subject merchandise from suppliers in [                          ] Those suppliers are unaffiliated with Dalian Huafeng. Dalian Huafeng paid for those purchases in U.S. dollars.

Huafeng Section D Response (July 12, 2010) at 7 (JA1000014). For the wood inputs at issue here, Huafeng did not make any ME purchases during the POR.

Huafeng Section D Response at Exhibit D-4.2 (JA1000139); Huafeng Second

Supplemental Section D Response (Nov.8, 2010) at Exhibit S-98 at pages 3-4

(JA1000523-24). All parties agree that Huafeng did not have any ME purchases of

wood inputs during the POR. Memorandum Of Points And Authorities In Support

Of Consolidated Plaintiff Dalian Huafeng Furniture Group Co., Ltd.'s 56.2 Motion

For Judgment On The Agency Record ("Huafeng 56.2 Brief") (Feb. 24, 2012) at 6

(JA1000941); Huafeng Section D Response at Exhibits D-4.1(JA1000138), D-4.2

(JA1000139), and D-5 (JA1000131-45); Huafeng Second Supplemental Section D

Response at Exhibit S-98 (JA1000523-24); Huafeng Revised Administrative Case

Brief (March 25, 2011) at 11 (JA1000838); Home Meridian Administrative Case

Brief (March 22, 2011) at 1(JA1000799). At no point in its questionnaire response

did Huafeng assert that it only consumed ME wood inputs in the production of

subject merchandise during the POR.

Commerce verified that Huafeng's questionnaire responses concerning its

pre-POR ME purchases accurately reflected the information contained in

Huafeng's books and records. *See* Verification at Dalian Huafeng Furniture Group

Co., Ltd. ("Verification Report") (Jan. 31, 2011) at 35 (JA1000628). Commerce

made no separate finding regarding the validity or reliability of those ME

purchases, e.g., whether those purchases were made from a qualifying ME source and reflected arm's length prices.[2]

Because Huafeng had no purchases of wood inputs from a ME supplier during the POR, Commerce used surrogate values contemporaneous with the POR to value its wood FOPs. Preliminary Analysis Memorandum for Dalian Huafeng Furniture Group Co., Ltd. (Jan. 31, 2011) at 3 (JA1000639); *IDM* at Cmt. 20 (JA1000908-12). Commerce explained its consistent practice of using a respondent's ME purchase prices to value FOPs only "when the total volume of the input purchased from all ME sources during the period of investigation or review exceeds 33 percent of the total volume of the input purchased from all sources during the period," as codified in *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716 (Dep't of Commerce Oct. 19, 2006) ("*Antidumping Methodologies*").[3] *IDM* at Cmt. 20 (JA1000908-12). Commerce also concluded

---

[2]  *See IDM* at Cmt. 20 ("We have not addressed Petitioners' assertions regarding the reliability of Huafeng's ME purchases because we are not relying on these prices in the final results.") (JA1000912).

[3]  Commerce has recently revised its policy regarding the use of ME purchase prices in non-market economy proceedings. *See Use of Market Economy Input Prices in Nonmarket Economy Proceedings*, 78 Fed. Reg. 46799 (Dep't of Commerce Aug. 2, 2013). In Commerce proceedings or segments of proceedings initiated on or after September 3, 2013, Commerce will use ME purchase prices rather than surrogate values where the ME input is produced in one or more ME

that using ME purchase prices from outside the POR may introduce distortions into the calculation and that contemporaneous surrogate values represented the best available information on the record. *Id.*

The Trade Court determined that Commerce failed to weigh the merits of valuing the wood inputs using non-contemporaneous ME purchase prices prior to 2009 versus contemporaneous surrogate values from 2009, which prevented Commerce from determining the best available information and caused the *Final Results* not to be in accordance with law. *Home Meridian I,* 865 F. Supp 2d at 1319 (JA000049). The Trade Court remanded for Commerce to "determine the wood input factor of production in accordance with the statutory or regulatory framework, as well as to make any necessary factual determinations." *Id.* at 1320 (JA000050).

On remand, Commerce provided additional explanation for its decision to value Huafeng's wood inputs using contemporaneous surrogate values rather than non-contemporaneous ME purchase prices. *First Redetermination* at 6-7 (JA1001019-20). Commerce noted that in antidumping proceedings involving non-market economy countries, it normally calculates normal value by valuing the non-market economy producers' FOPs using prices from an ME country that is at a

---

countries, and "substantially all" (*i.e.*, 85 percent) of the input is purchased from one or more ME suppliers. As in the regulation at issue in this appeal, the ME purchases must be made during the POR to qualify for the exception.

comparable level of economic development and that is also a significant producer of comparable merchandise. However, Commerce's regulations provide an exception to this practice by allowing the use of the actual price paid by the non-market economy producer for inputs purchased from ME suppliers in an ME currency to value these inputs. *Id.* at 5 (JA1001018). Commerce stated that it "interprets this regulatory exception to be limited in scope and not applicable outside of the POR." *Id.* Commerce noted that it has a preference for using pricing data that are contemporaneous with the period under consideration because "this is the time period for which the {normal value} of imports, and their dumping margin, must be determined." *Id.* at 6 (JA1001019), quoting *IDM* at Cmt. 20 (JA1000908-12).

Commerce also determined that the record does not support Home Meridian's claim that the wood consumed by Huafeng during the POR was 100 percent composed of pre-POR purchases from ME sources. *Id.* at 40 (JA1001053) (also explaining that "Home Meridian has not pointed to any evidence definitively showing that 100 percent of what was consumed to produce subject merchandise during the POR was wood inputs purchased from ME suppliers. Home Meridian's argument relies on this claim and, thus, it bears the burden to support the claim but it has not done so.")

11

In *Home Meridian II*, the Trade Court found that Commerce failed to provide a reasonable explanation for why surrogate values from the 2009 POR, as opposed to ME purchase prices from prior to 2009, were the best available information for valuing wood inputs. *Home Meridian II,* 922 F. Supp 2d at 1380 (JA000016). The Trade Court stated that Commerce did not "recognize that its proposed valuation methodology, applied to the facts of this case, is far less reflective of Huafeng's actual experience." *Id.* The Trade Court also noted that Commerce "lacked substantial evidence to discredit . . . claims that 100 percent of the inputs used in production during the POR were purchased from an ME supplier." *Id.* at 1376-77 (JA000013-15). The Trade Court then directed Commerce to use Huafeng's pre-2009 ME purchase prices to value the wood inputs in question unless Commerce moved by July 15, 2013 for leave to reopen the administrative record. *Id.* at 1382 (JA000018).

On July 15, 2013, the AFMC filed a *Motion for Reconsideration or, in the Alternative, for an Order Directing Commerce to Reopen the Record*, explaining that the Trade Court was mistaken in its assumption that all of the wood inputs used by Huafeng during the POR were sourced from ME suppliers (JA1001127-29). The AFMC pointed out that these statements were simply assertions of counsel and not supported by any record evidence. Alternatively, the AFMC argued that the Trade Court should instruct Commerce to request an additional

12

remand to address the factual issue of Huafeng's use of ME wood inputs and the reliability of the prices paid for such inputs. The Trade Court denied this motion, stating that there was no record evidence to contradict statements by counsel for Huafeng and Home Meridian in their briefs that Huafeng only used wood inputs purchased from ME suppliers in the production of subject merchandise. *Home Meridian III,* 925 F. Supp 2d at 1380 (JA000006). The Trade Court also noted that a request to reopen the record was a matter within the discretion of Commerce, not the AFMC, and that Commerce had not moved to have the record re-opened. *Id.* at 1381 (JA000007).

In the *Second Redetermination*, Commerce explained that it had declined to request to reopen the record because the percentages of ME and non-market economy inputs <u>consumed</u> in producing the subject merchandise is not a consideration in determining whether to value inputs using ME purchase prices. *Second Redetermination* at 7 (JA1001157). Commerce stated that it "continues to believe that the exception for using ME purchase prices, rather than surrogate values, to value FOPs is a narrow exception that applies only to purchases during the period under consideration." *Id.* Nevertheless, "under protest," but in accordance with the Trade Court's remand order that directed a specific outcome, Commerce issued a *Second Redetermination* in which it valued wood inputs based on the average price of Huafeng's non-contemporaneous ME purchases. The Trade

Court affirmed Commerce's *Second Redetermination* in *Home Meridian IV,* 2013

Ct. Intl. Trade LEXIS 144 at *5 (JA000004).

## SUMMARY OF ARGUMENT

Commerce's selection of contemporaneous surrogate values over non-

contemporaneous ME purchase prices to value certain wood inputs in calculating

Huafeng's dumping margin is supported by substantial evidence and otherwise in

accordance with law.  Commerce reasonably interpreted its regulations as not

providing for the use of ME purchase prices on the record of this review, because

Huafeng did not purchase any ME wood inputs during the POR.  Substantial

evidence supports Commerce's selection of surrogate values over ME purchase

prices as the best available information to value Huafeng's wood inputs.

Moreover, substantial evidence supports Commerce's finding that Huafeng did not

demonstrate that it consumed only ME wood inputs during the POR.

The Trade Court erred by failing to accord any deference to Commerce's

interpretation of its regulations as requiring ME purchases to be made during the

POR in order to qualify for an exception to the use of surrogate values.

Commerce's regulations unambiguously provide for the use of surrogate values to

value FOPs.  The only exception to this regulation applies when ME purchases are

made during the POR.  The exception for using ME purchase prices to value inputs

focuses on POR <u>purchases</u> rather than POR <u>consumption</u>.  In other words, when

ME purchases are made outside the POR, the exception does not apply, even if ME purchases prior to the POR are consumed during the POR. Commerce's regulations and narrowly limited exception are both a reasonable interpretation of the statutory requirement to use the "best available information" when calculating dumping margins.

The Trade Court also erred by finding that Commerce's selection of surrogate values over ME purchase prices to value Huafeng's FOPs is not supported by substantial evidence. Pursuant to the Trade Court's instructions, Commerce re-examined the evidence on the record and again determined that the Philippine import data during the POR were the best available information for valuing Huafeng's wood inputs. Commerce reexamined the data and found that the price differentials between Huafeng's ME purchases and the Philippine import data were not aberrational. Commerce also found that Huafeng had [

                                                                    ] Commerce also found that the prices paid by another respondent in 2008 were significantly higher and more in line with Philippine import values from 2009 than the ME prices paid by Huafeng for its wood purchases in 2008. Finally, Commerce emphasized that the Philippine import data used to value wood inputs were both contemporaneous with the POR and reflected actual prices paid by ME buyers of

the wood inputs that were classified under HTS categories that were specific to the wood inputs used by Huafeng to manufacture subject merchandise.

Finally, the Trade Court erred by making a factual finding that Huafeng only used ME wood inputs during the POR based on arguments of counsel that have no support in the record. In finding that Huafeng's ME purchase prices were more reflective of Huafeng's production costs, the Trade Court presumed, incorrectly, that Huafeng used only wood inputs from ME purchases to produce the subject merchandise. No record evidence supports this premise. In fact, record evidence shows that Huafeng lacks any production records that would permit Commerce to verify that Huafeng used only ME wood inputs in the production of subject merchandise.

## ARGUMENT

## I.   STANDARD OF REVIEW

This Court reviews Commerce's decisions *de novo*, applying the same standard of review as the Trade Court. Commerce's determinations must be upheld unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1272 (Fed. Cir. 2012).

When reviewing questions of law, the Court will uphold Commerce's interpretation of the antidumping statute as long as it does not conflict with the clearly expressed purpose and intent of Congress. *Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349, 1355 (Fed. Cir. 2007); *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001). If Congress has "directly spoken to the precise question at issue," the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). If the statute is silent or ambiguous, the Court will defer to the agency's "permissible construction of the statute." *Id.* at 843; *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). To survive judicial scrutiny, Commerce's interpretation of statutory requirements "need not be the *only* reasonable interpretation or even the *most* reasonable interpretation." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (emphasis in original). A court "must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Id.*

The Court gives even greater deference to Commerce's interpretation of its own regulations. The reviewing court must give deference where a regulation is ambiguous, "as long as . . . the agency's interpretation is neither plainly erroneous nor inconsistent with the regulation." *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 836 (Fed. Cir. 2006). Moreover, "deference to an agency's interpretation of its own

regulations is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own." *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,* 400 F.3d 1352, 1363-64 (Fed. Cir. 2005).

The Court reviews questions of fact under the substantial evidence standard. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of NY v. NLRB*, 305 U.S. 197, 229 (1938). The Court does not "displace the agency as trier of fact. If an agency has considered potentially conflicting evidence, the possibility that alternative interpretations of the evidence exist is not sufficient reason to disturb the agency's decision." *Daido Corp. v. United States* 869 F. Supp. 967, 973 (Ct. Int'l Trade 1994); *Nucor Corp. v. United States,* 612 F. Supp. 2d 1264, 1336-37 (Ct. Int'l Trade 2009)("{a} court must tread lightly in administrative cases, taking care not to infringe on an agency's mandate and discretion by re-weighing facts and substituting its judgment for that of the agency"). Even if the court could draw a different conclusion from the evidence, the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *Timken Co. v. United States*, 699 F.

Supp. 300, 306 (Ct. Int'l Trade 1988), *aff'd,* 894 F.2d 385 (Fed. Cir. 1990) ("it is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record").

Agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). The court's role is "not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

## II. COMMERCE'S SELECTION OF CONTEMPORANEOUS SURROGATE VALUES OVER NON-CONTEMPORANEOUS ME PURCHASE PRICES IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS IN ACCORDANCE WITH LAW

### A. Commerce Reasonably Interpreted Its Regulations As Not Providing For The Use of ME Purchase Prices To Value Huafeng's Wood Inputs

Commerce reasonably interpreted its regulations as not providing for the use of ME purchase prices to value Huafeng's wood inputs. As explained above, a reviewing court must give deference to an agency's reasonable interpretation of the statute and its implementing regulations. The U.S. Supreme Court explains that when according judicial deference to agency determinations,

> administrative implementation of a particular statutory
> provision qualifies for *Chevron* deference when it
> appears that Congress delegated authority to the agency
> generally to make rules carrying the force of law, and
> that the agency interpretation claiming deference was
> promulgated in the exercise of that authority. Delegation
> of such authority may be shown in a variety of ways, as
> by an agency's power to engage in adjudication or notice-
> and-comment rulemaking . . . .

*United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Under *Chevron*, where

a statute leaves room for interpretation, the court "must give deference to the

agency's interpretation of the statute as promulgated in the rules or regulations if

the agency's interpretation is 'reasonable.'" *Wheatland Tube Co. v. United States*,

495 F.3d 1355, 1360 (Fed. Cir. 2007) (quoting *Chevron*, 467 U.S. at 843-44).

Such deference applies to Commerce when it "expressly use{s} its formal

notice-and-comment rulemaking authority from Congress" to interpret a statute.

*Id.* Accordingly, if this Court finds that the result of Commerce's formal notice-

and-comment rulemaking process is reasonable, the Court should uphold that

interpretation. *See Mittal Steel USA, Inc. v. United States*, 31 CIT 1395, 1415

(2007).

In addition, Commerce has broad authority to interpret its own regulations,

and courts "as a general rule" should defer "unless that interpretation is plainly

erroneous or inconsistent with the regulation.'" *Decker v. Nw. Envtl. Def. Ctr.*,

133 S. Ct. 1326, 1337 (2013) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

This principle, known as *Auer* deference, has been applied by the Federal Circuit when reviewing Commerce's regulatory interpretations. *See, e.g., Torrington Co. v. United States,* 156 F.3d 1361, 1364 (Fed. Cir. 1998). As the Court has emphasized, Commerce is entitled to "substantial deference" when it is "interpreting and applying its own regulations." *Id.* at 1365.

This principle of *Auer* deference has been repeatedly reaffirmed. *See, e.g., Price v. Panetta,* 674 F.3d 1335, 1342 (Fed. Cir. 2012). In fact, the Federal Circuit has concluded that an agency's "interpretation of its regulations is entitled to {a} generous degree of deference even when that interpretation is offered in the very litigation in which the argument of deference is made." *Id.* Moreover, "broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in poly concerns." *Torrington,* 156 F.3d at 1364, quoting *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994).

Commerce has a longstanding practice of using pricing data to value factors of production that are contemporaneous with the POR. Both the Trade Court and this Court repeatedly have upheld this practice, and this Court should do so again here.

1. **The exception for using ME purchase prices, rather than surrogate values, to value FOPs is a narrow exception that applies only to purchases during the period under consideration**

Commerce's decision to use surrogate values to value wood inputs stems

from its ME inputs methodology codified in 19 C.F.R. § 351.408(c)(1).  Following

notice and comment rule-making procedures, Commerce clarified this

methodology in *Antidumping Methodologies,* where Commerce created:

> a rebuttable presumption that market economy input
> prices are the best available information for valuing an
> entire input when the total volume of the input purchased
> from all market economy sources <u>during the period of
> investigation or review</u> exceeds 33 percent of the total
> volume of the input purchased from all sources <u>during
> the period</u>.  In these cases, unless case-specific facts
> provide adequate grounds to rebut the Department's
> presumption, the Department will use the weighted-
> average market economy purchase price to value the
> entire input.  Alternatively, when the volume of an NME
> firm's purchases from market economy suppliers as a
> percentage of its total volume of purchases <u>during the
> period of review</u> is below 33 percent, but where these
> purchases are otherwise valid and meet the Department's
> existing conditions  . . . the Department will weight-
> average the weighted-average market economy purchase
> price with an appropriate surrogate value according to
> their respective shares of the total volume of purchases,
> unless case-specific facts provide adequate grounds to
> rebut the presumption.  In determining whether market
> economy purchases meet this 33 percent threshold, the
> Department will compare the volume that the producer
> purchased from market economy sources <u>during the
> period of investigation or review</u> with the respondent's
> total purchases <u>during the period</u>.

*Antidumping Methodologies,* 71 Fed. Reg. at 61717-61718 (emphasis added).

Based on the plain language of the regulation, ME purchase prices are the best

available information for valuing an input, such as wood inputs, but only when a

sufficient quantity of those ME purchases is made <u>during the period of</u>

<u>investigation or review</u>.

Thus, Commerce uses contemporaneous surrogate values to value FOPs,

unless an exception applies, *i.e.*, where a respondent has a sufficient quantity of

ME purchases of an input contemporaneous with the POR. *First Redetermination*

at 5 (JA1000018).

As Commerce explained in the *Final Results*, "we must determine whether

there was a meaningful number of ME purchases of an input during the period

under consideration in order to determine whether to use those ME prices to value

FOPs." *See IDM* at Cmt. 20 (JA1000908-12). Commerce further explained its

interpretation of the regulation in the *First Redetermination*:

> The Department normally calculates normal value by
> valuing the NME producers' FOPs using prices from an
> ME that is at a comparable level of economic
> development and that is also a significant producer of
> comparable merchandise. However, the Department's
> regulations provide an exception to this practice by
> allowing the use of the actual price paid by the NME
> producer for inputs purchased from ME suppliers in an
> ME currency to value these inputs . . . The Department
> interprets this regulatory exception to be limited in scope
> and not applicable outside of the POR.

*First Redetermination* at 5 (JA1001018).

Once Commerce determined that Huafeng had no ME purchases of wood inputs during the POR, Commerce was not required to go outside the POR to inquire about non-contemporaneous ME purchases. Commerce's rejection of Huafeng's non-contemporaneous ME purchase prices was a reasonable interpretation of the statute and its regulations. Neither the statute nor Commerce's regulations required any further inquiry. The Trade Court failed to defer to Commerce's interpretation of its own regulation and it improperly placed itself into the role of the agency by deciding which methodology Commerce should use and by deciding how much weight contemporaneous data deserves. Instead, this Court should accord *Auer* deference to Commerce's regulation implementing the statutory requirement for using the "best available information" when valuing factors of production, and to Commerce's clarification of its regulation, via the *Antidumping Methodologies*, both of which were formulated pursuant to notice and comment rule-making.

Commerce has a statutory obligation to determine the normal value of imports from non-market economy countries by reference to the "best available information," which includes information on FOPs. 19 U.S.C. § 1677b(c). Referencing its *Antidumping Methodologies* notice, Commerce determined that Huafeng's ME purchase prices of wood inputs from 2008 did not constitute the

"best available information."  Instead, Commerce determined that surrogate values for wood inputs from 2009 that are contemporaneous with the POR constitute the "best information available" as required by the statute. *IDM* at Cmt. 20 (JA1000908-12).  No statutory provision requires Commerce to consider ME purchase prices outside the POR in selecting the best available information when reliable surrogate values contemporaneous with the POR also are available.  The Trade Court concurred on this point, noting that it has "sustained Commerce's practice of favoring surrogate values that are contemporaneous with the POR, all other things being equal."  *Home Meridian II*, 922 F. Supp. 2d at 1373-74 (JA000011-13), citing *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 30 CIT 1173, 1177, 1179 (2006), *aff'd,* 228 Fed. App'x 1001 (Fed. Cir. 2007).

The Trade Court erred, however, by concluding that Commerce's interpretation of its regulation was unreasonable because it focused on contemporaneity at the exclusion of all other factors.  *Home Meridian II,* 922 F. Supp. 2d at 1379 (JA000016).  The Trade Court found that a focus on contemporaneity was improper in this case, "especially where here 100 percent of the inputs were purchased from an ME supplier." *Id.*  As explained below, the Trade Court erred in rejecting Commerce's finding that there was no evidence that

100 percent of the wood inputs for the subject merchandise were from a ME supplier.

Moreover, and contrary to the Trade Court's assertion that Commerce merely was creating a "blanket rule" elevating contemporaneity as the primary focus of data selection, Commerce weighed all the evidence on the record when it determined --correctly and in accordance with its previous rulemaking--that surrogate values provided the best information available for valuing wood inputs. *See*, *e.g.*, *First Redetermination* at 46 (JA1001059) ("Because the Philippine import data used to value Huafeng's wood inputs are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average and include HTS categories that contain the types of wood used by Huafeng, the Department finds that these data are the best available information for valuing Huafeng's wood inputs.").

Commerce's stated intention in *Antidumping Methodologies* was to create a rebuttable presumption that ME purchases exceeding 33 percent (*i.e.,* up to and including 100 percent) of total ME purchases <u>during the period of review</u> for a particular input are the best available information for valuing that input. *Antidumping Methodologies,* 71 Fed. Reg. at 61717-61718 (emphasis added).

The Court must accord *Auer* deference to Commerce's *Antidumping Methodologies* policy on ME inputs unless the resulting rule is patently

unreasonable.  *See Wheatland Tube Co.*, 495 F.3d at 1360.  The courts have not

disputed the reasoning of Commerce's *Antidumping Methodologies* policy on ME

inputs.  Indeed, since its promulgation, the Court of International Trade

consistently has assumed the policy's validity.  *See, e.g., Since Hardware

(Guangzhou) Co. v. United States*, No. 09-00123, 2010 Ct. Intl. Trade LEXIS 119

(Ct. Int'l Trade Sept. 27, 2010).  Likewise, this Court should accord *Auer*

deference to Commerce's decision not to use ME purchase prices outside the POR,

pursuant to its regulations and its *Antidumping Methodologies* policy regarding the

use of ME inputs.

>   ### 2. Commerce's interpretation of its regulation is consistent with its longstanding practice of using ME purchase prices contemporaneous with the POR

Commerce's reasonable interpretation of its regulation is consistent with its

longstanding practice of using contemporaneous pricing data from ME purchases

contemporaneous with the POR.  In the *Final Results*, Commerce properly applied

its longstanding practice of only using pricing data from ME purchases made

during the POR.  *See, e.g., Diamond Sawblades and Parts Thereof from the

People's Republic of China*, 71 Fed. Reg. 29303 (Dep't of Commerce May 22,

2006) (final LTFV determination) ("*Diamond Sawblades*"), Issues and Dec.

Memo. at Cmt. 23 ("the Department's stated preference is to consider only prices

paid to ME suppliers during the POI"); *Certain Automotive Replacement Glass*

*Windshields from the People's Republic of China*, 67 Fed. Reg. 6482 (Dep't of

Commerce Feb. 12, 2002) (final LTFV determination) ("*Glass Windshields*"),

Issues and Dec. Memo. at Cmt. 33 (stating that the Department would not use

"market economy inputs if they are insignificant <u>or</u> purchased outside of the period

of review") (emphasis added).

In applying this practice, Commerce repeatedly has emphasized the

importance of using pricing data that are contemporaneous with the period under

consideration in order to obtain the most accurate dumping margins possible:

> In exercising its discretion, the Department has
> developed a practice of using, whenever possible, price
> data that are contemporaneous with the period under
> consideration to value FOPs because this is the time
> period for which the NV of imports, and their dumping
> margin, must be determined. Constructing NV using
> values from within the period under consideration
> enhances the accuracy of margin calculations and is
> consistent with the statutory directive that NV "shall be
> the price . . . at a time reasonably corresponding to the
> time of the sale used to determine the export price or
> constructed export price . . ." It is for this reason that the
> Department looks to current purchases in analyzing ME
> purchase prices and in obtaining surrogate values when
> insufficient ME purchases exist during the POR.

*IDM* at Cmt. 20 (citations omitted) (JA1000908-12). Commerce provided

additional rationale for its longstanding practice:

> Moreover, using POR and pre-POR values to calculate
> NV may introduce distortions into the calculation. For
> example, applying financial ratios based on POR values
> (including raw material costs) to raw material assigned

> pre-POR values to calculate NV may yield results that do
> not represent the relationships between the business
> expenses during the POR. ME purchase prices from
> periods outside the POR may not constitute the "best
> available information" for valuing FOPs in cases where
> surrogate values contemporaneous with the POR are
> available. For this reason, the Department's practice is to
> use contemporaneous information when such information
> is available to the Department. In this case, we have
> acceptable contemporaneous SVs on the record for the
> FOPs in question.

*Id.* In rejecting the pre-POR ME purchase prices, Commerce followed its past

practice of using contemporaneous information to value FOPs and clearly

articulated a reasonable basis for exercising its discretion to do so.

The Trade Court repeatedly has upheld Commerce's practice of using prices

during the period under consideration to value FOPs. For example, in *Shakeproof*,

the Trade Court recognized Commerce's responsibility, under the statute, to

establish a value for a factor of production for a time period that reasonably

corresponds to the time of the sales used to determine the export price or

constructed export price. *Shakeproof*, 30 CIT at 1178. In fact, the Trade Court

continuously has found Commerce's use of information that is contemporaneous

with the period of investigation or review to be a reasonable exercise of its

discretion. *See, e.g.*, *Globe Metallurgical, Inc. v. United States*, 33 CIT 435

(2009); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT

1185, 1193 (2004).

Of course, in instances where reliable data that is contemporaneous with the period under consideration is not available, Commerce has looked outside the POR to obtain that data. But that is not the factual scenario of this review. Commerce explained that it found reliable contemporaneous surrogate values to value wood inputs, and Commerce reasonably exercised its discretion to use that data, rather than non-contemporaneous ME values. In fact, if Commerce had used Huafeng's ME purchase prices rather than contemporaneous surrogate values to value wood inputs, Commerce would have been subject to challenge for being inconsistent with its regulations and for ignoring its long-standing practice regarding ME purchases. Accordingly, this Court should uphold Commerce's exercise of its discretion.

Commerce stated in the *Final Results* that it "has developed a practice of using, whenever possible, price data that are contemporaneous with the period under consideration to value FOPs because this is the time period for which the NV of imports and their dumping margin must be determined." *IDM* at Cmt. 20 (JA1000908-12). The "practice" at issue here is the use of pricing data that are contemporaneous with the period under consideration to value FOPs. Commerce applies this practice consistently when considering whether to use surrogate values or ME purchase prices in valuing FOPs. *See, e.g., Diamond Sawblades*, 71 Fed. Reg. 29303, Issues and Dec. Memo. at Cmt. 23; *Glass Windshields*, 67 Fed. Reg.

6482, Issues and Dec. Memo. at Cmt. 33. Provided the data are reliable,

Commerce uses contemporaneous data to value FOPs.

Commerce resorts to data outside the POR only when reliable,

contemporaneous data are unavailable. The court in *QVD Food* affirmed the use

of data from outside the POR only because the contemporaneous data were not

reliable. *QVD Food Co. v. United States*, 721 F. Supp. 2d 1311, 1318 (Ct. Int'l

Trade 2010), *aff'd,* 658 F.3d 1318 (Fed. Cir. 2011). Importantly, even when

Commerce goes outside the POR to gather surrogate value data, Commerce

inflates the surrogate value data so that it will be contemporaneous with the POR.

*Certain Steel Threaded Rod From the People's Republic of China*, 76 Fed. Reg.

68400 (Dep't of Commerce Nov. 4, 2011) (admin. review final results).

Commerce follows this practice in interpreting other regulations as well, such as

Commerce's 90/60 day window rule, where Commerce only relies on sales within

the 90 days prior to and 60 days following the POR when there are no matches for

U.S. sales within the POR. *See* 19 C.F.R. § 351.414(f)(2) and (3). This again

demonstrates Commerce's preference for data that is contemporaneous with the

POR.

As part of its longstanding practice, Commerce considers other factors, in

addition to contemporaneity, when valuing FOPs. For example, in this case, a

Commerce considered the "specific options available to Commerce based upon the

particular facts on the record." *Home Meridian II,* 922 F. Supp. 2d at 1377 (JA000014-15). In considering those options, Commerce first looked to a surrogate country that could supply reliable economic data for the input in question. *First Redetermination* at 6 (JA1001019). The data from the surrogate country would be reliable if the country was economically comparable to the country under review and if the surrogate country was a significant producer of subject merchandise. *Id.* After considering these two preliminary criteria, Commerce then considered several other factors impacting the reliability of the surrogate value data, including contemporaneity, specificity, and whether the price is tax-exclusive. *Id.* After evaluating the reliability of the surrogate import data, Commerce then evaluated whether the exception to its regulation might apply. As demonstrated below, Commerce considered the ME purchase data supplied by Huafeng, but determined the Philippine surrogate value data to be the best information available. *Id.* at 10 (JA1001023).

Ignoring this analysis, the Trade Court asserted that Commerce never "pointed to substantial evidence on the record to demonstrate that Huafeng's input purchases are unreliable or aberrant." *Home Meridian II,* 922 F. Supp. 2d at 1378 (JA000015). Nothing in the statute requires Commerce to find ME purchase data to be unreliable or aberrant. Instead, the statute requires Commerce to use the "best information available" to calculate values for the FOPs. Commerce may

weigh other data on the record, which it did here, but it is not required to discredit all other information on the record. As the finder of fact charged with evaluating the best available information, Commerce's determination of what composes the best available information only can be reversed if Commerce's selection was unreasonable. *Cathedral Candle*, 400 F.3d at 1361. To that end, even though a reviewing court might have reached a different result on the same set of facts, Commerce's finding still must be affirmed so long as that finding is not plainly erroneous or inconsistent with the regulation. *Auer*, 519 U.S. at 461. Instead of deferring to Commerce's reasonable interpretation of its own regulation, and its application to this case, the Trade Court found that the ME prices are better, impermissibly substituting its own judgment for that of Commerce.

**B. Commerce's Selection Of Surrogate Values Over ME Purchase Prices Is Supported By Substantial Evidence**

Commerce's selection of surrogate values over ME purchase prices for Huafeng's wood inputs is supported by substantial evidence. Although Commerce verified that Huafeng's questionnaire responses concerning its pre-POR ME purchases accurately reflected the information contained in Huafeng's books and records, *see* Verification Report at 35, Commerce did not need to address the reliability of the ME purchase data, which was from outside the POR. Commerce did not verify the validity or reliability of those ME purchase prices, *i.e.*, whether those purchases were made from a qualifying ME source or reflected arm's length

prices.[4]  The fact that Commerce examined Huafeng's pre-POR ME purchases of

wood inputs during the verification does not make those purchases more valid or

more accurate than surrogate value data that are contemporaneous with the POR.

Commerce merely confirmed that Huafeng's questionnaire responses reflected

what was actually recorded in Huafeng's books and records.  *See* Verification

Report at 35 (JA1000628).

Instead, in the exercise of its discretion, and because Huafeng made no

purchases of wood inputs from a ME supplier during the POR, Commerce made a

reasonable determination that reliable and contemporary surrogate value data were

available to value wood inputs and that those data constituted the best information

available for valuing Huafeng's wood inputs.

On remand, at the Trade Court's instruction, Commerce re-examined

Huafeng's ME purchases in light of the statutory and regulatory framework and

again determined that the Philippine import data during the POR were the best

available information for valuing Huafeng's wood inputs.  *First Redetermination* at

4 (JA1001017).  To address the Trade Court's concern that the surrogate values

from the Philippine import data were aberrationally high, Commerce reexamined

the data and found that the price differentials between Huafeng's ME purchases in

---

[4]  *See IDM* at Cmt. 20 ("We have not addressed Petitioners' assertions
regarding the reliability of Huafeng's ME purchases because we are not relying on
these prices in the final results.") (JA1000908-12).

2008 and Philippine import data from 2009 did not mean that the Philippine data were distorted or misrepresentative.  *First Redetermination* at 8 (JA1001021).  To the contrary, swings in lumber prices were precisely the reason that Commerce relies on contemporaneous pricing data to calculate normal values.  Commerce explained that Huafeng, itself, had acknowledged it "[


]"  *Id.*, quoting Huafeng Second Supplemental Section D Response at 6 (JA1000508).  Commerce also found that the prices paid by another respondent in 2008 were "significantly higher" and "more in line with Philippine import values" from 2009 than the ME prices paid by Huafeng for its wood purchases in 2008.  *Id.* at 9 (JA1001022).  Finally, Commerce emphasized that the Philippine import data used to value wood inputs were both contemporaneous with the POR and reflected actual prices paid by ME buyers of the wood inputs that were classified under HTS categories that were specific to the wood inputs used by Huafeng to manufacture subject merchandise.  *Id.*

The Trade Court erred by rejecting Commerce's factual findings.  The Trade Court further erred by reiterating its determination in *Home Meridian I*, that "{u}sing the actual {purchase prices of the} inputs, if available and where they yield reliable values, would seem to promote accuracy more than does using flawed surrogate values."  *Home Meridian II,* 922 F. Supp. 2d at 1375 (JA000013).

quoting *Home Meridian I,* 865 F. Supp. 2d at 1319 (JA000049). Yet, in terms of accuracy, Commerce demonstrated in its *First Redetermination* how the surrogate value data were corroborated by purchases made by other respondents, and that even Huafeng [                                                    ]. *First Redetermination* at 8 (JA1001021). Commerce also found no definitive link between the ME purchases in 2008 and the subject merchandise produced during the POR in 2009, thus undercutting the idea that Huafeng's ME purchases were the actual [                          ] inputs. *Id.* at 41 (JA1001054). The Trade Court ignored this evidence. Instead, the Trade Court impermissibly became a "trier of fact" and determined that surrogate values were "far less reflective of Huafeng's actual experience" than its ME purchase prices, despite Commerce's findings to the contrary. *Home Meridian II,* 922 F. Supp. 2d at 1380 (JA000016). The Trade Court directed Commerce to either "adequately support" a request to reopen the record to further examine Huafeng's wood inputs purchases, or use Huafeng's non-contemporaneous ME purchase prices to value wood inputs in this case. *Id.*

The Trade Court erred by finding that Commerce failed to examine Huafeng's ME purchases and, therefore, made no factual determination as to whether the relevant wood inputs used in the production process was sourced from Huafeng's ME purchase prices. *Home Meridian I,* 865 F. Supp. 2d at 1319 (JA000049). Commerce reasonably declined to do so because the "percentages of

ME and non-market economy inputs consumed in producing the subject merchandise is not a consideration in determining whether to value inputs using ME prices." *Second Redetermination* at 7 (JA1001157). It was reasonable for Commerce to conclude that it makes no difference whether or not all of the wood inputs consumed during the POR was from ME sources, because Commerce considers only whether the ME input was purchased during the POR, not whether it was consumed during the POR. Commerce's regulation is clear on this issue, and even if it were ambiguous, Commerce's interpretation of its regulation is reasonable. *See Antidumping Methodologies,* 71 Fed. Reg. at 61717-61718.

### C. Commerce's Finding That Huafeng Did Not Demonstrate That It Only Used ME Wood Inputs Is Supported By Substantial Evidence

Even if it mattered whether only ME purchases were consumed during the POR, Commerce's factual finding in the *First Redetermination* that there is no evidence that Huafeng used only ME wood inputs during the POR is supported by substantial evidence. The Trade Court should not have reweighed the evidence to reach a different finding.

The Trade Court's reasoning starts from the premise that Huafeng used only wood inputs from ME purchases to produce the subject merchandise during the

POR.[5]  This premise is false.  Huafeng never stated to Commerce that 100 percent of the wood inputs used in production of the subject merchandise during the POR were from ME purchases.  Those statements were instead made by counsel in briefs to Commerce and the Trade Court.  Commerce found no record evidence supporting those assertions by counsel.  *See First Redetermination* at 40 (quoted above) (JA1001053).  In fact, as Commerce noted, "for three types of lumber, there were sufficient quantities of lumber purchased from NME suppliers to provide 100 percent of the lumber consumed during the POR."  *Id.* at 41 (JA1001054).  Thus, record evidence shows that ME purchases were not the only wood inputs that could have been used in the production of subject merchandise.  *Id.*

In footnote 6 of its opinion, the Trade Court stated that "Huafeng purchased 100 percent of its actual lumber and veneer inputs from its ME sources."  *Home Meridian II,* 922 F. Supp. 2d at 1373, n.6 (JA000011-12).  The Trade Court further explained that "Commerce was presented with evidence of ME purchases, which it had an opportunity to verify, along with <u>sworn statements</u> by Huafeng that 100 percent of the inputs it used were purchased from an ME supplier."  *Id.* at 1376 (emphasis added) (JA000013).  Citing no evidence other than these "sworn

---

[5] The Trade Court acknowledges that it previously affirmed Commerce's preference for contemporaneous surrogate values in *Shakeproof*, 30 CIT 1173.  The Court distinguished *Shakeproof,* however, on the basis that, in this case, "100 percent of the inputs used were from pre-POR purchases," making this case "unique." *Home Meridian II,* 922 F. Supp. 2d at 1379 (JA000016).

statements," the Trade Court states that Commerce was presented with "non-definitive but still substantial evidence" that wood inputs were purchased from ME sources as opposed to "zero evidence" to the contrary. *Id.*

The Trade Court's characterization of evidence regarding Huafeng's ME purchases as "non-definitive but still substantial" means that the Trade Court was improperly stepping into the role of a finder of fact. *See Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 276 F. Supp. 2d 1371, 1380 (Ct. Int'l Trade 2003) ("the Court must defer to Commerce as the finder of fact"). The Trade Court then concluded that absent a "good reason to reopen the record at this late stage," the "conclusion that Huafeng used 100 percent ME lumber inputs for its POR production will control the proceedings." *Home Meridian II,* 922 F. Supp. 2d at 1377, n. 11 (JA000014).

Contrary to the Trade Court's finding, there is no record evidence that Huafeng purchased all of its wood inputs from ME suppliers. Moreover, the record is clear that Huafeng lacks any production records which would permit Commerce to verify the unsupported arguments of its counsel that it only used ME wood inputs in the production of subject merchandise. *See First Redetermination* at 39-46 (JA1001052-59); *see also* Defendant's Response to Plaintiffs' Remand Comments (April 25, 2013) at 9 (JA1001117).

Huafeng never certified that 100 percent of its wood inputs purchases used to produce the subject merchandise came from ME suppliers. Instead, this statement was first asserted in Huafeng's case brief to Commerce in the administrative review proceeding. That brief was filed by counsel who had replaced the counsel that submitted Huafeng's questionnaire responses. In its March 25, 2011 administrative case brief (revised), Huafeng asserted:

> All lumber and veneer used to produce the subject merchandise during the period of review was purchased from a single market economy supplier and payment was made in U.S. dollars. These lumber and veneer purchases were made in 2008, prior to the 2009 period of review. See Huafeng's July 12, 2010 Section D Response at 7.

*See* Huafeng Administrative Case Brief (Revised) (March 25, 2011) at 11 (JA1000838). Huafeng's administrative case brief was not accompanied by a company or counsel certification of accuracy. In fact, case briefs cannot contain new factual information.

The administrative case brief cited only Huafeng's July 12, 2010 Section D Response at 7 (JA1000014), which was a response to a question posed in Commerce's standard questionnaire regarding ME purchases. Commerce's antidumping questionnaire asked Huafeng to "list the inputs that your company purchased from a ME supplier and paid for in a ME currency during the POR."

Antidumping Questionnaire at D-4 (JA1000014). In response, Huafeng stated the

following:

> Please see Exhibit D-4.1 & 4.2 for the Dalian
> Huafeng's Market Economy Purchase spreadsheet
> ("MEP Spreadsheet") during the POR and [        ].
> For some of the materials, Dalian Huafeng did not
> make any purchase (both market economy or
> domestic) during the POR, however, made {sic}
> some purchase during [                    ]. Dalian
> Huafeng purchased various materials used in the
> production of subject merchandise from suppliers
> in [                                        ]
> Those suppliers are unaffiliated with Dalian
> Huafeng. Dalian Huafeng paid for those purchases
> in U.S. dollars.

Nowhere did Huafeng assert that all wood inputs used to produce the subject

merchandise during the POR were purchased from ME suppliers. Commerce's

question asked for data on inputs purchased during the POR, not data on inputs

consumed during the POR. Read in the context of Commerce's question, it would

be unreasonable to infer from Huafeng's answer that it only consumed ME inputs

during the POR. Moreover, there is no other record evidence that Huafeng can cite

to support this proposition. In any event, it is for Commerce, not the Trade Court,

to weight the record evidence and make that determination.

Counsel for Huafeng made a similar statement about Huafeng's consumption

in Huafeng's 56.2 Brief, which again was unaccompanied by any factual

certification from Huafeng.  In its opening brief to the Trade Court, counsel for

Huafeng stated that

> {a}ll lumber and oak veneer and plywood inputs
> used to produce the subject merchandise during the
> period of review were purchased from a single
> market country supplier in a market economy
> country and all plywood inputs used to produce the
> subject merchandise during the period of review
> were purchased from a single market economy
> supplier located in another market economy
> country.  Huafeng's July 12, 2010 Section D
> Response at 7; Prop. Doc. #130; Appendix at Tab
> 8.

Huafeng 56.2 Brief at 6 (JA100941).  Aside from the July 12, 2010 Section D

Response at page 7 (JA1000014), Huafeng cites no other record evidence to

support this conclusion.  As demonstrated above, the Section D Response at page 7

does not say what counsel for Huafeng purports it to say.

    The only other statement on this issue made by Huafeng was in comments

filed with the Trade Court following oral argument, when counsel for Huafeng

asserted,

> Since the date of oral argument, Counsel has re-
> confirmed with Huafeng that during the period of
> review, all lumber, veneer and lumber inputs used
> to produce subject merchandise (wooden bedroom
> furniture exported to the United States) originated
> from market economy countries.

Supplemental Response of Consolidated Plaintiff Dalian Huafeng Furniture Group

Co. Ltd. (Aug. 31, 2012) at 3 (JA1001008).  Again, these comments were not

accompanied by a factual certification from Huafeng. Instead, the statement was simply an unverified assertion of counsel based on purported hearsay communications with Huafeng. No citation to record evidence was provided, because none exists. In addition, no sworn statements were submitted by Huafeng to support the assertions of counsel.

Commerce noted in its *First Redetermination* that "there is no evidence on the record that ties either ME purchases or NME purchases of lumber to consumption during the POR." *First Redetermination* at 41 (JA1001054). This conclusion was documented in Commerce's verification report, which was never refuted by Huafeng. For example, at page 12 of the verification report, Commerce notes that "Huafeng tracks the consumption of raw materials for each finished product by the product code." (JA1000605) Commerce further found that, "{o}nce a material is removed from inventory to be entered into production, the quantity withdrawn and the cost is recorded in hand-written material withdrawal sheets . . . The material withdrawal sheets also record the type of product being produced." Verification Report at 24 (JA1000617). Thus, as Commerce noted in its *First Redetermination*, record evidence demonstrates that "Huafeng only tracks the consumption of raw materials by product code, quantity, and cost but does not record the origin of the lumber consumed in its production records." *First Redetermination* at 42 (JA1001055). Huafeng never refuted this statement or

Commerce's findings in its verification report.  Thus,  Huafeng effectively conceded that it does not have production records which would permit Commerce to verify the unsupported arguments of its counsel that it only used ME wood inputs in the production of subject merchandise.

In its opinion addressing these arguments, the Trade Court admitted that the record contained no explicit statement that 100 percent of the wood inputs used in the production of subject merchandise in 2009 came from ME purchases in 2008. *Home Meridian III,* 925 F. Supp. 2d at 1380 (JA000006).  Rather, this statement was "first made in the case briefs before Commerce" which, as the AFMC notes above, were not sworn statements of company representatives but assertions of counsel who didn't even represent Huafeng when Huafeng submitted its questionnaire responses.  Rather than acknowledge its error and remand to Commerce for further review, the Trade Court conceded that such statements (which had served as the basis for its order directing the ultimate outcome) were only "implicit in Huafeng's questionnaire responses." *Id*.  The Trade Court made this determination, not Commerce, improperly becoming a finder of fact.  Thus, Commerce's factual finding in the *First Redetermination* that there is no evidence that Huafeng only used ME wood inputs during the POR is supported by substantial evidence.  This Court should defer to Commerce as the fact-finder.

## CONCLUSION

For the reasons set forth above, this Court should reverse Commerce's valuation of wood inputs in the *Second Redetermination*, and reinstate Commerce's determination to value wood inputs in accordance with its *First Redetermination*.

Respectfully submitted,

*/s/ Joseph W. Dorn*
Joseph W. Dorn
J. Michael Taylor
Mark T. Wasden

March 24, 2014                    Counsel for the Defendants Appellants

CASE PARTICIPANTS ONLY    Case: 14-1251    Document: 55    Page: 46    Filed: 03/24/2014

# ADDENDUM

### UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **HOME MERIDIAN INTERNATIONAL, INC. D/B/A SAMUEL LAWRENCE FURNITURE CO. D/B/A PULASKI FURNITURE CO.,**<br><br>Plaintiff,<br><br>**GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., and DALIAN HUAFENG FURNITURE GROUP CO., LTD.,**<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>**AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,**<br><br>Defendant-Intervenors. | **Before: Jane A. Restani, Judge**<br><br>**Consol. Court No. 11-00325** |

## JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decisions herein; now therefore, in conformity with said decision, it is hereby

JA000001

Consol. Court No. 11-00325                                              Page 2

        ORDERED, ADJUDGED, and DECREED that the redetermination by the United

States Department of Commerce upon remand is SUSTAINED.


                                    /s/ Jane A. Restani
                                        Jane A. Restani
                                            Judge

Dated: November 14, 2013
       New York, New York



**HOME MERIDIAN INTERNATIONAL, INC. D/B/A SAMUEL LAWRENCE FURNITURE CO. D/B/A PULASKI FURNITURE CO., Plaintiff, GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., and DALIAN HUAFENG FURNITURE GROUP CO., LTD., Consolidated Plaintiffs, v. UNITED STATES, Defendant, AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC., Defendant-Intervenors.**

**Consol. Court No. 11-00325**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

*35 Int'l Trade Rep. (BNA) 2211*; *2013 Ct. Intl. Trade LEXIS 144*; *SLIP OP. 2013-140*

**November 14, 2013, Dated**

**PRIOR HISTORY:** *Home Meridian Int'l v. United States, 925 F. Supp. 2d 1377, 2013 Ct. Intl. Trade LEXIS 106 (2013)*

**DISPOSITION:** [*1] Final Results of Redetermination in antidumping review sustained.

**COUNSEL:** Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer, Rebecca M. Janz, Sarah M. Wyss, and Susan L. Brooks, Mowry & Grimson, PLLC, of Washington, DC, for Plaintiff and Consolidated Plaintiffs Great Rich (HK) Enterprises Co., s Ltd. and Dongguan Liaobushang-dun Huada Furniture Factory.

Ned H. Marshak, Bruce M. Mitchell, and Mark E. Pardo, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington, DC, for Consolidated Plaintiff Nanhai Baiyi Woodwork Co., Ltd.

Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for Consolidated Plaintiff Dalian Huafeng Furniture Group Co., Ltd.

Carrie A. Dunsmore and Stephen C. Tosini, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With them on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of Counsel on the brief was Justin R. Becker, Attorney,

Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

J. Michael Taylor, Daniel [*2] L. Schneiderman, Joseph W. Dorn, Mark T. Wasden, and Prentiss L. Smith, King & Spalding, LLP, of Washington, DC, for Defendant-Intervenors.

**JUDGES:** Before: Jane A. Restani, Judge.

**OPINION BY:** Jane A. Restani

**OPINION**

Restani, Judge: This matter is before the court following a remand to the Department of Commerce ("Commerce") in *Home Meridian International, Inc. v. United States, 922 F. Supp. 2d 1366 (CIT 2013)* ("HMI"). The court found that Commerce's application of its surrogate valuation methodology was not supported by substantial evidence in this case. *Id. at 1376-77.* Furthermore, the court found that the use of Insular Rattan and Native Products' ("Insular Rattan") 2009 financial statement was improper. *Id. at 1382.* The court remanded these issues to Commerce, which issued a Final Results of Second Redetermination Pursuant to Court Order, ECF No. 130 ("Remand Results"). For the reasons stated below, Commerce's Remand Results are sustained.

**BACKGROUND**

35 Int'l Trade Rep. (BNA) 2211; 2013 Ct. Intl. Trade LEXIS 144, *;
SLIP OP. 2013-140

In HMI, the court addressed two issues. First, Plaintiff Home Meridian International, Inc. contested the use of surrogate values to value Consolidated Plaintiff Dalian Huafeng Furniture Group Co., Ltd.'s ("Huafeng") factors of production for wood inputs. See *HMI, 922 F. Supp. 2d at 1370.* [*3] The court determined that Commerce did not support by substantial evidence its decision to use surrogate values in the light of reliable evidence regarding Huafeng's market-economy purchases of these inputs. *Id. at 1375-77.* Second, the court held that Commerce did not support by substantial evidence its finding that Insular Rattan's financial statement was acceptable for financial ratio calculations. *Id. at 1382.* The court gave Commerce an opportunity to seek to reopen the record regarding Huafeng's wood inputs. Id. Commerce declined to do so. Otherwise, the court ordered Commerce to 1) use Huafeng's market-economy wood input purchase values to calculate normal value and 2) omit Insular Rattan's financial statement in its financial ratio calculations. Id.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdictions pursuant to *28 U.S.C. § 1581(c) (2006).* "The court shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." *19 U.S.C. § 1516a(b)(1)(B)(i).*

**DISCUSSION**

**I. Value of Huafeng's Wood Inputs**

In its initial determination, Commerce used surrogate values to calculate [*4] the normal value of Huafeng's products. See *HMI, 922 F. Supp. 2d at 1370.* Plaintiff argued that the method employed by Commerce for the calculation was not the method required under the relevant statutory provisions. Id. The court determined that the statute was written ambiguously such that Commerce could use any reasonable method of valuation it found appropriate, provided that its determination was supported by substantial evidence. *Id. at 1374.* The use of Commerce's chosen surrogate values in this case was not supported by substantial evidence, and therefore the court ordered that Commerce either seek to reopen the record or use Huafeng's actual market-economy wood input purchases to value the inputs. *Id. at 1382.* In its Remand Results, Commerce used Huafeng's actual market-economy wood input purchases and calculated a margin of 11.79 percent. Remand Results at 17. Commerce has complied with the court's order in this respect.

Defendant-Intervenors American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc. ("AFMC") summarily adopt the arguments in their previously denied request for reconsideration in order to preserve them for appeal. See [*5] AFMC's Cmts. Concerning Commerce's Final Results of Second Redetermination Pursuant to Court Order, ECF No. 133, 1-2. Because AFMC does not attempt to raise any new argument with respect to the Remand Results, the court will not reconsider AFMC's arguments at this juncture. As no other party challenges this aspect of the Remand Results, the court sustains Commerce's redetermination.

**II. Insular Rattan's 2009 Financial Statement**

Commerce initially used Insular Rattan's 2009 financial statement to calculate surrogate financial ratios. See *HMI, 922 F. Supp. 2d at 1380.* AFMC previously argued that Commerce used this incomplete financial statement contrary to evidence that called into question its reliability. Id. In HMI, the court held that Commerce could not use Insular Rattan's incomplete financial statement. See *id. at 1382.* Commerce complied with this order, and the parties have not contested this aspect of the Remand Results in their comments before the court.

**CONCLUSION**

For the foregoing reasons, the court finds that Commerce has complied with the court's order in HMI, and the Remand Results are SUSTAINED. Judgment will issue accordingly.

/s/ Jane A. Restani

Jane A. Restani

Judge

Dated: [*6] November 14, 2013

New York, New York



**HOME MERIDIAN INTERNATIONAL, INC. D/B/A SAMUEL LAWRENCE FURNITURE CO. and PULASKI FURNITURE CO.; and IMPORT SERVICES, INC., Plaintiffs, GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., and DALIAN HUAFENG FURNITURE GROUP CO., LTD., Consolidated Plaintiffs, v. UNITED STATES, Defendant, AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC., Intervenor Defendants.**

**Consol. Court No. 11-00325**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

*925 F. Supp. 2d 1377*; *35 Int'l Trade Rep. (BNA) 1939*; *2013 Ct. Intl. Trade LEXIS 106*; *SLIP OP. 2013-101*

**August 7, 2013, Decided**

**SUBSEQUENT HISTORY:** Appeal after remand at, Decision reached on appeal by *Home Meridian Int'l, Inc. v. United States, 2013 Ct. Intl. Trade LEXIS 144 (Ct. Int'l Trade, Nov. 14, 2013)*

**PRIOR HISTORY:** *Home Meridian Int'l, Inc. v. United States, 922 F. Supp. 2d 1366, 2013 Ct. Intl. Trade LEXIS 83 (2013)*

**DISPOSITION:** [**1] Intervenor Defendants' motion for reconsideration or to reopen the record is denied.

**COUNSEL:** Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer, Rebecca M. Janz, Sarah M. Wyss, and Susan L. Brooks, Mowry & Grimson, PLLC, of Washington, DC, for Plaintiffs[1] and Consolidated Plaintiffs Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory.

    1    Mowry & Grimson, PLLC withdrew as counsel for Import Services, Inc. on July 31, 2013. The court gave Import Services, Inc. thirty days to retain counsel. It has not done so as of the date of this opinion.

Ned H. Marshak, Bruce M. Mitchell, and Mark E. Pardo, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, for Consolidated Plaintiff Nanhai Baiyi Woodwork Co., Ltd.

Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for Consolidated Plaintiff Dalian Huafeng Furniture Group Co., Ltd.

Carrie A. Dunsmore and Joshua E. Kurland, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With them on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, [**2] Assistant Director. Of Counsel on the brief was Shana A. Hofstetter, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

J. Michael Taylor, Daniel L. Schneiderman, Joseph W. Dorn, Mark T. Wasden, Prentiss L. Smith, Sarah K. Davis, King & Spalding, LLP, of Washington, DC, for Intervenor Defendants.

**JUDGES:** Before: Jane A. Restani, Judge.

**OPINION BY:** Jane A. Restani

**OPINION**

[*1379] **OPINION AND ORDER**

Restani, Judge: Intervenor Defendants American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Co., Inc. (collectively "AFMC") move for reconsideration of the court's decision in *Home Meridian International, Inc. v. United States, Slip Op. 13-81, 922 F. Supp. 2d 1366, 2013 Ct. Intl. Trade LEXIS 83 (CIT June 25, 2013),* pursuant to *USCIT R. 59.*[2] Mem. in Supp. of the AFMC's Mot. for Reconsideration or, in the Alternative, for an Order Directing Commerce to Reopen the R. on Remand ("AFMC's Mot.") at 1. Alternatively, AFMC seeks an order requiring Commerce to reopen the record. Id. Plaintiffs Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. and Pulaski Furniture Co., as well as Consolidated Plaintiffs Great Rich (HK) Enterprises Co., Ltd. and Dongguan [**3] Liaobushangdun Huada Furniture Factory (collectively "HMI") oppose the motion. See Resp. of Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. & Pulaski Furniture Co.; Great Rich (HK) Enterprises Co., Ltd. & Dongguan Liaobushangdun Huada Furniture Factory to the AFMC's Mot. for Reconsideration or, in the Alternative, for an Order Directing Commerce to Reopen the R. on Remand. Although not endorsing the court's decision in Home Meridian, Defendant United States also contends that AFMC's motion is inappropriate. See Def.'s Resp. to AFMC's Mot. for Reconsideration ("Def.'s Resp.") (noting also that Commerce declined to move to reopen the record and instead issued a draft redetermination on July 31, 2013).

> 2  AFMC does not cite the rule under which it seeks reconsideration, but the court assumes the motion was made under this rule.

In its previous opinion, the court reviewed and remanded to the Department of Commerce ("Commerce") its Final Results of Redetermination Pursuant to Court Order (Dep't Commerce Feb. 25, 2013) ("Remand Results"), Dkt. No. 97. In Home Meridian, the court held, on the unique facts of this case, that Commerce's determination that Dalian Huafeng Furniture [**4] Group Co., Ltd. ("Huafeng") did not use market economy ("ME") wood inputs in manufacturing the subject merchandise was not based on substantial evidence. *2013 Ct. Intl. Trade LEXIS 83, at *22-26.* Additionally, the court held that the actual market economy prices paid for those inputs were, as a matter of law, the best information available on the record for valuing the inputs, as opposed to the surrogate values chosen [*1380] by Commerce. *Id. at *26-36.* The background of this case is set forth in the court's previous opinion. See *id. at *3-5.* The court presumes familiarity with that decision.

A motion for reconsideration will be granted "only in limited circumstances," such as for "1) an error or irregularity, 2) a serious evidentiary flaw, 3) the discovery of new evidence which even a diligent party could not have discovered in time, or 4) an accident, unpredictable surprise or unavoidable mistake which impaired a party's ability to adequately present its case." *Target Stores v. United States, 31 CIT 154, 157, 471 F. Supp. 2d 1344, 1347 (2007).* The grant or denial of a motion for reconsideration rests within the discretion of the court. *Id. at 157, 471 F. Supp. 2d at 1346-47.* A motion for [**5] reconsideration will not be granted "merely to give a losing party another chance to re-litigate the case." *Totes-Isotoner Corp. v. United States, 32 CIT 1172, 1173, 580 F. Supp. 2d 1371, 1374 (2008)* (citation omitted).

AFMC alleges the court erred by resting its decision "on the false predicate that 100 percent of the lumber inputs used in production during the period of review ("POR") were purchased from a market economy ("ME") supplier." AFMC Mot. 1. Additionally, AFMC faults the court for "failing to defer to Commerce's reasonable interpretation of its own regulations to value lumber inputs." Id. These arguments have been raised repeatedly in this case, and the court will not entertain them again through a motion to reconsider.

Contrary to AFMC's claim, the court set out the record evidence provided by Huafeng that supports the assertion it and HMI made before the agency that 100 percent of certain wood inputs used during the POR were from ME suppliers. See *Home Meridian, 2013 Ct. Intl. Trade LEXIS 83, at *22-26.* Although the explicit statement that 100 percent of these inputs were from market economy suppliers is first made in the case briefs before Commerce, the court found that [**6] this assertion was implicit in Huafeng's questionnaire responses, and the inference was properly before the agency in both Huafeng's and HMI's case briefs.[3] *Id. at *25.* Notably, neither AFMC nor Commerce characterized these statements as new factual submissions at the time case briefs were submitted to Commerce, and Commerce did not reject the briefs for presenting new factual evidence contrary to *19 C.F.R. § 351.302(d) (2013).* Thus, the court did not rely on an incorrect premise in evaluating the record, but rather one that was supported by substantial evidence.

> 3  AFMC points out that although questionnaire responses are certified by an attorney and a company official, case briefs filed before the agency are only certified by an attorney for the company and, therefore, cannot contain factual evidence. Compare Business Proprietary App. to Mem. of Points & Authorities in Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pls.' HMI. ("HMI App.") Tab 15 at 4-5 with HMI App. Tab 8 at 3

925 F. Supp. 2d 1377, *; 35 Int'l Trade Rep. (BNA) 1939;
2013 Ct. Intl. Trade LEXIS 106, **; SLIP OP. 2013-101

(certifying that the attorney "(1) [has] read the attached submission; and (2) based on the information made available to [her] by the forgoing companies, . . . [has] no reason to believe that this submission [**7] contains any material misrepresentation or omission of fact."). Although attorneys may not use their case briefs to submit new factual information, see *19 C.F.R. § 351.302(d)*, they certainly may use them to state explicitly what the record evidence states implicitly. Ultimately, this issue is not important to the court's determination in this case that there was no record evidence to contradict HMI's supported contention that Huafeng used in the subject merchandise certain wood inputs purchased from ME suppliers.

Additionally, as explained in its opinion, the court deferred to the reasonable methodology used by Commerce in evaluating which information is the best available on [*1381] the record for valuing inputs. See *Home Meridian, 2013 Ct. Intl. Trade LEXIS 83, at *10-20 & n.6* (summarizing Commerce's methodology and finding certain applications of it reasonable but noting that the Antidumping Methodologies policy statement is not directly applicable). The court, however, found that Commerce lacked substantial evidence for its determination that the selected surrogate values, on the unique facts of this case, were the best available information when compared to the actual market economy purchases, [**8] considering all relevant factors.

Finally, the court provided Commerce, not AFMC, with the option to exercise its discretion in seeking to reopen the record to conduct further factual investigation on Huafeng's use of market economy inputs. See *id. at *27 n.11, 43*. Because AFMC did not challenge this factual assertion prior to Commerce's final determination, instead focusing its case brief before the agency on legal arguments, see P.R. Doc. 10591, at 9-12, it does not have a right to demand that Commerce reopen the record on this issue. Commerce chose not to do so, see Def.'s Resp. at 3, and the court will not compel such action on this record.

For the foregoing reasons, AFMC's motion for reconsideration or in the alternative for an order to reopen the record is DENIED.

/s/ Jane A. Restani

Jane A. Restani

Judge

Dated: August 7, 2013

New York, New York



**HOME MERIDIAN INTERNATIONAL, INC. D/B/A SAMUEL LAWRENCE FURNITURE CO. and PULASKI FURNITURE CO.; and IMPORT SERVICES, INC., Plaintiffs, GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., and DALIAN HUAFENG FURNITURE GROUP CO., LTD., Consolidated Plaintiffs, v. UNITED STATES, Defendant, AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC., Intervenor Defendants.**

**Consol. Court No. 11-00325**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

*922 F. Supp. 2d 1366*; *35 Int'l Trade Rep. (BNA) 1687*; *2013 Ct. Intl. Trade LEXIS 83*; *SLIP OP. 2013-81*

**June 25, 2013, Dated**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Home Meridian Int'l v. United States, 925 F. Supp. 2d 1377, 2013 Ct. Intl. Trade LEXIS 106 (Ct. Int'l Trade, Aug. 7, 2013)*

**PRIOR HISTORY:** *Home Meridian Int'l, Inc. v. United States, 865 F. Supp. 2d 1311, 2012 Ct. Intl. Trade LEXIS 122 (2012)*

**DISPOSITION:** [**1] Final Results of Redetermination in antidumping review remanded to Commerce.

**COUNSEL:** Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer, Rebecca M. Janz, Sarah M. Wyss, and Susan L. Brooks, Mowry & Grimson, PLLC, of Washington, DC, for Plaintiffs and Consolidated Plaintiffs Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory.

Ned H. Marshak, Bruce M. Mitchell, and Mark E. Pardo, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington, DC, for Consolidated Plaintiff Nanhai Baiyi Woodwork Co., Ltd.

Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for Consolidated Plaintiff Dalian Huafeng Furniture Group Co., Ltd.

Carrie A. Dunsmore and Joshua E. Kurland, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of Counsel on the brief was Shana A. Hofstetter, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

J. Michael Taylor, [**2] Daniel L. Schneiderman, Joseph W. Dorn, Mark T. Wasden, Prentiss L. Smith, Sarah K. Davis, King & Spalding, LLP, of Washington, DC, for Intervenor Defendants.

**JUDGES:** Before: Jane A. Restani, Judge.

**OPINION BY:** Jane A. Restani

**OPINION**

[*1369] **OPINION AND ORDER**

Restani, Judge: This matter is before the court following a remand to the Department of Commerce ("Commerce") in *Home Meridian Int'l, Inc. v. United States, 865 F. Supp. 2d 1311 (CIT 2012)*. This case involves challenges to Commerce's final results in the fifth antidumping duty ("AD") review of certain wooden

bedroom furniture ("WBF") from the People's Republic of China ("PRC"). See Wooden Bedroom Furniture from the *People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729, 49,729 (Dep't Commerce Aug. 11, 2011)*. The court determines that for the reasons below, Commerce failed to comply with the court's remand order with respect to the valuation of Huafeng Furniture Group Co., Ltd.'s ("Huafeng") factors of production ("FOPs") and the use of Insular Rattan and Native Products' ("Insular Rattan") financial statement.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the previous opinion, although they are [**3] summarized briefly below. See generally *Home Meridian, 865 F. Supp. 2d at 1315-20, 1326-27*.

In its previous order, the court instructed Commerce to address six issues raised by Plaintiffs and Intervenor Defendants in their motions for judgment on the agency record. Specifically, the court ordered Commerce to: 1) reconsider whether surrogate values or market-economy ("ME") purchases should be used in valuing Huafeng's FOPs for wood inputs; 2) reclassify Huafeng's poly foam input; 3) explain its reliance on 2008 gross-national income ("GNI") data for labor wage rates; 4) support its finding that Insular Rattan's financial statements are acceptable for financial ratio calculations; 5) investigate whether combination rates are proper; and 6) explain its differing use of zeroing in administrative reviews and investigations. See *Home Meridian, 865 F. Supp. 2d at 1332*. On remand, Commerce: 1) continued to rely upon surrogate values to calculate normal value based on Huafeng's FOPs; 2) reclassified poly foam input as cellular plastic; 3) continued to rely on 2008 GNI data in calculating labor wage rates; 4) found Insular Rattan's financial statements to be reliable and acceptable; 5) determined [**4] that combination rates were not appropriate; and 6) explained its use of zeroing in reviews. See Final Results of Redetermination Pursuant to Court Order (Dep't Commerce Feb. 25, 2013) ("Remand Results"), Dkt. No. 97.

Plaintiffs Home Meridian International, Inc. and Import Services, Inc., as well as Consolidated Plaintiffs Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory (collectively "HMI"), continue to challenge Commerce's decision to use certain surrogate values. Plaintiffs argue that Huafeng's pre-period of review ME input purchases must be used to value Huafeng's FOPs. See Cmts. of Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. and Pulaski Furniture Co.; Import Servs., Inc.; Great Rich (HK) Enters. Co., Ltd.; & Dongguan Liaobushang-dun Huada Furniture Factory on Dep't of Commerce Feb. 25, 2013 Final Results of Redetermination Pursuant to

Ct. Order ("HMI Cmts.") 2-29. HMI also contends that Commerce has perpetuated a ministerial error in its [*1370] surrogate value calculations. Id. at 30. Intervenor Defendants American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Co., Inc. (collectively "AFMC") argue [**5] that Commerce's reliance upon Insular Rattan's financial statement is unsupported by substantial evidence and contrary to agency practice. See AFMC's Cmts. Concerning Commerce's Final Results of Redetermination Pursuant to Court Remand ("AFMC Cmts.") 2-7. Defendant United States responds that Commerce's determinations on both issues are supported by substantial evidence and in accordance with law. See Def.'s Resp. to Pls.' Remand Cmts. ("Def.'s Resp.") 3-17. [1]

> 1    No other consolidated plaintiff filed comments on the Remand Results. Additionally, no party has challenged Commerce's determinations regarding poly foam, labor wage rates, or zeroing. Accordingly, those determinations by Commerce are sustained. The parties also voluntarily dismissed the claim related to combination rates. See Stipulation of Dismissal of Count Five (Combination Duty Rates) of Compl., Dkt. No. 100.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to *28 U.S.C. § 1581(c)*. The court will not uphold a determination by Commerce if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *19 U.S.C. § 1516a(b)(1)(B)(i)*.

## DISCUSSION

### I. Value of Huafeng's Wood [**6] Inputs

HMI contends that Commerce violated the applicable statutory and regulatory framework when it used surrogate values to calculate the normal value of Huafeng's products. HMI Cmts. 3-29. HMI insists that Commerce was required to use Huafeng's ME purchases, all of which were made prior to the period of review ("POR"). Id. Additionally, HMI asserts that even if Commerce's methodology were permitted by the applicable statute and regulation, substantial evidence fails to support Commerce's selection of surrogate values as the best information available when compared with Huafeng's ME purchase prices. Id. Defendant asserts that Commerce has a reasonable practice of not using pre-POR ME input purchases in calculating normal value and that the chosen surrogate values constituted the best available information on the record. Def.'s Resp. 3-12. The court concludes that HMI's interpretations of the

922 F. Supp. 2d 1366, *; 35 Int'l Trade Rep. (BNA) 1687;
2013 Ct. Intl. Trade LEXIS 83, **; SLIP OP. 2013-81

applicable statute and Commerce regulation are not mandated because both the statute and regulation are ambiguous. HMI's claim that Commerce lacked substantial evidence to support its decision, however, has merit.

In non-market economy ("NME") [2] AD cases, [3] Commerce "shall determine the normal [**7] value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." [4] *19 U.S.C. § 1677b(c)(1).* [*1371] Among other costs, the factors of production include "quantities of raw materials employed." Id. *§ 1677b(c)(3).* In calculating normal value, "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." Id. *§ 1677b(c)(1).* Furthermore, Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are -- (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." Id. *§ 1677b(c)(4).* [5]

2 Commerce considers the PRC to be an NME within the definition of the statute, and no party has challenged that designation in this case. See *19 U.S.C. § 1677(18)*; Remand Results at 5.

3 Dumping is defined as the sale of goods at less than fair value, calculated by a fair comparison between the export price or constructed export [**8] price and normal value. See *19 U.S.C. §§ 1677(34), 1677b(a).*

4 In market economy cases, Commerce typically calculates normal value based on the price of the goods in the domestic market of the investigated entity. See *19 U.S.C. § 1677b(a)(1).* Where this is not possible, the prices of the goods in a surrogate third-country market are used, or alternatively, Commerce constructs a normal value by calculating the total costs of production, including an allowance for general expenses and profits. See id. These two methodologies ultimately target two types of pricing behavior, international price discrimination (using the home market or third-country price methodology) and below-cost sales (using the constructed value methodology). See *Ad Hoc Shrimp Trad Action Comm. v. United States, 596 F.3d 1365, 1371 (Fed. Cir. 2010)* (recognizing that the NME methodology does not relate to price discrimination but rather costs); see also John H. Jackson et al., Legal Problems of International Economic Relations 756-58 (5th ed. 2008).

5 As explained below, Commerce's current methodology is a blend of the use of surrogate values, authorized in *subsection (c)* of the statute, and the use of actual costs for [**9] the producer, similar to *subsections (e)* and (f). In the parallel context of constructed value in ME cases, the statute requires that "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." *19 U.S.C. § 1677b(f)(1)(A).* This provision applies to *subsections (b)* and (e) of the section, covering cost of production and constructed value. Id. *§ 1677b(f).* The NME AD methodology is analogous to the constructed value methodology, and the subsection addressing the NME methodology previously included a specific reference to *subsection (e), 19 U.S.C. § 1677b(c)(1) (1988),* which was deleted by the Uruguay Rounds Agreement Act in 1994. See Uruguay Round Agreements Act, 103 Pub. L. 465, 108 Stat. 4809, 4882-83 (1994). The legislative history indicates that the modification to this subsection was not intended to be substantive. S. Rep. No. 103-412, at 73 (1994).

"Nowhere does the statute speak directly to any methodology Commerce must employ [**10] to value the factors of production, indeed the very structure of the statute suggests Congress intended to vest discretion in Commerce by providing only a framework within which to work." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 59 F. Supp. 2d 1354, 1357, 23 Ct. Int'l Trade 479 (CIT 1999)*; see *QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011)* (recognizing that Commerce is entitled to deference in interpreting the undefined term "best available information"). Nonetheless, selection of the best available information must be in line with the overall purpose of the antidumping statute, which the Federal Circuit has explained as be "determining current margins as accurately as possible." *Rhone Poulenc, Inc v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)*; see also *Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994)* ("Lasko II") ("[T]here is much in the statute that supports the notion that it is Commerce's duty to determine margins as accurately as possible, and to use the best information available to it in doing so."). In calculating normal value in the NME context, the particular aim of the statute is to determine the non-distorted [**11] cost of producing such goods. See *Lasko Metal Prods., Inc. v. United States, 810 F. Supp. 314, 316-17, 16 Ct. Int'l Trade 1079 (CIT 1992)* ("Lasko I").

A. Commerce's Methodology

In applying this framework, Commerce has confronted situations in which an NME producer sourced its inputs from an [*1372] ME supplier, paying for the goods in a convertible, ME currency. The court previously has held that the statute is silent regarding the methodology that Commerce must use under these circumstances; it also has held, however, that an interpretation prohibiting Commerce from considering actual prices paid by the producer, while possible, would conflict with the statute's purpose. *Lasko I, 810 F. Supp. at 317-18*; see also *Lasko II, 43 F.3d at 1446* ("In this case, the best available information on what the supplies used by the Chinese manufacturers would cost in a market economy country was the price charged for those supplies on the international market."). To account for this gap in the law, Commerce has promulgated a regulation:

> The Secretary normally will use publicly available information to value factors. However, where a factor is purchased from a market economy supplier and paid for in a market economy currency, the Secretary [**12] normally will use the price paid to the market economy supplier. In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, the Secretary normally will value the factor using the price paid to the market economy supplier.

*19 C.F.R. § 351.408(c)(1) (2012)*. Additionally, Commerce has established a general hierarchy for selecting the best available information that it will use to value an entity's FOPs:

> We generally seek to value factors using (in order of preference): (1) Prices paid by the NME manufacturer for items imported from a market economy; (2) prices in the primary surrogate country of domestically produced or imported materials; (3) prices in one or more secondary surrogate countries reported by the industry producing subject merchandise in the secondary country or countries; and (4) prices in one or more secondary surrogate countries from sources other than the industry producing the subject merchandise.

*Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China, 56 Fed. Reg. 20,588, 20,590 (Dep't Commerce May 6, 1991)*. In fact, Commerce has gone even [**13] further in stating that "using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law." *Final Determinations of Sales at Less Than Fair Value: Oscillating Fans and Ceiling Fans From the People's Republic of China, 56 Fed. Reg. 55,271, 55,275 (Dep't Commerce Oct. 25, 1991)* ("Oscillating Fans").

Commerce has further refined the meaning of when "[Commerce] normally will use" ME supplier data, as stated in *19 C.F.R. § 351.408(c)(1)*. Specifically, Commerce will "disregard[] the prices of inputs that could not possibly have been used in the production of subject merchandise during the period of investigation or review." *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716, 61,716 (Dep't Commerce Oct. 19, 2006)* ("AD Methodologies"). This focus on inputs used in production is in line with Commerce's preference of using contemporaneous ME purchases because Commerce "presumes that a factor purchased and paid for from an ME supplier is used by the respondent during that period." Issues and Decision Memorandum for the Antidumping Duty Investigation of [**14] Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam, A-552-802, POI: 4/1/03-9/30/03 (Nov. 29, 2004), Cmt. 8 (emphasis added), available at http://ia.ita.doc.gov/frn/summary/vietnam/04-26977-1.pdf (last visited June 25, 2013). Additionally, Commerce has previously rejected non-contemporaneous [*1373] ME purchases in favor of contemporaneous surrogate values, at least when non-contemporaneous ME inputs did not comprise 100 percent of the inputs actually used in production during the POR. See *Home Meridian, 865 F. Supp. 2d at 1317 n.5* (collecting Commerce determinations). Where, however, the NME producer sources at least 33 percent of its inputs from an ME supplier during the POR, Commerce will use the weighted average of those actual purchases to value the entire input, including purchases from NME suppliers. *AD Methodologies, 71 Fed. Reg. at 61,717-18* (discussing extensively what percentage of input purchases are necessary to render the prices "meaningful" in valuing a company's entire input purchase). [6] In summary, Commerce will normally use ME purchases to value inputs provided that the purchases were made and the inputs were used during the POR. Where only surrogate [**15] values are being compared, rather than choosing between surrogate and ME values, Commerce has a practice of selecting the best available information based on several factors including contemporaneity, specificity, and tax-exclusivity. See Remand Results at 6.

_____

6   The AD Methodologies policy statement is not directly applicable here because it dealt with

Page 5

922 F. Supp. 1366, *; 35 Int'l Trade Rep. (BNA) 1687;
2013 Ct. Intl. Trade LEXIS 83, **; SLIP OP. 2013-81

establishing the percentage of ME input purchases during the POR needed to allow Commerce to use those prices to value the NME-sourced inputs. See *71 Fed. Reg. at 61,717*. The primary issue addressed in that statement was whether a small percentage of ME-supplied inputs was reflective of the price of the total inputs purchased because it was not possible for the entire amount of inputs to be sourced at the small-order ME price. Here, Huafeng purchased 100 percent of its actual lumber and veneer inputs from its ME sources. During the POR, however, it purchased no lumber and veneer inputs whatsoever, rendering the application of this practice meaningless as no percentage can be calculated with a denominator of zero (the total input purchases during the POR).

The court previously has upheld certain applications of Commerce's so-called mix-and-match [**16] methodology, finding that "[t]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country." *Lasko I, 810 F. Supp. at 317* (rejecting a claim that Commerce was required by the statute to use only surrogate values); see also *Lasko II, 43 F.3d at 1445* (contrasting ME prices and surrogate values, the latter of which Commerce uses in its "factors of production methodology to estimate [normal value] for the merchandise in question" (emphasis in original)). In explaining why the methodology was reasonable, the court noted that the "[c]osts of production in a surrogate country will never perfectly approximate what the costs in an NME would be in an open market situation. Any inaccuracies in the mix-and-match approach likely stem from surrogate values analysis, not Commerce's attempt to improve upon it" by using purchase prices from ME suppliers. *Lasko I, 810 F. Supp. at 317 n.4*; see also *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382-83 (Fed. Cir. 2001)* (recognizing that because surrogate values are [**17] at best estimates, the best available information for valuing domestic inputs was the actual purchase price of imported ME inputs). The court, however, has sustained Commerce's practice of favoring surrogate values that are contemporaneous with the POR, all other things being equal. [7] See [*1374] *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 30 CIT 1173, 1177, 1179 (2006)* ("Shakeproof III").

[7] Under the market economy methodology, the statute requires that the "normal value of the subject merchandise shall be the price described in subparagraph (B), at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." *19 U.S.C. § 1677b(a)(1)(A)*. Although this clause is not applicable in NME cases, which are analyzed under *subsection (c)*, Commerce of course must make some reasonable connection between the normal value and the export price. It typically does so by using values for both that are contemporaneous with the POR. See Remand Results at 6. Commerce departs from the strict application of its preference for POR prices in other circumstances, such as through application of the 90/60 day contemporaneity [**18] rule whereby in ME cases Commerce may consider home market sales from 90 days prior to and 60 days after the POR. See *19 C.F.R. § 351.414(f)(2)-(3)*.

HMI argues that the text of *19 U.S.C. § 1677b(c)(1)* unambiguously prohibits the application of Commerce's methodology in this case. The statute requires Commerce to base normal value on "the factors of production utilized in producing the merchandise." *§ 1677b(c)(1)* (emphasis added). HMI contends that this compels Commerce to use actual price data to the exclusion of any surrogate values when pre-POR inputs are "utilized" in production. See HMI Cmts. 4. Although "utilized" could be interpreted to require Commerce to rely on actual costs of the specific inputs used in production by the particular producer, this portion of the statute is ambiguous. Furthermore, HMI's reading seems inconsistent with the rest of the subsection. For example, *§ 1677b(c)(3)* defines "the factors of production utilized in producing merchandise" in general terms such as labor, raw materials, energy costs, and capital costs. This supports the conclusion that the clause relied upon by HMI simply is directing Commerce to value the types of inputs actually used by the [**19] particular producer, without specifically addressing any temporal aspects with regard to cost. Even if this were not the case, Commerce's interpretation of the ambiguous provision is reasonable, and therefore the court defers to that interpretation. Similarly, HMI's argument based on Commerce's regulation requiring it to "normally" use ME data is without merit. "Normally" is clearly an ambiguous term designed to allow Commerce discretion in uncontemplated abnormal situations. Commerce as the promulgating agency may reasonably interpret its meaning. See *Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1337, 185 L. Ed. 2d 447 (2013)*. But see *id. at 1338* (Roberts, C.J., concurring); *id. at 1339* (Scalia, J., concurring in part and dissenting in part) (questioning the continued application of Auer deference). This is not to say, however, that the general thrust of HMI's argument is inaccurate, as Commerce must still calculate dumping margins as accurately as possible and in line with the producer's actual experience, employing the best available

Case: 14-1251 Case: 14-1251 PARTICIPANTS ONLY Document: 46 Page: 68 Filed: 03/28/2014 Filed: 03/24/2014

Page 6

922 F. Supp. 1366, *; 35 Int'l Trade Rep. (BNA) 1687;
2013 Ct. Intl. Trade LEXIS 83, **; SLIP OP. 2013-81

information on the record. [8] See Remand Results at 7 (acknowledging that the aim of using ME prices, where possible, in the NME context is "to capture the company's [**20] actual POR experience with market prices").

> 8 The court notes some tension between Commerce's asserted blanket methodologies. Commerce focuses on contemporaneous purchases based on a presumption that those inputs will be used in production and excludes inputs not actually used in production. Despite this policy's focus on production, Commerce purports to employ a methodology in this case that disregards production concerns, focusing instead exclusively on the time of purchase. Commerce has not based this shift in focus on evidence of record here.

## B. Substantial Evidence

Even though HMI unsuccessfully argues that the applicable statute and regulation unambiguously require Commerce to use ME purchase prices in all cases to value FOPs, HMI correctly asserts that Commerce must support the application of its methodology in this particular case with [*1375] substantial evidence. Commerce has failed to do so here. "[W]hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case. Form should be disregarded for substance and the emphasis should be on economic reality." *Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 2013 U.S. App. LEXIS 10008, at *19 (Fed. Cir. May 20, 2013)* [**21] (internal quotation marks, citations, and brackets omitted). For example, the court has rejected Commerce's selection of surrogate values based solely on the fact that they are more contemporaneous and non-aberrational where Commerce has failed to consider whether the less contemporaneous data "[was] an accurate reflection of the price paid" for the input by the producer. See *Yantai Oriental Juice Co. v. United States, 26 CIT 605, 617-18 (2002)* (remanding to Commerce for an explanation of why domestic data, adjusted for inflation or deflation, "would not more accurately approximate the experiences of" producers during the POR); see also *Olympia Indus. v. United States, 7 F. Supp. 2d 997, 1001, 22 Ct. Int'l Trade 387 (CIT 1998)* (rejecting Commerce's blanket policy as a justification for not considering NME trading company data instead of comparing it to alternative surrogate value data).

In its previous opinion, the court explained that based on the record, "[i]f the only wood inputs into the subject merchandise were market economy inputs, contemporaneity would not outweigh all other factors," especially in light of flaws in the selected surrogate values.

*Home Meridian, 865 F. Supp. 2d at 1318-19.* The court [**22] noted that "[u]sing the actual [purchase prices of the] inputs, if available and where they yield reliable values, would seem to promote accuracy more than does using flawed surrogate values." *Id. at 1319.* The court also explained that "Commerce cannot create a blanket rule that prevents it from comparing the merits of contemporaneous and non-contemporaneous data, and thereby prevents Commerce from determining the best available information." Id. Finally, the court required Commerce to consider the factual allegation by AFMC that Huafeng had not used the ME-sourced inputs that it claimed to have used, an allegation that Commerce did not previously address. Id. Because this factual question is a threshold issue, the court turns to it first.

## 1. Factual Dispute as to Inputs Used

The parties continue to dispute HMI's claim that 100 percent of the wood inputs used by Huafeng during the POR were purchased from an ME supplier. See HMI Cmts. 9-15; Def.'s Resp. 8-10. On remand, Commerce purportedly weighed the record evidence and determined that Huafeng had purchased its wood inputs from both ME and NME suppliers in the thirteen months prior to the POR, with the exception of two inputs that were [**23] purchased entirely from ME suppliers. Remand Results at 8. For all inputs, Commerce found that sufficient inventories of unknown origin existed, such that NME-supplied inputs could have been used by Huafeng to make all of the subject merchandise during the POR. Id. HMI continues to argue that it and Huafeng always have claimed that all of Huafeng's wood inputs that were used during the POR were supplied by ME producers. HMI Cmts. 10-11. HMI also submits that these assertions were supported by Huafeng's original and supplemental Section D questionnaire responses. Id. (citing Section D questionnaire responses). HMI claims that Commerce's determination is, at best, speculation and, at worst, the application of an impermissible adverse inference. Id. at 10-15. Defendant contends that Commerce based its decision on substantial evidence because HMI has failed [*1376] to present sufficient evidence to prove its allegation. Def.'s Resp. 8-10.

Commerce asserted in response to HMI's challenges that "[r]ather [**24] than identifying evidence that definitively shows that Huafeng's consumption of lumber consisted entirely of ME-purchased lumber, Home Meridian relies on circumstantial evidence to support its claims." Remand Results at 41 (citing Huafeng's Section D supplemental responses). Commerce reached this conclusion despite the fact that it verified that Huafeng separated its inputs based on country of origin at the manufacturing site and segregated its workshops based on shipping destination; Commerce also did not find any-

thing that contradicted Huafeng's assertions as to the price or quantity of its ME purchases. Verification Report (Jan. 31, 2011) Bus. Proprietary App. to Mem. of Points and Auth. in Supp. of R. 56.2 Mot. for J. on the Agency Record by Pls. HMI (Feb. 29, 2012) ("HMI App."), Tab 16, at 4-5, 26. Instead, Commerce merely noted that the handwritten material withdrawal slips did not specify the origin of the input when materials were withdrawn from supply and entered into production. See Remand Results at 41. This appears to be the piece of direct evidence Commerce required. See id. ("[T]here is no evidence on the record that ties either ME purchases or NME purchases of lumber [**25] to consumption during the POR.")

Although Commerce certainly has the authority to discredit Huafeng and HMI's claims that a certain percentage of the wood inputs used were sourced from an ME supplier, such a decision must rest upon substantial evidence. Here, Commerce was presented with evidence of ME purchases, which it had an opportunity to verify, along with sworn statements by Huafeng that 100 percent of the inputs it used were purchased from an ME supplier. Commerce opted not to conduct an in-depth verification of these ME purchases because it considered the evidence irrelevant, but its failure to do so does not discredit Huafeng's claim. [9] Indeed, as HMI has argued, some of Commerce's verification report corroborates Huafeng's assertions, such as the separation of ME and NME inputs at the work site, the division of workshops based on product destination, and the use of separate control numbers ("CONNUMS") for products bound for the United States. See Verification Report (Jan. 31, 2011) HMI App., Tab 16, at 4-5, 15, 26.

> 9   Commerce declined to conduct further verification of the ME purchases because it decided to apply a blanket policy of excluding pre-POR ME purchase data, even at [**26] the verification stage before surrogate values were calculated.

When presented with conflicting evidence that provides substantial evidence to support opposite conclusions, the court will defer to Commerce's reasoned choice between the two. Where, however, as here, Commerce is presented with non-definitive but still substantial evidence to support one factual conclusion and zero evidence to the contrary, beyond mere speculation, the only reasonable choice for Commerce is the one for which evidence exists. [10] Accordingly, the court finds that Commerce lacked substantial evidence to discredit Huafeng and HMI's claims that 100 percent of the inputs used in production [*1377] during the POR were purchased from an ME supplier. [11]

> 10   Where there is a gap in the record, Commerce may employ facts otherwise available and draw an adverse inference against a non-cooperating respondent under some circumstances. See *19 U.S.C. § 1677e*. Commerce did not state that it was using such a tool here, and its application of such an inference likely would not be permissible. See Remand Results at 42 (recognizing that few, if any, companies keep the type of direct evidence Commerce appears to be demanding).
>
> 11   Of course, [**27] under Commerce's own practice, a small percentage of ME inputs is normally sufficient to value the entire set of inputs. If Commerce has good reason to reopen the record at this late stage to address the factual issue of Huafeng's use of ME wood inputs, it may move for permission to do so. Otherwise, the conclusion that Huafeng used 100 percent ME wood inputs for its POR production will control the proceedings.

### 2. Best Available Information

In light of this conclusion, the court turns to Commerce's decision as to what data set constituted the best available information. Although somewhat unclear, Commerce decided on remand that even if HMI's factual allegations regarding the source of its inputs were true, Huafeng's pre-POR purchase data still would not constitute the best available information on the record for valuing those inputs because the purchases were made during the year prior to the POR. Remand Results at 5-7. Commerce supported this determination by relying on its policy that it "normally calculates normal value by valuing the NME producers' FOPs using prices from an ME that is at a comparable level of economic development and that is also a significant producer of comparable [**28] merchandise." Id. at 5. Commerce then contended that it has created a narrow exception to the rule by permitting actual market economy purchase prices to be used rather than surrogate values when they are contemporaneous with the POR and the inputs are used within the POR. [12] Id. at 5.

> 12   In its Remand Results, Commerce also compared actual ME price data to surrogate value data under the criteria for deciding between competing surrogate values, although Commerce recognized that actual price data is not a surrogate value. Remand Results at 5-6. It does not appear that Commerce relied on this comparison in arriving at its decision, and at any rate, it seems to make little analytical sense. It is unsurprising that actual ME purchases by a producer may be from an economically different country,

fail to represent broad market averages, and may be inclusive of taxes. See id. This does not make such purchases somehow less accurate as a data source for valuing the inputs, and in fact, the court and Commerce have noted repeatedly that actual purchase data are generally preferable to surrogate estimates, all other considerations equal. See *Lasko I, 810 F. Supp. at 317-18*; *Oscillating Fans, 56 Fed. Reg. at 55,275* [**29] ("[U]sing surrogate values when market-based values are available would, in fact, be contrary to the intent of the law.").

As set out above and in Home Meridian, selection of the best available information is, except in the rarest of cases, a balancing of competing options, not a binary decision made with respect to one data source in isolation. The selection cannot be made without consideration of the specific options available to Commerce based upon the particular facts on the record. Here, Commerce was presented with two potential sources for valuing Huafeng's inputs, Huafeng's nearly contemporaneous [13] but pre-POR ME purchases and contemporaneous surrogate values based on import data under three Philippine tariff subheadings. [14]

[13] [[ ]] of Huafeng's ME purchases occurred during the [[ ]] of 2008, just prior to the POR. For example, [[ ]] of its pine lumber purchases, [[ ]] of its poplar lumber purchases, and [[ ]] of its oak lumber purchases were made between [[ ]]. Market Economy Inputs During 2008 or Before (Oct. 12, 2010) HMI App., Tab 15, Ex. S-39, at 3.

[14] Philippine harmonized tariff schedule subheading 4407.10 covers "wood sawn or chipped lengthwise, sliced or peeled, whether [**30] or not planed, sanded or end-jointed, of a thickness exceeding 6mm, coniferous;" 4407.99 covers "wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6mm, other;" and 4408.90 covers "sheets for veneering (including those obtained by slicing laminated wood), for plywood or for similar laminated wood and other wood, sawn lengthwise, sliced or peeled, whether or not planed, sanded, spliced or end-jointed, of a thickness not exceeding 6 mm, other." Letter from King & Spalding to Commerce re: Submission of Publicly Available Information to Value Factors of Production (Nov. 15, 2010), P.R. 435, Ex. 3, at 234-37.

[*1378] Instead of comparing the substance and merits of these two options, Commerce again undertook a cursory, binary consideration. Commerce has not pointed to substantial evidence on the record to demonstrate that Huafeng's input purchases are unreliable or aberrant, and it has not argued as much. At most, Commerce noted that a single supplier from the 2008 review paid higher input prices to a different supplier. Remand Results at 9. Commerce also failed to respond to any of HMI's explanations differentiating its purchases [**31] from those of the other producer. HMI Cmts. 20-23. Commerce merely acknowledged that different suppliers may have different prices at different times. See Remand Results at 8-9. Even if the prices are pre-POR, Commerce has established a relatively simple way to adjust for the lack of contemporaneity of valuation data. It is able to add or subtract from the pre-POR prices an inflation or deflation adjustment to reflect changes in relative prices at the macroeconomic level. [15] Because this simple adjustment exists, if even needed here, Huafeng's ME purchase prices are specific and easily convertible to reflect POR prices.

[15] Commerce contends that inflating ME prices is not appropriate because they are not based on broad market averages and inflation does not account for product-specific changes in price over time. See Remand Results at 7. Commerce, however, consistently inflates pre-POR surrogate and actual values when needed, and it does not seem that an adjustment to non-contemporaneous surrogate values via an inflator accounts for price fluctuations any better than one applied to actual prices.

In contrast, the court noted in Home Meridian its concerns with the surrogate values chosen [**32] by Commerce, especially with the basket tariff line used to value some inputs, as it is a basket subheading that includes many types of woods not used by Huafeng in its products. See *865 F. Supp. 2d at 1319*. On remand, Commerce partially corroborated the surrogate prices, which are largely based on imports from North American and Europe, with reference to a single respondent in 2008 in order to address the court's concern regarding the large year-over-year increase in prices. [16] Remand Results at 9; see Surrogate Value Submission (Nov. 15, 2010), HMI App., Tab 19, Ex. 2 (listing the source countries underlying the Philippine import data). A partial corroboration of the surrogate values does not, however, trump Commerce's stated preference for ME values as furthering statutory intent. Further, such corroboration does not address the concerns about the specificity of the basket tariff heading, 4407.99. [17]

[16] It remains particularly alarming that most of the surrogate values are [[ ]] Huafeng's ME purchase prices, even if a single producer paid prices to [[ ]] that were somewhat similar to those of the non-specific wood imports into the Philippines

utilized by Commerce. See [**33] HMI Cmts. 27-29.

17 Commerce notes that no party challenged the particular tariff classifications used to calculate surrogate values, including this basket subheading. Remand Results at 9. The lack of objection, however, merely indicates that neither party argued for a more specific tariff subheading, possibly because one might not exist. It does not mean that the parties acknowledged that a general basket subheading is more specific than the actual ME purchase data submitted by Huafeng.

[*1379] Although Commerce continues to cite to its general preference for contemporaneity among equally useful values, its continued reliance on the court's affirmation of that preference in Shakeproof III fails to recognize that such a preference may not be absolute; the preference is permissible only when there is "no dispute about the representativeness of Commerce's chosen surrogate value." Shakeproof III, 30 CIT at 1180 n.7 (distinguishing Yantai, 26 CIT at 617). At any rate, the limited approval of such a policy in Shakeproof III is distinguishable from the unique facts of the present case where 100 percent of the inputs used were from pre-POR purchases. See id. Under the unique facts of this case, Commerce's [**34] conclusion that its fictional surrogate values better reflect the actual experience of the producer, especially in light of the imprecision of surrogate values generally, is unsustainable. The court is unable to square Commerce's asserted blanket policy of ignoring actual ME data unless the inputs are both purchased and used within the POR with Commerce's statutory obligation to use the best available information on the record, and its previous statements about what kind of value data are the best available data. As noted supra, although Commerce reasonably may prefer both conditions be met in the abstract, such reasoning breaks down under the circumstances of the present case where no input purchases at all were made during the POR. Commerce's stated preference for contemporaneous purchases is in part based on its presumption that those purchases will be used during the POR. Commerce has failed to explain its departure from this practice of focusing on when the inputs were used in production, especially where here 100 percent of the inputs were purchased from an ME supplier in contrast to the 33 percent threshold Commerce uses when considering whether to use contemporaneous ME purchases [**35] to value even the other 67 percent. [18]

18 The court has recently held that in applying the 33 percent rule, Commerce may not blindly reject the use of actual ME purchase data where it amounts to 32.9 percent of total input purchases. See Gold East Paper (Jiangsu) Co., Ltd. v. United States, Slip Op. 13-74, Ct. No. 10-00371, at 6 , 918 F. Supp. 2d 1317, 2013 Ct. Intl. Trade LEXIS 74 (CIT June 17, 2013) (finding application of this rigid policy to be "unreasonable, arbitrary and capricious under the circumstances" where Commerce failed to explain why the actual purchase data were not the best available information, notwithstanding Commerce's preferred input threshold).

Additionally, statements by Commerce such as "[t]he true experience of the company during the POR is that it chose not to make ME purchases during that time frame" are unhelpful to the court. [19] Remand Results at 7. HMI's proposed methodology does not seek to pretend that Huafeng made ME input purchases during the POR. Rather, it simply advocates that Commerce give consideration to the prices Huafeng actually paid. This advances Commerce's own stated policies of using data that advances fairness, predictability, and accuracy. See Oscilating Fans, 56 Fed. Reg. at 55,275 ("Where [**36] we can determine that a NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the [*1380] intent of the law."). Commerce fails to recognize that its proposed valuation methodology, applied to the facts of this case, is far less reflective of Huafeng's actual experience because it pretends that Huafeng purchased all of its inputs during the POR at the estimated surrogate values. This fails to gauge accurately whether Huafeng sold its products at dumped prices into the U.S. market. [20] Given the clear disparity between these two potential valuation methods and Commerce's failure to provide any reasonable explanation of its preference for surrogate values on these facts, unless Commerce adequately supports a request to reopen this record to further examine Huafeng's wood purchases, Commerce must use Huafeng's ME purchase prices to value wood FOPs in this case. Commerce may adjust the values for inflation or deflation, if needed, based on the time of purchase. [21]

19 Commerce also explains that the use of pre-POR ME prices "would [**37] suggest that pre-POR ME prices are preferable to POR surrogate values because they reflect the respondent's POR purchasing experience -- which is not necessarily the case." Remand Results at 9. It is unclear in what circumstances actual purchases, under market conditions, would not accurately reflect a producer's purchasing experience. These prices reflect the reality of what the producer actually paid as compared to the fiction Commerce proposes. In any case, such unusual circumstances do not exist here.

922 F. Supp. 2d 1366, *; 35 Int'l Trade Rep. (BNA) 1687;
2013 Ct. Intl. Trade LEXIS 83, **; SLIP OP. 2013-81

20   NME dumping methodology is essentially an adjusted below-cost methodology. Certainly if this were an analogous ME AD case based on the cost of production methodology, Commerce would be hard pressed to argue that a producer making well-timed purchases of inputs has sold its goods below cost simply because input prices rose between the time of purchase and the time of sale.

21   Because the court remands to Commerce to revalue Huafeng's wood inputs, it need not address HMI's ministerial error claim. See HMI Cmts. 30.

## II. Insular Rattan Financial Statement

AFMC argues that Commerce again erred in using the 2009 financial statement of Insular Rattan in calculating surrogate financial ratios. [**38] AFMC Cmts. 2-7. It argues first that Commerce's finding that the statement is reliable and unaffected by subsidies is unsupported by substantial evidence. Id. at 2-5. It further argues that Commerce acted contrary to its prior practice by continuing to include the "questionable" financial statement in its calculations, despite the existence of eleven other reliable financial statements on the record. Id. at 5-6. Defendant acknowledges that the court remanded this same issue back to Commerce in another case, but nonetheless makes the same previously rejected arguments. Def.'s Resp. 3 n.1; see *Dongguan Sunrise Furniture Co. v. United States, 904 F. Supp. 2d 1359, Slip Op 13-46 (CIT Apr. 5, 2013).* Defendant contends that Commerce did not blindly rely upon the "unqualified" statement by Insular Rattan's auditor, but instead relied on the completeness of all aspects of the statement, other than the missing tax line. Def.'s Resp. 14. Defendant also claims that because Philippine generally accepted accounting principles require disclosures of subsidies, the lack of any such disclosure provides evidence that no countervailable subsidy was received by Insular Rattan. [22] Id. at 13-14.

22   Defendant [**39] also contends that arguments involving the effective date of the relevant accounting principle, IAS 20, were not made before the agency and therefore have not been exhausted by HMI. Def.'s Resp. 15-16. Because the court remands Commerce's determination on other grounds, it need not consider the exhaustion question. The court notes, however, that HMI generally challenged Commerce's reliance on the non-disclosure of subsidies to support its finding, although HMI did not directly refer to IAS 20. See Petitioners' Cmts. Concerning Draft Results of Redetermination (Jan. 10, 2013) Dkt. No. 113-2, Attach. 2, at 8.

Commerce selected financial statements in this review based on whether the companies were: "producers of merchandise identical to subject merchandise which received no countervailable subsidies, and earned a before tax profit in 2009 for which [Commerce has] financial information." *Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Intent To Rescind Review in Part, 76 Fed. Reg. 7534, 7544* [*1381] *(Dep't Commerce Feb. 10, 2011).* Commerce also requires complete financial statements to ensure reliability. [23] See *Dongguan Sunrise Furniture Co. v. United States, 865 F. Supp. 2d 1216, 1243 (CIT 2012).*

23   Commerce [**40] previously rejected Insular Rattan's financial statement due to different defects than the ones at issue here. See Issues and Decision Memorandum for the Final Results of the 2007 Antidumping Duty Administrative and New Shipper Reviews, A-570-890, POR: 1/1/07-12/31/07, at 35 (Aug. 10, 2009), available at http://ia.ita.doc.gov/frn/summary/PRC/E9-19666-1.pdf (last visited June 25, 2013), aff'd *Lifestyle Enter., Inc. v. United States, 768 F. Supp. 2d 1286, 1310-11 (CIT 2011).*

On remand, Commerce continued to speculate as to how Insular Rattan's financial statement, which facially conflicts with the applicable accounting standard, remains complete and reliable for use in surrogate financial ratio calculations. See Remand Results at 17-19; Resolution No. 24-00 (July 31, 2000) App. to AFMC's Cmts. Concerning Commerce's Final Results of Redetermination Pursuant to Ct. Remand, Tab. 2, at 21 (requiring financial statements to contain a separate tax line). The court already has held that the financial statement in question is "dubious" without some further basis to support Commerce's reliance. See *Home Meridian, 865 F. Supp. 2d at 1326-27.* Merely stating that the rest of the financial statement [**41] facially complies with the applicable accounting standards and that the statement is "unqualified" is insufficient to provide substantial evidence to negate the obvious lack of a required tax line. For the same reason, Commerce's assumption that Insular Rattan would have disclosed any subsidies under applicable accounting principles, whether they existed at the time or not, is unreasonable in light of the tax line omission.

Additionally, although Defendant argues that the tax line is not a critical component of the financial statement because it is not directly used in surrogate financial ratio calculations, it is directly related to another important tax line, profit, which is used in calculating financial ratios. See *Dongguan, 904 F. Supp. 2d 1359, Slip Op 13-46, at*

922 F. Supp. 2d 1366, *; 35 Int'l Trade Rep. (BNA) 1687;
2013 Ct. Intl. Trade LEXIS 83, **; SLIP OP. 2013-81

*12*. Commerce acknowledges that without proper disclosures, it is unable to reconstruct financial statements to conform the statement to proper accounting standards, eliminating any possible remedy for this defect. See Remand Results at 18 ("The Department does not have the ability to look behind financial statements used as surrogates by questioning the surrogate company."). The lack of a tax line also limits Commerce and the parties' ability [**42] to determine whether an undisclosed tax subsidy was received. [24]

> [24] The court notes that Insular Rattan's overhead expenses; selling, general and administrative ("SG&A") expenses; and profits were significantly lower than those of the other companies used to calculate financial ratios, possibly indicating other issues with Insular Rattan's financial statement. See Final Results Surrogate Value Memorandum (Aug. 5, 2011) App. to AFMC's Resp. Br. in Opp'n to Pls.' Mots. for J. on the Agency Record, Tab 15, at 3.

Finally, Commerce's attempt to distinguish its decision to include Insular Rattan's statement in this review, despite refusing to do so in the third administrative review, is unreasonable. Although an agency is permitted to depart from its prior practice, it must provide a reasonable explanation for doing so. See *NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1328 (Fed. Cir. 2009).* Commerce's only explanation for its shift in practice is that the financial statement in the third review lacked auditor notes while the statement here lacked a tax line. Remand Results at 17-19. Commerce does not assert necessity, as other statements are available for [*1382] use in financial ratio calculations. [**43] Although notes are certainly different from a tax line,

Commerce has not provided a reasoned basis for concluding that the omission of notes renders the statement incomplete and unreliable while the omission of a tax line does not, especially in light of the requirement under applicable accounting principles that both be disclosed.

Accordingly, Commerce's finding that the statement was reliable was not based on substantial evidence but rather speculation as to why the apparent deficiency is neither real nor important, and its selection was contrary to Commerce's practice. The court remands this issue so that Commerce may remove Insular Rattan's facially defective financial statement from the pool for calculation of financial ratios.

## CONCLUSION

For the foregoing reasons, Commerce has until July 15, 2013, to seek to reopen the record. Otherwise, the court remands the matter to Commerce to: 1) use Huafeng's actual ME wood input purchases to calculate normal value, adjusted as needed, and 2) omit Insular Rattan's financial statement in its financial ratio calculations. Commerce shall file its remand determination by August 26, 2013. The parties shall have until September 23, 2013, to file [**44] objections, and Defendant shall have until October 8, 2013, to file its response.

/s/ Jane A. Restani

Jane A. Restani

Judge

Dated: June 25, 2013

New York, New York



**HOME MERIDIAN INTERNATIONAL, INC. D/B/A SAMUEL LAWRENCE FURNITURE CO. and IMPORT SERVICES, INC., Plaintiffs, GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FUR-NITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., and DALIAN HUAFENG FURNITURE GROUP CO., LTD., Consolidated Plaintiffs, v. UNITED STATES, Defendant, AMERICAN FURNITURE MANUFACTURERS COM-MITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COM-PANY, INC., Intervenor Defendants.**

**Consol. Court No. 11-00325**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

*865 F. Supp. 2d 1311*; *34 Int'l Trade Rep. (BNA) 2044*; *2012 Ct. Intl. Trade LEXIS 122*; *SLIP OP. 2012-120*

**September 19, 2012, Decided**

**SUBSEQUENT HISTORY:** Appeal after remand at, Remanded by *Home Meridian Int'l, Inc. v. United States, 2013 Ct. Intl. Trade LEXIS 83 (Ct. Int'l Trade, June 25, 2013)*

**DISPOSITION:** [**1] In anti-dumping duty matter Plaintiffs' and Consolidated Plaintiffs' motion for judgment on the agency record granted. Nanhai Baiyi Woodwork Co., Ltd.'s motion for judgment on the agency record granted. Dalian Huafeng Furniture Group Co., Ltd.'s motion for judgment on the agency record granted. Intervenor Defendants' motion for judgment on the agency record granted in part and denied in part.

**COUNSEL:** Kristin H. Mowry, Mowry & Grimson, PLLC, of Washington, DC, argued for the plaintiffs and for the consolidated plaintiffs, Great Rich (HK) Enter-prises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory. With her on brief were Jeffrey S. Grimson, Jill A. Cramer, Keith F. Huffman, Sarah M. Wyss, and Susan L. Brooks.

Ned H. Marshak, Bruce M. Mitchell, and Mark E. Pardo, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, for the consolidated plaintiff, Nanhai Baiyi Woodwork Co., Ltd.

Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for the consolidated plaintiff Dalian Huafeng Furniture Group Co., Ltd.

Joshua E. Kurland, Trial Attorney, Commercial Litiga-tion Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. [**2] With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Carrie A. Dun-smore, Trial Attorney. Of counsel on the brief was Shana Hofstetter, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.

J. Michael Taylor, King & Spalding, LLP, of Washing-ton, DC, argued for intervenor defendants. With him on the brief were Daniel L. Schneiderman, Joseph W. Dorn, Mark T. Wasden, Prentiss L. Smith, and Sarah K. Davis.

**JUDGES:** Before: Jane A. Restani, Judge.

**OPINION BY:** Jane A. Restani

**OPINION**

[*1314] **OPINION AND ORDER**

Restani, Judge: This action challenges the Depart-ment of Commerce's ("Commerce") final results ren-

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

dered in the fifth antidumping ("AD") duty review of certain wooden bedroom furniture ("WBF") from the People's Republic of China ("PRC"). See *Wooden Bedroom Furniture from the People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729, 49,729 (Dep't Commerce Aug. 11, 2011)* ("Final Results"). Plaintiffs Home Meridian International, Inc. and Import Services, Inc. along with consolidated plaintiffs Great Rich (HK) Enterprises Co., Ltd. and Dongguan [**3] Liaobushangdun Huada Furniture Factory (collectively "HMI") moved for judgment on the agency record. Mot. for J. Upon the Agency R. Pursuant to *Rule 56.2* by Pls. Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. & Pulaski Furniture Co. & Import Svcs., Inc. & Consol. Pl. Great Rich (HK) Enterprises Co., Ltd. & Dongguan Liaobushangdun Huada Furniture Factory ("HMI Br."). Consolidated Plaintiffs Nanhai Baiyi Woodwork Co., Ltd. ("Nanhai Baiyi") and Dalian Huafeng Furniture Group Co., Ltd. ("Huafeng") each moved for judgment on the agency record. Mem. of Points and Auths. in Supp. of Consol. Pl. Dalian Huafeng Furniture Group Co., Ltd.'s 56.2 Mot. for J. on the Agency R. ("Huafeng Br."); Mot. of Pl. Nanhai Baiyi Woodwork, Co. Ltd. for J. on the Agency R. Under *USCIT Rule 56.2* ("Nanhai Baiyi Br."). HMI adopted the arguments made by Huafeng. HMI Br. 33. Intervenor Defendants American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc. (collectively [*1315] "AFMC"), which were plaintiffs in one of the consolidated actions, also moved for judgment on the agency record. AFMC's *Rule 56.2* Br. in Supp. of its Mot. for J. on the Agency R. ("AFMC Br."). [**4] For the reasons stated below, the court remands in part and sustains in part the Final Results.

## BACKGROUND

In January 2005, Commerce published an AD duty order on WBF from the PRC. *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture From the People's Republic of China, 70 Fed. Reg. 329, 329 (Dep't Commerce Jan. 4, 2005).* In January 2010, AFMC and others requested an administrative review of certain companies exporting WBF to the United States between January 1, 2009 and December 31, 2009, thereby triggering the fifth administrative review of *WBF.[1] Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Intent To Rescind Review in Part, 76 Fed. Reg. 7534, 7535 (Dep't Commerce Feb. 10, 2011)* ("Preliminary Results"). After publishing a notice of initiation and receiving questionnaire responses and comments, Commerce selected one mandatory respondent: *Huafeng.[2] Id. at 7535.* In November [*1316] and

December 2010, Commerce verified the antidumping questionnaire and supplemental questionnaire responses of Huafeng. *Id. at 7536.*

1    The subject merchandise includes [**5] the following items:

(1) Wooden beds such as loft beds, bunk beds, and other beds; (2) wooden headboards for beds (whether stand-alone or attached to side rails), wooden footboards for beds, wooden side rails for beds, and wooden canopies for beds; (3) night tables, night stands, dressers, commodes, bureaus, mule chests, gentlemen's chests, bachelor's chests, lingerie chests, wardrobes, vanities, chessers, chifforobes, and wardrobe-type cabinets; (4) dressers with framed glass mirrors that are attached to, incorporated in, sit on, or hang over the dresser; (5) chests-on-chests, highboys, lowboys, chests of drawers, chests, door chests, chiffoniers, hutches, and armoires; (6) desks, computer stands, filing cabinets, book cases, or writing tables that are attached to or incorporated in the subject merchandise; and (7) other bedroom furniture consistent with the above list.

The scope of the order excludes the following items: (1) Seats, chairs, benches, couches, sofas, sofa beds, stools, and other seating furniture; (2) mattresses, mattress supports (including box springs), infant cribs, water beds, and futon frames; (3) office furniture, such as desks, stand-up desks, computer cabinets, [**6] filing cabinets, credenzas, and bookcases; (4) dining room or kitchen furniture such as dining tables, chairs, servers, sideboards, buffets, corner cabinets, china cabinets, and china hutches; (5) other non-bedroom furniture, such as television cabinets, cocktail tables, end tables, occasional tables, wall systems, book cases, and entertainment systems; (6) bedroom

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

furniture made primarily of wicker, cane, osier, bamboo or rattan; (7) side rails for beds made of metal if sold separately from the headboard and footboard; (8) bedroom furniture in which bentwood parts predominate; (9) jewelry armories; (10) cheval mirrors; (11) certain metal parts; (12) mirrors that do not attach to, incorporate in, sit on, or hang over a dresser if they are not designed and marketed to be sold in conjunction with a dresser as part of a dresser-mirror set; (13) upholstered beds and (14) toy boxes.

*Final Results, 76 Fed. Reg. at 49,730 31* (footnotes deleted).

2   Commerce initially decided to review both Huafeng and the Dorbest Group. All review requests for the Dorbest Group were withdrawn. *Preliminary Results, 76 Fed. Reg. at 7535.* Commerce then named Dongguan Sunrise Furniture Co., Taicang Sunrise Wood Industry [**7] Co., Ltd., and Huafeng Designs (collectively "Fairmont") as additional mandatory respondents. *Id. at 7535 36.* "[A] number of interested parties withdrew their review requests, including all review requests of the mandatory respondent Fairmont." Id. Commerce rescinded the review with respect to 119 entities, including Fairmont. *Id. at 7536.* The court has previously expressed its view that the selection of one respondent does not fit well with the statutory scheme. Obviously, the all others rate does not reflect a broadly based average. Here, no party challenges the selection of one respondent as unsupported by the record or per se contrary to law.

In the Final Results, Commerce assigned Huafeng a separate rate of 41.75%.[3] *Final Results, 76 Fed. Reg. at 49,733;* see also Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China, A-570-890, POR 1/1/09 12/31/09 (Aug. 5, 2011) ("Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/prc/2011-20434-1.pdf (last visited Sept. 17, 2012). All non-mandatory respondents also received Huafeng's separate rate [**8] of 41.75%. *Final Results, 76 Fed. Reg. at 49,733.* Commerce assigned the PRC-wide entity a rate of 216.01%. Id.

3   Commerce amended the Final Results, but did not change the assigned dumping margins. *Wooden Bedroom Furniture From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 57,713, 57,713 (Dep't Commerce Sept. 16, 2011).*

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to *28 U.S.C. § 1581(c).* The court will not uphold Commerce's final determination in an AD review if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." *19 U.S.C. § 1516a(b)(1)(B)(i).*

## DISCUSSION

### I. Value of Lumber, Veneer and Plywood[4]

4   A dumping margin is the difference between the normal value ("NV") of merchandise and the price for sale in the United States. See *19 U.S.C. § 1673e(a)(1); 19 U.S.C. § 1677(35).* For merchandise exported from a non-market economy ("NME"), such as the PRC, Commerce calculates NV "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, [**9] coverings, and other expenses." *19 U.S.C. § 1677b(c)(1).* The factors of production include, but are not limited to, labor hours, raw materials, energy and other utilities, and representative capital cost, including depreciation. Id. *§ 1677b(c)(3).* Surrogate values from market economy countries are often used as a measure of these costs. See id. *§ 1677b(c)(1), (4); GPX Int'l Tire Corp. v. United States, 715 F. Supp. 2d 1337, 1347 (CIT 2010),* aff'd, *666 F.3d 732 (Fed. Cir. 2011),* reh'g granted, *678 F.3d 1308 (Fed. Cir. 2012).*

Huafeng and HMI argue that Commerce erred when it used Philippine import data contemporaneous with the period of review ("POR") instead of Huafeng's market economy purchases in order to value lumber, veneer, and plywood. HMI Br. 8; Huafeng Br. 8 28. The Government contends that Commerce's determination was proper because Huafeng's market economy purchases were not made during the POR and therefore not the "best available information." Def.'s Resp. to Pls.' *Rule 56.2* Mots. ("Def. Resp. Br.") 23. Specifically, the Government argues that Commerce, in exercising its discretion to interpret its regulations, "has developed a practice, whenever

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

possible, of using price [**10] data that are contemporaneous with the period of review . . . ." Def. Resp. Br. 23. Huafeng and HMI's claim has merit.

In determining normal value for non-market economies, Commerce must use "the best available information . . . ." *19 U.S.C. § 1677b(c)(1)(B)*. When valuing [*1317] factors purchased from a market economy supplier, Commerce's regulations stipulate that:

> [T]he Secretary normally will use the price paid to the market economy supplier. In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, the Secretary normally will value the factor using the price paid to the market economy supplier.

*19 C.F.R. § 351.408(c)(1)*. Furthermore, Commerce creates:

> . . . a rebuttable presumption that market economy input prices are the best available information for valuing an entire input when the total volume of the input purchased from all market economy sources during the period of investigation or review exceeds 33 percent of the total volume of the input purchased from all sources during the period. In these cases, unless case-specific facts provide adequate grounds to rebut the Department's presumption, the Department [**11] will use the weighted-average market economy purchase price to value the entire input.

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61,716, 61,717 18 (Dep't Commerce Oct. 19, 2006) ("Antidumping Methodologies").[5]

5  In the past, Commerce has favored contemporaneous surrogate values over non-contemporaneous market economy purchases, but it has never addressed a situation where such purchases were 100% of the actual inputs of the subject merchandise. See Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of diamond sawblades and Parts Thereof from the People's Republic of China, A-570-900 Investigation, at

75 76 (May 15, 2006), available at http://ia.ita.doc.gov/frn/summary/PRC/E6-7763-1 .pdf (last visited Sept. 17, 2012) (declining to use market economy purchases where such purchases were made prior to the period of investigation); Issues and Decision Memorandum for the Final Results of Antidumping Investigation of Automotive Replacement Glass ("ARG") Windshield from the People's Republic of China, A-570-867, Investigation, 7/1/00-12/31/00, at Cmt. 32 [**12] (Feb. 12, 2002), available at http://ia.ita.doc.gov/summary/prc/02-3383-1.t xt (last visited Sept. 17, 2012) (rejecting market economy purchases because they were either insignificant or outside the period of investigation); Issues and Decision Memorandum for the 2002-03 Antidumping Duty Administrative Review: Certain Hot-Rolled Carbon Steel Flat Products from Romania, A-485-806, Admin. Rev. 2002/03, at 25 (June 6, 2005), available at http://ia.ita.doc.gov/frn/summary/romania/E5-306 7-1.pdf (last visited Sept. 17, 2012) (declining to use pre-POR purchases as "a benchmark against which [to] measure the surrogate values in the instant review's POR"). Commerce's determinations in those proceedings were never reviewed by the court with regard to market economy purchases.

Section § 1677b "sets forth procedures in an effort to determine margins 'as accurately as possible.'" *Lasko Metal Products, Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)* (quoting *Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)*) (finding that Commerce may permissibly mix methodologies, using market purchases to value some factors and surrogates to value others). "Where we can determine [**13] that a NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law." *Lasko, 43 F.3d at 1446* (quoting Oscillating Fans and Ceiling Fans from the *People's Republic of China, 56 Fed. Reg. 55,271, 55,275 (Dep't Commerce Oct. 25, 1991)*); see *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v.* [*1318] *United States, 268 F.3d 1376, 1379, 1383 (Fed. Cir. 2001)* (agreeing with Commerce that "the actual price paid for the imports constitutes the best available information . . . ."); *Taian Ziyang Food Co. v. United States, 783 F. Supp. 2d 1292, 1330 (CIT 2011)* (finding that "product specificity" takes precedence over contemporaneity). But, Commerce also has an interest in using values that are contemporaneous with the POR because Commerce must establish the value of a factor of production for a specific time period in order to calculate the normal value of imports within that time

period as accurately as possible under *19 U.S.C. § 1677b(a)(1)(A)*. See *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 30 CIT 1173, 1177 (2006)*.

The [**14] parties agree that Huafeng made no market economy purchases of lumber during the POR. Huafeng Br. 7. Huafeng alleges that it purchased 100% of its pine, poplar, birch, elm, and oak lumber as well as its oak veneer from a market economy supplier from December 2007 to December 2008, immediately before the period of review which ran from January 2009 to December 2009. Resp. of Dalian Huafeng to the Dep't of Commerce Antidumping Request for Information ("Huafeng Resp. to Request for Information") (July 12, 2010), P.R. 338, Mem. of Points and Auths. in Supp. of *Rule 56.2* Mot. for J. on the Agency R. by Pls. Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. & Pulaski Furniture Co. and Import Svcs., Inc. & Consol. Pl. Great Rich (HK) Enters. Co., Ltd. & Dongguan Liaobushshangdun Huada Furniture Factory ("HMI App."), Tab 14, at 7, Ex. D-4. For the first time, at oral argument, AFMC and the Government contested Huafeng's allegations that 100% of relevant wood input for the subject merchandise during the POR was from these market economy purchases made during the prior calendar year. In the Preliminary Results, Commerce "did not consider market purchases made by Huafeng prior to [**15] the POR . . . ." Preliminary Analysis Memo. for Dalian Huafeng Furniture Group Co., Ltd. (Jan. 31, 2011), P.R. 472, App. to AFMC's *Rule 56.2* Br. in Supp. of Its Mot. for J. on the Agency R. ("AFMC App."), Tab 18, at 3. In lieu of Huafeng's market economy purchases, Commerce used 2009 Philippine import data. Id. In the Final Results, Commerce relied upon its "practice of using, whenever possible, price data that are contemporaneous with the period under consideration to value [Factors of Production] . . . ." Issues and Decision Memorandum 49. Commerce explained that it treats market economy purchases the same as surrogate values: Adjusted pre-POR market economy purchases or surrogate values are used to construct normal value "only when there are no acceptable contemporaneous [surrogate values] on the record . . . ." Id. Commerce pointed to the statutory directive that normal value "shall be the price . . . at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price . . . ." *19 U.S.C. § 1677b(a)(1)(A)*.

If the only wood inputs into the subject merchandise were market economy inputs, contemporaneity would not outweigh all other [**16] factors. See *Lasko, 43 F.3d at 1446*; *Shakeproof, 268 F.3d at 1382*. Commerce must look at the record. If the administrative record does not reveal whether market economy purchases were the only inputs for the relevant wood inputs, this is one fac-

tor which Commerce may weigh. Another factor is that the surrogate value data chosen by Commerce have notable flaws: 1) Commerce's Philippine Harmonized Tariff Schedule ("HTS") subheadings [*1319] 4407.10.90, 4407.99.90, and 4408.90.90[6] show a significant and unexplained increase over the market economy purchases made during the immediate prior calendar year,[7] and 2) HTS subheading 4407.90.90 is a basket category that includes lumber other than the poplar, birch, and elm used by Huafeng. Accuracy is important. Using the actual inputs, if available and where they yield reliable values, would seem to promote accuracy more than does using flawed surrogate values.

6   Philippine HTS 4407.10.90 is "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm. Coniferous Other[.]" Letter from King & [**17] Spalding to Commerce re: Submission of Publicly Available Information to Value Factors of Production (Nov. 15, 2010), P.R. 435, Ex. 2, at 234. Philippine HTS 4407.99.90 is "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm. Other: Other[.]" Id. at 236. Philippine HTS 4408.90.90 is "Sheets for veneering (including those obtained by slicing laminated wood), for plywood or for other similar laminated wood and other wood, sawn lengthwise, sliced or peeled, whether or not planed, sanded, spliced or end-jointed, of a thickness not exceeding 6 mm. Other Other[.]" Id. at 237.

7   The surrogate value applied by Commerce increased the value of Huafeng's wood input by nearly [[      ]] over Huafeng's market economy purchases from 2008. HMI Br. 20 21. AFMC has offered possible causes for this increase, but none of these were mentioned by Commerce. The AFMC's Resp. in Opp. to Pls.' *Rule 56.2* Mots. for J. on the Agency R. ("AFMC Resp. Br.") 5 n.3.

Here, Commerce did not examine Huafeng's market economy purchases and therefore made no factual determination as to whether the relevant wood inputs were from market economy purchases. [**18] Commerce also did not determine whether or not such purchases were reliable indications of normal value. Commerce did not weigh the merits of using slightly non-contemporaneous market economy purchases of actual inputs versus contemporaneous surrogate values. Instead, Commerce found that accuracy could be determined solely by examining whether or not the values were from the POR. In defense of this position, Commerce stated that "using POR and pre-POR values to

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

calculate NV may introduce distortions." Issues and Decision Memorandum 49. Yet Commerce frequently uses non-POR values for a variety of reasons. See, e.g., infra § III(A). Where two data sets are equally accurate, Commerce may prefer the contemporaneous data set over the non-contemporaneous data set. See *Shakeproof Assembly, 30 CIT at 1178-79* (finding that Commerce may prefer one surrogate value over another on the basis of contemporaneity). Commerce, however, never determined whether the two data sets were equally accurate because it explicitly declined to look at Huafeng's non-contemporaneous market economy purchases. Commerce cannot create a blanket rule that prevents it from comparing the merits of contemporaneous and non-contemporaneous [**19] data, and thereby prevents Commerce from determining the best available information.[8]

8 Huafeng and HMI argue that Commerce's regulations mandate that Commerce use non-contemporaneous market economy purchases where such purchases are the actual input for the subject merchandise even when those purchases are outside the POR. Huafeng Br. 8 11; HMI Br. 16 18. Commerce did not address the probity of Huafeng's market economy purchases. Issues and Decision Memorandum 51. Additionally, Commerce's verification of Huafeng's questionnaire responses is insufficient for the court to conclude that Commerce determined that Huafeng's market economy purchases were the actual input for the subject merchandise. See Verification at Dalian Huafeng Furniture Group Co., Ltd. ("Huafeng Verification"), P.R. 474 (Jan. 31, 2011), HMI App., Tab 16, at 35. On remand, Commerce will have the opportunity to complete its factual determinations. Thus, the court does not resolve HMI and Huafeng's claim that the statute and regulations mandate that Commerce accept their non-contemporaneous market economy purchases.

[*1320] Because Commerce relied upon contemporaneity to the exclusion of all other factors and failed to make necessary [**20] factual findings, Commerce's interpretation is not in accordance with law. The court remands this matter to Commerce to determine the wood input factor of production in accordance with the statutory or regulatory framework, as well as to make any necessary factual determinations.[9]

9 HMI argues that Commerce erred in failing to correct a ministerial error when Commerce converted the surrogate value of plywood from a volume-based price to a unit-based price. HMI Br. 30 33. Because the court remands the issue of

the value of plywood to Commerce on the aforementioned grounds, the court need not reach the issue of whether this was a ministerial error. Commerce, however, should not perpetuate an error if it exists and if it continues to use the affected data.

HMI also argues that Commerce should consider inflating Huafeng's 2008 market economy purchases to 2009 levels. HMI Br. 14 15. Commerce did not consider this issue because it did not examine Huafeng's market economy purchases. Commerce may address both issues on remand to the extent they are relevant.

**II. Surrogate Value of Poly Foam**

AFMC argues that Commerce's decision to value poly foam as a non-cellular plastic imported under the Philippine [**21] HTS heading 3920, rather than as a cellular plastic imported under HTS heading 3921, is unsupported by substantial evidence. AFMC Br. 11. AFMC's argument has merit.

Huafeng describes its poly foam as "packing material to protect goods in the containers." Huafeng Resp. to Request for Information, AFMC App., Tab 6, at Ex. D-5.[10] Initially, Huafeng classified its poly foam under HTS subheading 3904.10.00, "Poly(vinyl chloride), not mixed with any other substances[.]"[11] Asean Harmonized Tariff Nomenclature (AHTN) Book, 2010 Nomenclature ("AHTN Book"), Ch. 25 40, at 39.20 39.21, available at http://www.tariffcommission.gov.ph/AHTN Chapter39.pdf (last visited Sept. 17, 2012); AFMC Br. 5. In response to Commerce's critique that Huafeng's suggested classification was likely incorrect, Huafeng changed its categorization of poly foam to HTS subheading 3920.30.90, non-cellular "polymers of styrene."[12] Resp. of Dalian Huafeng to the Dep't of Commerce's Sept. 21, 2010 Supplemental Questionnaire ("First Supplemental Resp.") (October 12, 2010), P.R. 391, HMI App., Tab 15, at 4 5; see also AHTN Book at 39.20 39.21. Commerce asked Huafeng to explain its selection of HTS subheading 3920.30.90. Resp. [**22] of Dalian Huafeng to Questions 43-72 of the Dep't of Commerce's Oct. 25, 2010 Supplemental Questionnaire ("Second Supplemental Resp.") (Nov. 8, 2010), P.R. [*1321] 429, HMI App., Tab 17, at 2-3. Huafeng responded that the "[p]oly foam reported by Dalian Huafeng consists of polyethylene, the composition of which is shown on the [Value Added Tax ("VAT")] invoice issued by the supplier."[13] Id. at 3. Confused,[14] Commerce asked a follow up question:

Philippine HTS 3920.20 contains non-cellular polymers of propylene. Does your poly foam consist primarily of

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

non-cellular polymers of propylene? As stated in the previous response, Non-cellular poly vinyl chloride packing materials appear to be classified within HTS 3920.4x.xx. Please suggest an alternate HTS if necessary.

Id.[15] In response, Huafeng changed its categorization again and responded that "[p]oly foam reported by Dalian Huafeng consists of polythene, which should be classified under Philippine HTS 3920.10[.]90." Id. In the Final Results, Commerce classified poly foam as polyethylene, under HTS subheading 3920.10.90. Issues and Decision Memorandum 17. Commerce found that Huafeng had twice classified its poly foam as a non-cellular plastic under [**23] HTS heading 3920. Id. Commerce determined that, "Petitioners have cited to nothing on the record contradicting Huafeng's consistent statements that its poly foam should be classified under HTS categories for products consisting of non-cellular plastic." Id.

10   The parties have placed the information discussed in this section in their public briefs and appendices, despite their extensive use of the confidential administrative record. No party has objected. The court treats information placed on the public record as public.

11   Philippine HTS subheading 3904.10.00 does not exist, but HTS subheading 3904.10 fits Huafeng's description. HTS subheading 3904.10 consists of "Polymers of vinyl chloride or of other halogenated olefins, in primary forms Poly(vinyl chloride), not mixed with any other substances[.]" AHTN Book at 3904.10.

12   Philippine HTS 3920.30.90 reads in full: "Other plates, sheets, film, foil and strip, of plastics, non-cellular and not reinforced, laminated, supported or similarly combined with other materials Of polymers of stryene Other[.]" AHTN Book at 39.20 39.21.

13   The VAT invoice submitted by Huafeng showed [[ ]] Second Supplemental [**24] Resp., C.R. 157, at Ex. S-96. "Polyethylene" is "a polymer of ethylene," especially "one of a group of partially crystalline lightweight thermoplastics" with particular chemical and physical characteristics. Polyethylene, Webster's Third New Int'l Dictionary, Unabridged, Merriam-Webster (2002), available at http://unabridged.merriam-webster.com/ (last visited Sept. 17, 2012). "Polythene" is polyethylene used as a plastic. Polythene, Webster's Third New

Int'l Dictionary, Unabridged, Merriam-Webster (2002), available at http://unabridged.merriam-webster.com/ (last visited Sept. 17, 2012).

14   Commerce seems to have misread Huafeng's first response to mean Huafeng categorized poly foam under HTS subheading 3920.20.90, non-cellular "polymers of propylene." The error derived from Commerce's questionnaires, where inquiries regarding poly foam were alongside questions regarding Huafeng's other packing materials, including packing tape. See First Supplemental Resp., P.R. 391, HMI App., Tab 15, at 4 5; Second Supplemental Resp., P.R. 429, HMI App., Tab 17, at 2 3. Huafeng chose HTS subheading 3920.20.90, polymers of propylene, for its packing tape. First Supplemental Resp., P.R. 391, HMI App., [**25] Tab 15, at 5; see also Second Supplemental Resp., P.R. 429, HMI App., Tab 17, at 3.

15   "HTS 3920.4x.xx" refers to merchandise under HTS heading 3920 "Other plates, sheets, film, foil and strip, of plastics, non-cellular and not reinforced, laminated, supported or similarly combined with other materials. Of polymers of vinyl chloride[.]" AHTN Book at 39.20 39.21.

Commerce's determination relied entirely on Huafeng's "consistency" in classification. Custom and Border Protection ("CBP") Ruling NY J81106, stating that plastic foam is cellular polyethylene and should be classified under HTS subheading 3921.19, calls that classification into question. AFMC's Post Preliminary Results Surrogate Value Submission (March 7, 2011), P.R. 489, AFMC App., Tab 20, at Attach. 13. Additionally, the World Customs Organization ("WCO") Explanatory Notes state that cellular plastics include foam plastics. Id. at Attach. 14, VII 39 12. These sources support the common definition of foam in the industrial context: Foam is a "material in a lightweight cellular spongy or rigid form produced by foaming," such as "expanded plastic." Foam, Webster's Third New Int'l Dictionary, Unabridged, Merriam-Webster (2002) (emphasis [**26] added), available at [*1322] http://unabridged.merriam-webster.com/ (last visited Sept. 17, 2012).[16] Huafeng has not disputed these characterizations of poly foam in its briefs and did not appear at oral argument to answer any questions on this issue. HMI also did not brief the issue or respond to questions at oral argument on this issue. Given the evidence on the record, Commerce must do more than refer to the inconsistent statements of a respondent to unseat conventional wisdom. Although Huafeng twice chose an HTS subheading which was non-cellular, Huafeng has offered three different classifications in response to Commerce's three requests for information.[17] Huafeng's answers were

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

consistently unresponsive to Commerce's questions and in tension with a CBP Ruling and the WCO Explanatory Notes.

16    AFMC makes this argument based on an older dictionary definition of foam as "a material in a lightweight cellular form resulting from introduction of gas bubbles during manufacture." AFMC Br. 11 (citing Webster's New Collegiate Dictionary, G. & C. Merriam Co. (1977), available at http://www.merriam-webster.com/dictionary/foam).

17    Commerce's verification required an examination of Huafeng's poly foam.  [**27] Despite the back-and-forth between Huafeng and Commerce pre-dating verification, that portion of the verification report does not address poly foam. Huafeng Verification, P.R. 474, HMI App., Tab 16, at 40 41.

The Government counters that "Huafeng's responses are more specific to their own input than general dictionary definitions . . . ." Def. Resp. Br. 22. Despite Commerce's requests for Huafeng to explain its classification, no record evidence supports the Government's conclusion.[18] Additionally, Commerce's dismissal of the CBP Ruling on the basis that "the poly foam under consideration was cellular and thus [inapplicable] to Huafeng's non-cellular poly foam" fails to address AFMC's core point: Poly foam is necessarily cellular. Issues and Decision Memorandum 17. Commerce also did not address the WCO Explanatory Notes. Id. Thus, other than Huafeng's inconsistent responses, Commerce has provided no basis to believe that poly foam is ever non-cellular.

18    On brief, the Government alternates between stating that Commerce valued poly foam under HTS subheading 3920.30.90 and under 3920.10.90. See Def. Resp. Br. 20, 21. The court treats all these references as HTS subheading 3920.10.90 because  [**28] this was Commerce's final determination. See Issues and Decision Memorandum 17.

In the light of overwhelming evidence that poly foam is cellular, Huafeng's word alone does not constitute substantial evidence that its poly foam is non-cellular. Thus, Commerce's determination to value poly foam under HTS heading 3920 is unsupported by substantial evidence. The court remands the issue to Commerce so that it can apply the correct HTS subheading and derive the appropriate value therefrom.[19]

19    AFMC proposes HTS subheading 3921.19, "Other plates, sheets, film, foil and strip, of plastics Cellular Of other plastics: Plates and sheets forms[.]" AFMC Br. 7. The court expresses no opinion as to the merit of this classification.

### III. Surrogate Value of Labor

#### A. Contemporaneity of Data & Selection of Bookend Countries

AFMC argues that Commerce erred when it selected the bookend countries using 2008 gross national income ("GNI") data instead of 2009 GNI data. AFMC Br. 22. This claim has merit.

In the methodology applied here Commerce selects bookend countries, two countries with the highest and lowest GNIs of countries which are economically similar to the PRC and produce comparable merchandise,  [*1323] in order  [**29] to delineate the set of countries for wage rate calculations. Factor Valuation Memorandum (Jan. 31, 2011), App. to AFMC's Resp. Br. in Opp'n to Pls.' Mots. for J. on the Agency R. ("AFMC Resp. App."), Tab 16, at Attach. III, 1.[20] Here, Commerce identified the bookend countries from the Surrogate Country Memorandum's list of economically comparable countries.[21] Id.; Issues and Decision Memorandum 28. At the time the Surrogate Country Memorandum was drafted, only 2008 GNI data were available. Issues and Decision Memorandum 28 29. In January 2011, when Commerce identified the bookend countries, Commerce chose not to use 2009 GNI data which were also available. Commere explained that "[t]he selection of bookend countries is inextricably linked to the 2008 GNI data that was available to the Department at the time the Surrogate Country Memorandum was issued." Id. at 28 29. Commerce added that "[t]o now reselect the bookend countries based on 2009 data . . . would result in identifying one set of economically comparable countries as a starting point for purposes of our initial surrogate country selection and a different, inconsistent, set of economically comparable countries as a starting  [**30] point for purposes of our labor rate calculation." Id. at 29.

20    The Factor Valuation Memorandum was not placed on the administrative record. AFMC has put an excerpted version of the Factor Valuation Memorandum in its response appendix. No party has objected to this version.

21    When determining which countries are economically similar to China, Commerce uses per-capita GNI to identify countries at roughly the same level of economic development as China. Here, those countries were India, the Philippines, Indonesia, Ukraine, Thailand, and Peru.

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China ("Surrogate Country Memorandum") (Apr. 26, 2010), P.R. 248, at 2.

Commerce has not explained what links the selection of possible surrogate countries to the selection of the bookend countries for the purpose of wage rate calculations. Additionally, Commerce explicitly excluded surrogate wage calculations from its Surrogate Country Memorandum, P.R. 248, at 2, and considered the list of surrogate countries "non-exhaustive." Id. at 1; Factor Valuation Memorandum, AFMC Resp. App. Tab 16, at [**31] Attach. III, 1, n.3; see *Dorbest Ltd. v. United States, 755 F. Supp. 2d 1291, 1298 (CIT 2011)* ("Dorbest V") (finding that the surrogate country list was not exhaustive as it "allow[ed] for the possibility of introducing a more balanced range of countries from which to draw labor wage rate data").

Commerce did not "reselect" (nor would it have been required to "reselect") the bookend countries, as it claims, Def. Resp. Br. 29, because selection of bookend countries took place after the 2009 GNI data were available. Furthermore, Commerce has identified no impact from selecting bookend countries that differ from those listed in the Surrogate Valuation Memorandum. See *Dorbest V, 755 F. Supp. 2d at 1298* ("[T]here is no indication here that the methodology applied in Fujian Lianfu Forestry to select a primary surrogate country is similar to the methodology for determining surrogate wage rates. [*Fujian Lianfu Forestry Co., Ltd. v. United States, 638 F. Supp. 2d 1325, 1348-49 (CIT 2009)*.]"). Finally, as the prior wood input discussion indicates, Commerce clearly places a high value on using data within the POR. See supra § I; Def. Resp. Br. 23 27; Issues and Decision Memorandum 49. Here it [**32] has ignored the fact that this is POR data.

[*1324] Commerce has insufficiently explained the connection between the selection of surrogate countries and the selection of bookend countries. Absent a new and persuasive explanation, on these facts Commerce's decision to reject contemporaneous data in favor of non-contemporaneous data is unreasonable. The court remands the selection of bookend countries for redetermination or further explanation.

**B. Absolute/Relative Differences**

AFMC argues that Commerce erred when it used absolute differences in GNI rather than relative differences when selecting the range of countries considered to be economically comparable to China. AFMC Br. 27. AFMC concedes that the substantively identical issue was before the court in Dongguan Sunrise. *Dongguan*

*Sunrise Furniture Co., Ltd. v. United States, 865 F. Supp. 2d 1216, 1237-39, Slip Op. 2012-79, 2012 WL 2045753, at *12 (CIT 2012)*; see AFMC Br. 28. In Dongguan Sunrise, the court found that "[a]lthough AFMC has pointed out an alternative method for determining which countries are economically comparable that would result in a more preferable rate for AFMC, it has not shown that Commerce's methodology or the use of absolute differences is [**33] unreasonable or unsupported." *Dongguan Sunrise, 865 F. Supp. 2d 1216, 1237-39, 2012 WL 2045753, at *12*. Here, Commerce used the same methodology and explained itself in essentially the same manner. See Issues and Decision Memorandum 29. AFMC's current arguments add nothing. The court agrees with the reasoning of *Dongguan Sunrise* and sustains this aspect of the determination.

**IV. Financial Statements**

AFMC argues that Commerce should rely on the financial statements of Kirsten, Inc. ("Kirsten") and Cancio Associates, Inc. ("Cancio") to establish surrogate financial ratios because Commerce erred in finding that they had significant retail operations. AFMC Br. 18, 20. AFMC also argues that Commerce should not rely on the financial statement of Insular Rattan and Native Products Corp. ("Insular Rattan") because the financial statement does not include a line item for taxes, which is necessary to determine whether the company received tax subsidies. AFMC Br. 7 8. AFMC's argument with regard to Insular Rattan has merit although its arguments with regard to Kirsten and Cancio do not.

**A. Kirsten**

AFMC argues that Commerce erred in excluding Kirsten's financial statements on the basis that Kirsten engaged in "significant retail [**34] operations" and the examined respondent did not. AFMC Br. 20 22. Specifically, AFMC argues that the absence of evidence in Kirsten's financial statements and on Kirsten's website regarding significant retail operations casts significant doubt on Commerce's claims that third-party websites demonstrate that Kirstin engaged in significant retail operations. Id. at 20 21.

Commerce determined that Kirsten may have significant retail operations based on Kirsten's website, an online business directory entry for Kirsten, and photographs of the outside of one of Kirsten's buildings. Issues and Decision Memorandum 39. Commerce found that Kirsten's website indicated that it operated showrooms and served the local market through an entity called "CASA MUEBLES SM." Id.; AFMC's Post-Preliminary Results Surrogate Value Submission (May 7, 2011), P.R. 489, AFMC App., Tab 20, at Attach. 1-B. Commerce paired Kirsten's address from an online business directo-

ry with an online picture of that address, which appeared to [*1325] be located in a shopping mall. Issues and Decision Memorandum 39; Home Meridian Rebuttal Surrogate Value Submission (Mar. 17, 2011), P.R. 500, AFMC App., Tab 21, at Ex. 1. AFMC argues that [**35] because Kirsten's financial statements do not reference the existence of retail stores or operations, instead emphasizing manufacturing and exporting, Commerce's determination lacks substantial evidence. AFMC Br. 21. Kirsten's website, however, clearly states that the company has four showrooms.[22] Commerce also noted that there were "multiple useable financial statements" on the record from other companies for which there was no indication of any retail activity. Thus, sufficient data was available to calculate the necessary financial ratios. Issues and Decision Memorandum 39. AFMC's contention relies on the principle that the silence of Kirsten's financial statements on the existence of retail operations disproves Commerce's interpretation of various websites. Commerce permissibly interpreted the record as evidence that Kirsten likely possessed significant retail operations. Thus, Commerce's determination that Kirsten's financial statements did not constitute the "best available information" for calculating surrogate financial ratios was supported by substantial evidence.

> 22 Although, as AFMC notes, the portion of Kirsten's website indicating that they have four showrooms was not put [**36] on the record, AFMC itself included significant other portions of the same website on the record. AFMC Br. 20; AFMC's Post-Preliminary Results Surrogate Value Submission, P.R. 489, AFMC App., Tab 20, at Ex.1-B. The website in its current form echoes Commerce's factual findings. Kirsten Int'l Inc., http://www.kirsten-intl.com/pages/showrooms.ht ml (last visited Sept. 17, 2012). Additional information on the retail nature of this shopping mall exists. Whether or not the court may take judicial notice of public information readily accessible to all parties, there seems no purpose in sending back this issue for Commerce to find what it has already found. Regardless of further supportive facts external to the record, at this point the determination is sufficiently supported by the record.

## B. Cancio

AFMC argues that Commerce's exclusion of Cancio's financial statements, on the basis that Cancio had retail operations, is unsupported by substantial evidence. AFMC Br. 18. Specifically, AFMC contends that Cancio's financial statement "conclusively contradicts" Commerce's determination that the financial statements include the retail operations of CADI Showrooms. Id. at 19.

Commerce determined that [**37] expenses for CADI Showrooms were reflected in Cancio's financial statements. Issues and Decision Memorandum 43. CADI Showrooms sells Cancio's furniture and accessories to residential clients and is "managed by Cancio Associates." Id. CADI Showrooms has four main divisions: Cancio Contract, CADI Office Systems, CADI Showrooms, and Cancio Export. Id.; Home Meridian Rebuttal Surrogate Value Submission, P.R. 500, AFMC App., Tab 21, at Ex. 5, 1 2. Commerce interpreted this as evidence that the entity CADI Showrooms was a retail division covered by the financial statement. Issues and Decision Memorandum 43. Commerce supported this view with evidence of Cancio's outsized administrative rental expense (which comprised 26% of selling, general, and administrative ("SG&A") expenses) and the fact that Cancio and CADI Showrooms shared the same office address. Id. at 43 & n.117. Commerce also noted again that "there are multiple usable financial statements on the record from other companies that do not have retail operations . . . ." Id. at 43. Accordingly, it found the volume and range of information [*1326] that it used sufficient to derive the necessary financial ratios, without Cancio's information.

Commerce's [**38] decision that Cancio's financial statements did not provide the "best available information" for calculating the financial ratios was reasonable based on the information available on the record. AFMC argues that a note in Cancio's financial statements on revenue contradicts Commerce's determination. AFMC Br. 19. The note states that "[t]his account consists of gross earnings on completed contracts amounting to P28,259,932 and P46,561,119 as of December 31, 2009 and 2008, respectively." AFMC's Post-Preliminary Results Surrogate Value Submission, P.R. 489, AFMC App., Tab 20, Attach. 5-A, at 18. AFMC contends that this note indicates that Cancio's entire revenue was attributable to "completed contracts" and therefore CADI Showrooms' revenue and expenses cannot be included in the statements because retail sales cannot be contract sales. AFMC Br. 19. AFMC fails to explain why the phrase "completed contracts" is applicable only to non-retail transactions. Why cannot retail sales also be contract sales? Examples of contractual retail sales include credit card transactions, lay-away purchases, and installment plans. Additionally, "completed contract" typically refers to the completed contract [**39] accounting method[23] and has no bearing on the relationship between a subsidiary retail operation and its parent company.[24] Thus, Commerce's decision to exclude Cancio's financial statements has not been significantly undermined.

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

23   Under the completed contract accounting method, any income/expense from a long-term contract is realized only in the year that the work on the contract is completed. *Spang Indus., Inc. v. United States, 791 F.2d 906, 907 (Fed. Cir. 1986)*.

24   AFMC is correct in noting that Commerce neglected to respond to the "completed contracts" portion of AFMC's argument in its decision. AFMC Br. 19; AFMC Reply Br. in Supp. of Its *Rule 56.2* Mot. for J. on the Agency R. ("AFMC Reply Br.") 4. Contrary to AFMC's fears, however, the court does not rely on the Government's post-hoc rationalization in concluding that Commerce could exclude Cancio's financial statements. See id. at 4 5.

## C. Insular Rattan

AFMC argues that Commerce erred when it used the 2009 financial statements from Insular Rattan when calculating the surrogate financial ratios for factory overhead, SG&A expenses, and profit because Insular Rattan's financial statements fail to disclose the company's tax expense, as  [**40] required by the Philippine Accounting Standards. AFMC Br. 7 8. The parties agree that the same argument was contested in Dongguan Sunrise. AFMC Br. 17. As in the prior administrative review, Commerce defended its use of Insular Rattan's financial statements on the basis that the statements were "affirmed by the auditor to be prepared in accordance with the GAAP of the Philippines," Commerce "does not rely on income taxes in calculating financial ratios" and the record contained no evidence that Insular Rattan had received subsidies. Issues and Decision Memorandum 38; see Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China, A-570-890, POR 1/1/08 12/31/08, at 88 (Aug. 11, 2010), available at http://ia.ita.doc.gov/frn/summary/PRC/2010 20499 1.pdf (last visited Sept. 17, 2012). In Dongguan Sunrise, the court found Insular Rattan's financial statements were potentially unreliable, but that "[w]ithout further information, the court [*1327] cannot determine whether Commerce has decided unreasonably to use a dubious financial statement." *Dongguan Sunrise, 865 F. Supp. 2d at 1243, 2012 WL 2045753, at *16.*  [**41] Because the facts and arguments are identical, and the court agrees with *Dongguan Sunrise*, the court remands for reconsideration of the use of this statement or for an explanation as to why Commerce finds that Insular Rattan's financial statement is generally reliable and also unaffected by subsidies.

## V. Combination Rates

AFMC argues that Commerce abused its discretion by refusing to develop the record with necessary information regarding circumvention in order to apply combination rates, and instead by requiring AFMC to supply conclusive proof of circumvention. AFMC Br. 29 32. AFMC relies on CBP data in the form of two sets of entry documents with sequential numbering from two different companies, and data that shows that the vast bulk of the entries were from the company with the lower rate, to argue that Commerce cannot decline to investigate in light of such prima facia evidence of circumvention.[25] AFMC Br. 33 38.[26] Because AFMC's evidence is not "speculative", as claimed by Commerce, and there also appears to be issue with AD circumvention with respect to WBF largely due to the large number of exporters involved and the widely varying rates applicable to the exporters, Commerce  [**42] must investigate and decide whether combination rates are appropriate in the context of this subject merchandise.

25   AFMC points to two entry numbers, [[ ]] Proprietary Information Relating to the July 11, 2011 Issues and Decision Memorandum (Aug. 5, 2011), C.R. INT_021493, at 2 3. This type of behavior is not speculative.

26   AFMC has once again placed an article from Furniture Today on the record as evidence that Commerce should have used combination rates. AFMC Br. 28. The court has repeatedly rejected this article as insufficient proof to require Commerce to apply combination rates. See *Dongguan Sunrise, 865 F. Supp. 2d at 1252, 2012 WL 2045753, at *24*; *Lifestyle Enter., Inc. v. United States, 768 F. Supp. 2d 1286, 1313-14 (CIT 2011)*. Commerce may choose to consider the article as somewhat supportive, even if it is insufficient by itself.

It is a truism that "[t]he application of combination rates is left to the discretion of Commerce." *Dongguan Sunrise, 865 F. Supp. 2d at 1252, 2012 WL 2045753, at *24* (citing *19 C.F.R. § 351.107(b)(1)*); *Tung Mung Dev. Co. v. United States, 354 F.3d 1371, 1381 (Fed. Cir. 2004)*. As the court has cautioned, however, "[a]n agency's failure to collect pertinent  [**43] data . . . in some situations may constitute an abuse of discretion." *Dongguan Sunrise, 865 F. Supp. at 1252, 2012 WL 2045753, at *24* (citing *U.S. Steel Grp. v. United States, 18 CIT 1190, 1202, 873 F. Supp. 673, 687 (1994)*, aff'd *96 F.3d 1352 (Fed. Cir. 1996))*.

Here, Commerce asserts that "the application of combination rates would be too large of an administrative burden to be practicable,"[27] the facts in the instant case do not match with the facts from a prior instance

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

where Commerce imposed combination rates,[28] and "there is no record [*1328] evidence concerning specific producer/exporters shifting their exports from high-margin to low-margin exporters." Issues and Decision Memorandum 26.

27   Commerce's argument that applying combination rates would be a large administrative burden is irrelevant if Commerce's inaction permits circumvention of AD law in contravention of the AD statute. See *Lifestyle Enter., 768 F. Supp. 2d at 1314, 2012 WL 2045753, at *25*. Also, Commerce has not explained precisely why this is such a burden.

28   Commerce's duty to use combination rates or otherwise prevent circumvention of AD law has nothing to do with whether or not the facts of the instant case correspond with the facts in Pistachios from Iran. See Issues [**44] and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain In-Shell Raw Pistachios from Iran, A-507-502, ADR: 07/01/02-06/30/02 (Feb. 7, 2005) at 16, available at http://ia.ita.doc.gov/frn/summary/iran/E5-596-1.p df (last visited Sept. 17, 2012); see also Import Administration Policy Bulletin 03.2: Combination Rates in New Shipper Reviews (Mar. 3, 2004), available at http://ia.ita.doc.gov/policy/bull03-2.html (last visited Sept. 17, 2012) (outlining the policies for implementation of combination rates where the system is being circumvented). Furthermore, Commerce considered four factors in that review and it is unclear if Commerce considered these factors or otherwise investigated AFMC's allegations of circumvention.

These reasons are all unsupportive of Commerce's decision either because they are not explained or simply do not agree with the evidence of record. Because Commerce failed to investigate clearly raised allegations as to the circumvention of AD law in this administrative review of WBF, which was supported by apparently reliable record evidence, Commerce abrogated its duty to ensure that exporters and producers do not [**45] circumvent AD law. In Donguan Sunrise, the court noted that:

The broader issue is whether Commerce should in its short form questionnaire, which focuses on whether a respondent is to get a rate other than that of the PRC-entity, ask about shipments of subject merchandise for or by another company. Apparently this type of inquiry

was included previously. The court is concerned that Commerce's answer that it cannot act because it has no circumvention data and the fact that it does not ask for the data creates a familiar geometric object. The court declines to order a new investigation here because AFMC's evidence of circumvention is largely based on its own client's general statements to a magazine. This is a troubling area, however, and Commerce should be prepared to alter its investigation techniques or explain its actions carefully in the future. It is also not a satisfactory answer that Commerce does attend to these problems in new shipper reviews.

*Dongguan Sunrise, 865 F. Supp. 2d at 1253, 2012 WL 2045753, at *25*. Commerce argues that this case is just like Dongguan Sunrise, but, in fact, the companies at issue were treated differently. Unlike in *Dongguan Sunrise,* here Commerce did not apply the 216.01% [**46] PRC-wide rate to the company accused of routing other companies' sales through its low AD rate.[29] Additionally, in Dongguan Sunrise, "Commerce examined and verified the sales of Nanjing Nanmu and determined that the sales were actually from Nanjing Nanmu." *Dongguan Sunrise, 865 F. Supp. 2d at 1252, 2012 WL 2045753, at *24*. Commerce also found that the increase in Aosen's shipments through lower-rate companies could be attributed to legitimate business reasons. Id. Commerce made no such efforts or findings in the instant case except to state in a blanket manner that "in instances where companies may be improperly misreporting their entries to CBP, such instances will be reported to CBP for proper action under that agency's fraud provisions." Issues and Decision Memorandum 26. It is unclear whether Commerce in fact reported such instances CBP and, if they were reported, what actions were taken.

29   [[

]]

Accusations and evidence of circumvention date back to the third administrative review of WBF, indicating an issue that seems particular to the subject merchandise at issue in the instant case. Such [*1329] behavior may be a byproduct of the complex network of hundreds of [**47] Chinese exporters and producers, which may necessitate greater investigation and oversight of WBF than other subject merchandise. Because Commerce did not collect data relating to the circumvention of AD law or otherwise explain why such data were unnecessary in this case to prevent circumvention, Commerce likely abused its discretion to apply anti-

Case: 14-1251 CASE PARTICIPANTS ONLY Document: 46 Page: 86 Filed: 03/24/2014

Page 13

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

dumping duty remedies itself. Thus, the issue of combination rates is remanded to Commerce to investigate and decide whether combination rates are appropriate.

## VI. Zeroing[30]

> 30    "Zeroing is the practice whereby the values of positive dumping margins are used in calculating the overall margin, but negative dumping margins are included in the sum of margins as zeroes." *JTEKT, 642 F.3d. at 1383* (citing *Dongbu, 635 F.3d at 1366*).

HMI asks the court to remand the issue of zeroing so that Commerce may comply with the Federal Circuit's holdings in *Dongbu Steel Co. v. United States, 635 F.3d 1363, 1366 (Fed. Cir. 2011)* and *JTEKT Corp. v. United States, 642 F.3d 1378, 1383-84 (Fed. Cir. 2011)*; HMI Br. 23. Because this issue was not raised in the brief at the agency level, the court first addresses administrative exhaustion before reaching the merits.

## A.    [**48] Administrative Exhaustion

The Government argues that the issue of zeroing should not be remanded because HMI failed to exhaust its administrative remedies. Def. Resp. Br. 38. HMI counters that invoking administrative remedies with respect to zeroing would have been futile and the court therefore should excuse HMI's failure to exhaust administrative remedies. HMI Br. 28 29.

The court "shall, where appropriate, require the exhaustion of administrative remedies." *28 U.S.C. § 2637(d)*. Exhaustion may be waived in certain circumstances, including where unexpected legal developments arise or a challenge to agency action would have appeared futile. *Gerber Food (Yunnan) Co. v. United States, 601 F. Supp. 2d 1370, 1377 (CIT 2009)* (discussing situations where waiver of the exhaustion requirement is appropriate); see *Budd Co., Wheel & Brake Div. v. United States, 15 CIT 446, 452, n.2, 773 F. Supp. 1549, 1555 n.2 (1991)*. The futility exception requires a party to demonstrate that it would have been "required to go through obviously useless motions in order to preserve [its] rights." *Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007)* (quoting *Walsh v. United States, 151 Ct. Cl. 507, 511 (1960))*.

The    [**49] parties agree that HMI did not challenge Commerce's use of zeroing in administrative reviews in its administrative case brief. HMI Br. 23; Def. Resp. Br. 9. Nine days after HMI submitted its administrative case brief, the Federal Circuit announced a decision requiring Commerce to explain or abandon its inconsistent use of zeroing in administrative reviews but not in investigations. See *Dongbu, 635 F.3d at 1373*;

HMI Br. 25 26; Def. Resp. Br. 9. Following Dongbu, HMI attempted to raise the issue of zeroing on two occasions before Commerce issued its final results. See infra n. 30.

"Both Dongbu and JTEKT came as a surprise to many because a long-line of cases seemed to allow Commerce great discretion in making the [zeroing] calculation at issue." *Union Steel v. United States, 823 F. Supp. 2d 1346, 1348 (CIT 2012)*, appeal docketed, Appeal No. 2012-1248 (Fed. Cir. 2012). Considering the numerous past decisions affirming Commerce's use of zeroing in administrative [*1330]    reviews, see *id. at 1350-52*, HMI correctly believed that challenging Commerce's use of zeroing would have been futile. Moreover, the same day that Dongbu was issued, HMI promptly sent a letter notifying Commerce of the recent decision [**50] and indicated its intent to challenge the continued use of zeroing in administrative reviews.[31] Thus, in the instant case, HMI's failure to exhaust administrative remedies with respect to zeroing is excused due to 1) an unexpected legal development, 2) a challenge to Commerce's use of zeroing in administrative reviews as a practical matter appeared futile prior to Dongbu, and 3) HMI acted promptly in attempting to rectify its understandable failure to exhaust once Dongbu was issued.

> 31    Plaintiffs sent notices of the intervening Federal Circuit decision to Commerce on March 31, 2011 (the same day Dongbu was published) and June 6, 2011. See Letter from Arent Fox to Commerce re: Notice of Intervening CAFC Decision (June 6, 2011), P.R. 541; Letter from Commerce to Mowry & Grimson re: Untimely Written Argument in March 31, 2011, Letter (Apr. 5, 2011), P.R. Doc. 527, HMI App., Tab 12, at 1; see also HMI Br. 26. Commerce rejected these submissions as untimely. Letter from Commerce to Mowry & Grimson re: Untimely Written Argument in March 31, 2011, Letter (Apr. 5, 2011), P.R. Doc. 527, HMI App., Tab 12, at 1; Letter from Commerce to Arent Fox re: Untimely Written Argument in June 6, 2011, Letter    [**51] (June 6, 2011), P.R. 542, HMI App., Tab 13, at 1; see also HMI Br. 25 26.

The Government and AFMC's view that nothing prevented HMI from raising the issue in its administrative case brief is too narrow on these facts. See Def. Resp. Br. 41 42; AFMC Resp. Br. 17. Defendants argue that "[t]he mere fact that an adverse decision may have been likely does not excuse a party from satisfying statutory or regulatory requirements to exhaust administrative remedies." *Tianjin Magnesium Int'l Co. v. United States, 722 F. Supp. 2d 1322, 1330 (CIT 2010)* (citations omitted); see also Def. Resp. Br. 42. Defendants seem

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

merely to argue that because a subsequent case questioned the validity of Commerce's zeroing, it was not futile for HMI to make its argument to Commerce. That the law seemed to change due to a judicial opinion, however, is at the core of the recognized exceptions to the exhaustion requirement. *Gerber Food, 601 F. Supp. 2d at 1377.* The Federal Circuit's decisions in Dongbu and JTEKT made a challenge to Commerce's use of zeroing tenable, in so far as those decisions required Commerce to provide an explanation for its differing use of zeroing in ongoing administrative reviews but not in [**52] new investigations.[32] Thus, for a variety of reasons HMI's failure to exhaust administrative remedies with respect to zeroing is excused.

    32   The Government and AFMC also argue that the court has already expressly rejected the futility exception in a similar situation. *Fuwei Films (Shandong) Co. v. United States, 791 F. Supp. 2d 1381, 1384-85 (CIT 2011)*; see also Def. Resp. Br. 42; AFMC Resp. Br. 16. In Fuwei Films, the plaintiff moved to amend its complaint to challenge Commerce's use of zeroing after Dongbu was issued. The court held that the futility exception was inapplicable because "[t]here was nothing preventing Fuwei from asserting its rights at the administrative level." *Id. at 1385.* In Fuwei Films, the court noted that had plaintiffs asserted its rights with vigor by, for example, submitting a letter to Commerce challenging the use of zeroing as "an unreasonable interpretation of the dumping statute," Fuwei would have "created a record suitable for judicial review." Id. In the present case, HMI promptly submitted two letters to Commerce, indicating its intent to challenge Commerce's use of zeroing in the wake of Dongbu. HMI Br. 25 26. The facts of the present case suggest waiver [**53] of exhaustion is not inappropriate here.

**B. Commerce's Explanation**

    Having determined that the zeroing issue is properly before the court, HMI [*1331] argues that the issue should be remanded to Commerce to calculate Huafeng's dumping margin without zeroing. HMI Br. 24 25. Dongbu, however, merely requires Commerce to provide a reasonable justification for its inconsistent use of zeroing.[33] *Dongbu, 635 F.3d at 1373*; see also *JTEKT, 642 F.3d at 1384-85* ("In order to satisfy the requirement set out in Dongbu, Commerce must explain why . . . [it is] reasonable to continue zeroing in one phase, but not the other."). Because Commerce's use of zeroing was not challenged until after the briefing had concluded and Commerce declined to accept "untimely" arguments, Commerce in this administrative review provided no

justification. This is very similar to the situation in *Dongbu.* As this matter is remanded on other grounds, this issue is also remanded to Commerce to provide an explanation for its differing use of zeroing in administrative reviews and investigations.

    33   Several challenges to Commerce's continued use of zeroing in administrative reviews have been stayed pending the Federal Circuit's decision [**54] in Union Steel (Fed. Cir. No. 2012-1248). See *JTEKT Corp. v. United States, Slip Op. 2012-72, 2012 Ct. Intl. Trade Lexis 73, 2012 WL 2000993 (CIT June 4, 2012)*; *JTEKT Corp. v. United States, Slip Op. 2012-73, 2012 Ct. Intl. Trade LEXIS 74, 2012 WL 2001379 (CIT June 4, 2012)*; *NTN Bearing Corp. of Am. v. United States, Slip Op. 2012-75, 2012 Ct. Intl. Trade LEXIS 78, 2012 WL 1999645 (CIT June 4, 2012)*; *SKF USA Inc. v. United States, Slip Op. 2012-74, 2012 Ct. Intl. Trade LEXIS 75, 2012 WL 1999685 (CIT June 4, 2012)*; *NSK Corp. v. United States, Slip Op. 2012-76, 2012 Ct. Intl. Trade LEXIS 76, 2012 WL 1999641 (CIT June 4, 2012)*; *NSK Bearings Eur., Ltd. v. United States, Slip Op. 2012-77, 2012 Ct. Intl. Trade LEXIS 77, 2012 WL 2001745 (CIT June 4, 2012)*. The court explained its rationale for granting stays on the zeroing issue:

    In summary, the pending litigation in the Court of Appeals is likely to affect the disposition of plaintiffs' claim challenging [Commerce's] zeroing practice. While the case at bar concerns a different antidumping duty order and administrative review than are involved in Union Steel, both cases raise the same general issue of whether the Department's application of the zeroing methodology in an administrative review of an antidumping duty order is lawful. A stay, therefore, will serve the interest of judicial economy and conserve the resources of [**55] the parties. Moreover, defendant and defendant-intervenor have failed to show, or even allege, that the proposed stay would cause them harm.

*NSK Corp, Slip Op. 2012-76, 2012 Ct. Intl. Trade LEXIS 76, 2012 WL 1999641, at *1.* No party to

Case: 14-1251 CASE PARTICIPANTS ONLY Document: 47 Page: 88 Filed: 03/24/2014

Page 15

865 F. Supp. 2d 1311, *; 34 Int'l Trade Rep. (BNA) 2044;
2012 Ct. Intl. Trade LEXIS 122, **; SLIP OP. 2012-120

this case has requested a stay. Moreover, several unrelated issues within this case are remanded. Thus, the interests of orderliness and judicial efficiency weigh in favor of granting a remand on the zeroing issue as well. In addition, later explanations, not present here, supporting zeroing in reviews have been upheld. See *Union Steel, 823 F. Supp. 2d at 1346*; *Far Eastern New Century Corp v. United States., 867 F. Supp. 2d 1309, Slip Op. 2012-110, 2012 Ct. Intl. Trade LEXIS 112, 2012 WL 3715105, at *2 (CIT 2012)*; *Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 853 F. Supp. 2d 1352, Slip Op. 2012-100, 2012 Ct. Intl. Trade LEXIS 102, 2012 WL 3104900, at *6 (CIT 2012)*.

## VII. Separate Rates of Other Respondents

AFMC argues that if Huafeng's separate-rate dumping margin is increased, Commerce should adjust the weighted-average separate-rate of the other respondents, which were calculated based on Huafeng's rate. AFMC Br. 38. The Government argues that only those respondents subject to an injunction of liquidation (Nanhai Baiyi,[34] Great Rich (HK) Enterprise Co., Ltd., Dongguan [**56] Liaobushangdun, and Huafeng) may have their rates adjusted based on any changes to Huafeng's rates. Def. Resp. Br. 38; Pls. Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. & Pulaski Furniture Co. & Import Svcs., Inc. & Consol. [*1332] Pl. Great Rich (HK) Enterprises Co., Ltd. & Dongguan Liaobushangdun Huada Furniture Factory Reply Br. in Supp. of *Rule 56.2* Mot. for J. upon the Agency R. 14. The court agrees with the reasoning in *Dongguan Sunrise* that the Government's argument has merit. *Dongguan Sunrise, 865 F. Supp. 2d at 1253, 2012 WL 2045753, at *25*. Pursuant to the statutory scheme the way to obtain a change in final assessment rates when a court decision is not in agreement with the Commerce determination is to have liquidation of relevant entries enjoined. See *19 U.S.C. § 1673b(c), (e)*. Domestic parties, just as respondents, may have liquidation of entries enjoined. *Zenith Radio Corp. v. United States, 710 F.2d 806, 811-12 (Fed. Cir. 1983)*. Thus, AFMC could have preserved this relief. AFMC has not sought this relief. Accordingly, its request is denied.[35]

34 Nanhai Baiyi argues that should Commerce recalculate Huafeng's rate, Commerce should also recalculate Nanhai Baiyi's dumping margin. Nanhai Baiyi [**57] Br. 7 8. No party claims otherwise. Because Nanhai Baiyi was subject to suspension of liquidation, Commerce should recalculate Nanhai Baiyi's rate to reflect any changes to Huafeng's rate.

35 What action Commerce may take on deposit rates when assessment rates are not changed is not an issue that has been briefed adequately before the court and the court expresses no opinion on it.

## CONCLUSION

For the foregoing reasons, the court remands the matter for Commerce to reconsider or explain whether a surrogate value or market economy purchases constitute the best available information for certain wood inputs, apply the correct HTS sub-heading for poly foam, reconsider or explain its reliance on 2008 GNI data for labor wage rate calculations, reconsider or explain why Insular Rattan's financial statement is generally reliable and usable, obtain the necessary information to decide whether combination rates are appropriate, and provide the required explanation of its zeroing practice. If Commerce calculates a different separate rate for Huafeng, Commerce shall make appropriate adjustment for assessment purposes to the separate rates of the parties before the court in this litigation. Commerce's [**58] determination is sustained in all other respects.

As further investigation is ordered, Commerce shall file its remand determination with the court within 120 days of this date. The parties shall have 30 days thereafter to file objections, and the Government will have 15 days thereafter to file its response.

/s/ Jane A. Restani

Jane A. Restani

Judge

Dated: This 19th day of September, 2012

New York, New York

*HOME MERIDIAN INTERNATIONAL V. US*                    PUBLIC
**CAFC Appeal No. 2014-1251**

## CERTIFICATE OF SERVICE

This is to certify that on this 24th day of March 2014, I have caused a copy of the foregoing **NON-CONFIDENTIAL BRIEF OF DEFENDANTS-APPELLANTS** to be served upon the following parties via the method indicated below:

<u>**VIA CM/ECF:**</u>

Kristin Heim Mowry
**Mowry & Grimson, PLLC**
Suite 810
5335 Wisconsin Avenue, N.W.
Washington, DC 20015
khm@mowrygrimson.com

Bruce M. Mitchell
**Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP**
25th Floor
399 Park Avenue
New York, NY 10022
bmitchell@gdlsk.com

Lizbeth Robin Levinson
Kutak Rock
Suite 1000
1101 Connecticut Ave., N.W.
Washington, DC 22205
liz.levinson@kutakrock.com

Stephen Carl Tosini
**U.S. Department of Justice**
Commercial Litigation Branch, Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
stephen.tosini@usdoj.gov

*/s/ Joseph W. Dorn*
Joseph W. Dorn
**KING & SPALDING LLP**
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 737-0500

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii), this brief includes 10,056 words.

This brief has been prepared in Microsoft Office Word 2003 using a proportionally spaced typeface (14 point Times New Roman font). In preparing this certificate, the undersigned has relied upon the word count feature of this word-processing system as permitted by Fed. R. App. P. 32(a)(7)(C)(i).

*/s/ Joseph W. Dorn*
Joseph W. Dorn
J. Michael Taylor
Mark T. Wasden
KING & SPALDING LLP

Counsel for Defendants-Appellees
American Furniture Manufacturers
Committee for Legal Trade and Vaughan-
Bassett Furniture Company, Inc.

Dated: March 24, 2014