CORRECTED

NONCONFIDENTIAL

2014-1251

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
_____

HOME MERIDIAN INTERNATIONAL, INC., DBA Samuel Lawrence Furniture Co., DBA Pulaski Furniture Company, GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., DALIAN HUAFENG FURNITURE GROUP CO., LTD.,

Plaintiffs – Appellees,

v.

UNITED STATES

Defendant,

v.

AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE, VAUGHAN-BASSETT FURNITURE COMPANY, INC.,

Defendants – Appellants.
_____

Appeal from the United States Court of International Trade in consolidated case no. 11-00325, Judge Jane A. Restani
_____

**RESPONSE BRIEF OF PLAINTIFFS-APPELLEES HOME MERIDIAN INTERNATIONAL, INC., DBA SAMUEL LAWRENCE FURNITURE CO., AND PULASKI FURNITURE COMPANY; GREAT RICH (HK) ENTERPRISES CO., LTD. AND DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY**
_____

June 6, 2014

Kristin H. Mowry
Jeffrey S. Grimson
Jill A. Cramer
Sarah M. Wyss
Daniel R. Wilson*
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel for Home Meridian International,
Inc., DBA Samuel Lawrence Furniture Co.,
Pulaski Furniture Company; and Great
Rich (HK) Enterprises Co., Ltd. and
Dongguan Liaobushangdun Huada
Furniture Factory*
*Admitted only in Maryland. Practice
directly supervised by principals of the firm
admitted to the D.C. Bar

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
## HOME MERIDIAN INTERNATIONAL v. US
## No. 14-1251

## AMENDED CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees Home Meridian International, Inc. d/b/a Samuel Lawrence Furniture Co. and Pulaski Furniture Company; and Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory. certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

Home Meridian International, Inc. d/b/a Samuel Lawrence Furniture Co. and Pulaski Furniture Company; and Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
Home Meridian International, Inc.; and Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory are the real parties in interest.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
Mowry & Grimson, PLLC (Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer, Susan Lehman Brooks, Sarah M. Wyss, Rebecca M. Janz, Daniel Wilson).

June 6, 2014                    /s/ Kristin H. Mowry
Date                           Signature of counsel

                                    Kristin H. Mowry
                               Printed      name      of      counsel

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF RELATED CASES ............................................. 1

STATEMENT OF ISSUES ............................................................ 1

STATEMENT OF THE CASE AND FACTS RELEVANT TO THE
    ISSUES ..................................................................................... 4

SUMMARY OF ARGUMENT ...................................................... 9

ARGUMENT ................................................................................ 11

I.    Standard of Review.................................................................. 11

II.   Commerce Erred in Rejecting Huafeng's ME Purchases Because
    They Were Not Purchased During the POR........................... 15

  A.  There Is No Requirement That ME Purchases Be Made During
     the POR............................................................................... 16

  B.  Case Law Does Not Dictate the Outcome in the Final Results............... 22

  C.  Prior Commerce Cases Do Not Dictate the Outcome Here .................... 25

III.  Huafeng's ME Purchase Data Were Reliable ......................... 31

  A.  The Record Evidence Does Not Support Commerce's Finding
     That ME Purchases Were Not Consumed During the POR.................... 31

    1.   There Is No Question That 100 Percent of the Plywood and Oak
       Veneer Huafeng Used in Production During the POR Were Sourced
       From a ME Supplier........................................................ 34

    2.   Commerce's Rejection of Huafeng's ME Purchases Lacked
       Substantial Evidence...................................................... 35

  B.  Commerce Could Not Reasonably Question the Accuracy of the ME
     Purchases Data..................................................................... 40

  C.  Commerce's Attempt to Justify Rejection of the ME Purchase Data
     Based on a Comparison to the 2008 Respondent Utterly Fails............... 41

  D.  Huafeng Gave Legitimate Reasons for Purchasing ME Inputs Prior to
     the POR............................................................................... 45

IV.  The CIT Gave Proper Deference to Commerce ..................... 47

V.   Commerce's Determination That Surrogate Values Were the Best
    Available Information Was Not Supported by Substantial Evidence
    or in Accordance with Law ................................................... 52

A.    Commerce Did Not Adequately Explain Why the HTS Data Are Significantly Higher Than ME Purchases ..................................... 55

B.    The HTS Classifications Are Overly Broad And Inaccurate ........ 58

VI.    The AFMC Has Provided No Valid Reason for Ignoring the Second Remand ................................................................................................ 60

CONCLUSION ............................................................................................ 62

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rule 28(d)(1)(B), confidential business proprietary information has been deleted from this non-confidential brief. The deleted information was designated as confidential business proprietary information by Dalian Huafeng Furniture Group Co., Ltd. in submissions to the U.S. Department of Commerce and the Court of International Trade and by the American Furniture Committee for Legal Trade et al. as subject to confidential treatment based on submissions for which a respondent claimed proprietary treatment during the course of a prior administrative proceeding before the U.S. Department of Commerce. The confidential business proprietary information that has been redacted on pages 3, 5, 37-38, 40, 42-46, 55-58 concerns information relating to Huafeng's production process. The confidential business proprietary information that has been deleted on pages 42-45 concerns information from past proceedings designated by the American Furniture Committee for Legal Trade et al. as subject to confidential treatment based on submissions for which a respondent claimed proprietary treatment during the course of a prior administrative proceeding.

# TABLE OF AUTHORITIES

## Cases

Agro Dutch Indus., Ltd. v. United States, 508 F.3d 1024 (Fed. Cir. 2007) ............14

Auer v. Robbins, 519 U.S. 452 (1997) ....................................................14

Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984)...............................14

Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197 (1938)...................................14

Globe Metallurcial, Inc. v. United States, 33 CIT 435 (Ct. Int'l Trade 2009) ........23

Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,
    28 CIT 1185 (Ct. Int'l Trade 2004) ....................................24

Home Meridian Int'l, Inc. v. United States,
    865 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) ............................... passim

Home Meridian Int'l, Inc. v. United States,
    922 F. Supp. 2d 1366 (Ct. Int'l Trade 2013) ............................... passim

Home Meridian Int'l, Inc. v. United States,
    925 F. Supp. 2d 1377 (Ct. Int'l Trade 2013) .......................................... 9, 37, 51

Home Meridian Int'l, Inc. v. United States,
    No. 11-00325, 2013 Ct. Int'l Trade LEXIS 144 (Ct. Int'l Trade 2013)................9

Home Meridian Int'l, Inc. v. United States,
    No. 11-325, slip op. 13-81 (Ct. Int'l Trade Aug. 7, 2013) ....................................3

Jinan Yipin Corp. v. United States, 637 F. Supp. 2d 1183
    (Ct. Int'l Trade 2009)........................................................52

Lasko Metal Prods. v. United States, 43 F.3d 1442 (Fed. Cir. 1994)........... 3, 17, 52

Mid Continent Nail Corp. v. United States, 725 F.3d 1295 (Fed. Cir. 2013) .........11

Motor Vehicle Mfr.'s Ass'n v. State Farm Mutual Auto. Ins. Co.,
    463 U.S. 29 (1983)..............................................................33

iii

Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003)...................13

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006)...................12

NSK Corp. v. United States, 716 F.3d 1352 (Fed. Cir. 2013),
    cert denied, 572 U.S. ____ (2014) ............................................... 11, 12

QVD Food Co., Ltd. v. United States, 721 F. Supp. 2d 1311
    (Ct. Int'l Trade 2010)........................................................................28

Royal Thai Gov't v. United States, 436 F. 3d. 1330 (Fed. Cir. 2006)...................12

Shakeproof Assembly Components v. United States,
    30 CIT 1173 (Ct. Int'l Trade 2006) ........................................... 22, 23

Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v.
    United States, 268 F.3d 1376 (Fed. Cir. 2001)........................ 2, 17, 52

Sichuan Changhong Electric Co. v. United States,
    460 F. Supp. 2d 1338 (Ct. Int'l Trade 2006) .....................................29

Since Hardware (Guangzhou) Co. v. United States,
    2010 Ct. Intl. Trade LEXIS 119 (Ct. Int'l Trade Sept. 27, 2010) .....................21

Suramerica De Aleaciones Laminadas, C.A. v. United States,
    44 F.3d 978 (Fed. Cir. 1994)..............................................................12

Yantai Oriental Juice Co. v. United States,
    26 CIT 605 (Ct. Int'l Trade 2002) ........................................... 24, 25

Zhejiang Dunan Hetian Metal Co. v. United States,
    652 F.3d 1333 (Fed. Cir. 2011) .........................................................13

**Statutes**

19 U.S.C. § 1677b..................................................................................52

19 U.S.C. § 1677b(a)(1)(A) ...................................................................17

19 U.S.C. § 1677b(c)(1)..........................................................................16

## Other Administrative Authorities

Antidumping Methodologies: Market Economy Inputs, Expected
 Non-Market Economy Wages, Duty Drawback; and Request for
 Comments, 71 Fed. Reg. 61,716 (Dep't Commerce Oct. 19, 2006) ...... 15, 20, 21

Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:
 Final Results of the Antidumping Admin. Review and New Shipper Review,
 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009).....................................28

Certain Helical Spring Washers From the People's Republic of China;
 Final Results of Antidumping Duty Administrative Review,
 65 Fed. Reg. 31,143 (Dep't Commerce May 16, 2000) ....................................53

Certain Non-Frozen Apple Juice Concentrate From the People's
 Republic of China: Final Results of New Shipper Review,
 68 Fed. Reg. 71,065 (Dep't Commerce Dec. 22, 2003).....................................30

Certain Steel Threaded Rod From the People's Republic of China:
 Final Results and Final Partial Rescission of Antidumping Duty
 Administrative Review, 76 Fed. Reg. 68,400
 (Dep't Commerce Nov. 4, 2011) ..........................................................................20

Final Determination of Sales at Less than Fair Value and Final Partial
 Affirmative Determination of Critical Circumstances: Diamond
 Sawblades and Parts Thereof from the People's Republic of China,
 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) ............................... 25, 27

Final Determination of Sales at Less Than Fair Value: Certain
 Automotive Replacement Glass Windshields From The People's
 Republic of China, 67 Fed. Reg. 6,482 (Dep't Commerce Feb. 12, 2002).........26

Final Determination of Sales at Less Than Fair Value: Certain Automotive
 Replacement Glass Windshields From The People's Republic of China,
 67 Fed. Reg. 6,482 (Dep't Commerce Feb. 12, 2002)........................................26

Notice of Final Determination of Sales at Less Than Fair Value and
 Negative Final Determination of Critical Circumstances:
 Certain Color Television Receivers From the People's Republic
 of China, 69 Fed. Reg. 20,594 (Dep't Commerce Apr. 16, 2004) ......................29

Notice of Preliminary Determination of Sales at Less Than Fair Value:
  Certain Automotive Replacement Glass Windshields From the
  People's Republic of China, 66 Fed. Reg. 48,233
  (Dep't Commerce Sept. 19, 2001) .......................................................................26

Oscillating Fans and Ceiling Fans from the People's Republic of China: Final
  Determination, 56 Fed. Reg. 55,271 (Dep't Commerce Oct. 25, 1991)..............53

Wooden Bedroom Furniture From the People's Republic of China: Final Results
  and Final Rescission in Part, 76 Fed. Reg. 49,729
  (Dep't Commerce Aug. 11, 2011) .........................................................................6

## Regulations

19 C.F.R. § 351.408(c)(1) ............................................................................... 18, 19

19 C.F.R. § 351.414(f)(2), (3)..............................................................................28

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees Home Meridian International, Inc. d/b/a Samuel Lawrence Furniture Co. and Pulaski Furniture Company; and Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory (collectively "Home Meridian et al.") state that no other appeal in or from the same civil action was previously before the U.S. Court of Appeals for the Federal Circuit or any other appellate court. No other appeal is pending in this or any other court that will directly affect this Court's decision on appeal.

## STATEMENT OF ISSUES[1]

Whether the Department of Commerce ("Commerce") has unbounded discretion to place extra-statutory requirements that reject the actual market economy costs of inputs used by a Chinese manufacturer in an unusual and extreme case where (1) the Chinese company purchased zero or minimal amounts of these inputs within China, (2) the Chinese company stated during the original proceeding that the product exported to the United States solely incorporated these same market inputs (a claim not contested by Appellants until the appeal before the U.S. Court of International Trade ("CIT")) and (3) the inputs in question,

---

[1] Pursuant to Fed. R. App. P. 28(b) and Fed. Cir. R. 28(b) Home Meridian et al. omit the jurisdictional statement but include the other required statements and information set forth in Fed. R. App. P. 28(b) because they are not satisfied with appellant's statement.

consisting of plywood and several other veneer and lumber materials, constituted the overwhelming percentage of the cost to make the wooden bedroom furniture at issue?

Answer:   No.   Commerce does not have unfettered discretion to categorically exclude data from even consideration as "best information available" based on requirements not codified in the antidumping statute or in Commerce's own regulations.   As demonstrated herein, Commerce erred in the Final Results and the First Remand Redetermination.   The court below was correct in twice remanding the case and in affirming the Second Remand Redetermination where Commerce finally and correctly used the Chinese producer's market inputs, resulting in a reduction of the antidumping margin from 41.75 percent to 11.79 percent.

The overarching statutory objective in antidumping cases is to calculate margins as accurately as possible.  See Shakeproof Assembly v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).  Market purchases of inputs provide high quality data with which to calculate a respondent's costs because the prices are not distorted by non-market influences and because such costs are, by definition, the most specific to the input consumed especially when contrasted with general import data from unspecified varieties and qualities of inputs typically used by

Nonconfidential - Confidential Material Deleted

Commerce as surrogate information.  See generally Lasko Metal Prods. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (recognizing that "using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law" (emphasis supplied)).

Here, Commerce rejected the Chinese producer's actual costs of imported plywood and other major wood inputs because those purchases were made prior to the period of review ("POR"), although as noted by the CIT below, a [


].  See Home Meridian Int'l, Inc. v. United States, No. 11-325, slip op. 13-81 at 18 n.13 (Ct. Int'l Trade Aug. 7, 2013) (Confidential Version) (JA000036).  Neither the statute nor Commerce's own regulation place any restriction on the timing that qualifies, or disqualifies, use of a respondent's actual market input costs as best information available.  But in the initial Final Results and First Remand Redetermination Commerce robotically and, without any basis, rejected use of those actual costs citing its own uncodified "practice" of refusing to use non-contemporaneous market purchase data, despite the fact that Commerce routinely adjusts the timing of other less-specific cost information used to establish normal value by inflating it with wholesale price index adjustors where that less-specific information is not contemporaneous with the period of review.

3

Commerce's "practice" of applying more restrictive requirements that <u>single out</u> market purchases as compared to other surrogate values operated categorically and irrationally to exclude a whole class of data from consideration, data representing the market economy cost of the inputs actually consumed by the producer, contrary to the statutory requirement to use the "best information available."   Commerce's original Final Results and First Remand Redetermination therefore, were contrary to law, as held by the CIT below.   Appellants utterly fail to establish that Commerce's Second Remand Redetermination, in which Commerce used the pre-POR market purchases, conflicted with the statute or Commerce's regulations. Nor did Commerce appeal or otherwise appear in this action to support Appellants.

This Court should <u>summarily affirm</u> the CIT below and should uphold Commerce's second remand redetermination.

## STATEMENT OF THE CASE AND FACTS RELEVANT TO THE ISSUES

Plaintiffs-Appellees Home Meridian International, Inc. d/b/a Samuel Lawrence Furniture Co. and Pulaski Furniture Company are importers of subject merchandise in the underlying fifth administrative review of the antidumping determination of wooden bedroom furniture from the People's Republic of China covering 2009 entries.  Plaintiff-Appellee Great Rich (HK) Enterprises Co., Ltd.

and Dongguan Liaobushangdun Huada Furniture Factory is an exporter of the subject merchandise assigned the separate rate in the review.

During the administrative review in question, mandatory respondent Dalian Huafeng Furniture Co., Ltd./Dalian Huafeng Furniture Group Co., Ltd. (hereinafter "Huafeng") submitted certified evidence of its purchases of inputs sourced from market economy ("ME") suppliers.   In its questionnaire responses, Huafeng provided information on its 2008 ME purchases of pine, poplar, birch and elm lumber as well as oak veneer and plywood used in the production of subject merchandise during the POR. See Letter from Perkins Coie to Commerce re: Fifth Administrative Review Sect. D Resp. at Company Official Certificate & Ex. D-5 (July 12, 2010) ("Sect. D Resp.") (JA1000004, JA1000140-41); Letter from Perkins Coie to Commerce re: Fifth Administrative Review Supp. Sect. D Resp. at Company Official Certificate & Ex. S-39 & S-40 (Oct. 12, 2010) ("Oct. 12 Supp. Sect. D Resp.") (JA1000451, JA1000462-69).   Huafeng also provided a spreadsheet identifying the unit price of its ME purchases and demonstrating that the purchases closely aligned with the POR, with most purchases pre-dating the POR by [                    ]. See Letter from Perkins Coie to Commerce re: Fifth Administrative Review Resp. to Qs. 43-72 of the Dept's Oct. 25, 2010 Supp. Questionnaire re: Sect. D at Company Official Certificate & Ex. S-98 (Nov. 8,

2010) ("Nov. 8 Supp. Sect. D Resp.") (JA1000500, JA1000523-24). Huafeng reported its actual purchase price for these wood inputs. See id. at Ex. S-98 (JA1000523). At verification, Commerce made multiple findings regarding Huafeng's wood input inventory and recording of material input costs. See infra Section III.A.2.

In its Final Results, Commerce determined the antidumping duty rate for Huafeng and the separate rate respondents was 41.75 percent. See Wooden Bedroom Furniture From the People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729, 49,733-34 (Dep't Commerce Aug. 11, 2011) ("Final Results") (JA1000925-26). Pertinent to this appeal, Commerce used surrogate values rather than Huafeng's ME purchases to value the plywood, lumber and veneer factors of production. See Mem. from Christian Marsh to Ronald K. Lorentzen re: Issues & Dec. Mem. for the Final Results of the Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China at Cmts. 7 & 20 (Aug. 5, 2011) ("I&D Mem.") (JA1000876-77, JA1000908-12).

Home Meridian et al. and Huafeng appealed the use of these surrogate values in the Final Results to the CIT. The CIT found that Commerce's determination to use surrogate values instead of Huafeng's actual ME purchases in

6

the Final Results for the wood inputs in question was not in accordance with law because Commerce relied upon contemporaneity to the exclusion of all other factors, failed to make factual findings related to Huafeng's ME purchases of wood inputs and failed to weigh the merits of the contemporaneous and non-contemporaneous data. See Home Meridian Int'l, Inc. v. United States, 865 F. Supp. 2d 1311, 1318-20 (Ct. Int'l Trade 2012) ("Home Meridian I") (JA000049-50). The court noted that "{i}f the only wood inputs into the subject merchandise were market economy inputs, contemporaneity would not outweigh all other factors." Id. at 1318 (JA000049). The CIT remanded the Final Results for Commerce "to reconsider or explain whether a surrogate value or market economy purchases constitute the best available information for certain wood inputs." Id. at 1332 (JA000059).

In the First Remand Redetermination, Commerce again found that the surrogate values were the best available information for valuing Huafeng's plywood, pine, poplar, birch and elm lumber and oak veneer inputs. See Final Results of Redetermination Pursuant to Court Order in Home Meridian Int'l, Inc. v. United States, Consol. Ct. No. 11-00325, Slip Op. 12-120 (Sept. 19, 2012) at 3-10 (Feb. 25, 2013), ECF No. 97 ("First Remand Redetermination") (JA1001016-23).

7

In its review of the First Remand Redetermination, the CIT determined that Commerce failed to "support the application of its methodology in this particular case with substantial evidence." Home Meridian Int'l, Inc. v. United States, 922 F. Supp. 2d 1366, 1374-75 (Ct. Int'l Trade 2013) ("Home Meridian II") (JA000013). The CIT first found that Commerce had "zero evidence . . . beyond mere speculation," to discredit Huafeng's claims that 100 percent of the wood inputs at issue that were used in production during the POR were purchased from an ME supplier, whereas Huafeng had provided substantial, even if "non-definitive," evidence to support that assertion. See id. at 1376-77 (JA000014). The CIT then examined whether Commerce had substantial evidence to determine that the surrogate values were the best information on the record if Huafeng's wood inputs were 100-percent sourced from MEs. See id. at 1377 (JA000014). The court determined that Commerce "fail{ed} to provide any reasonable explanation of its preference for surrogate values." Id. at 1380 (JA000016). Accordingly, and after Commerce elected to rely solely on the alleged open issue of whether Huafeng actually consumed 100 percent of the ME inputs at issue, the CIT remanded the case again, directing Commerce to do one of two things: either "request to reopen the record" to reexamine Huafeng's wood purchases consumption or "use Huafeng's actual ME wood input purchases to calculate normal value, adjusted as

8

needed." Id. at 1380, 1382 (JA000016, JA000018). The CIT denied a motion for reconsideration by the American Furniture Manufacturers Committee for Legal Trade et al. ("AFMC"). See Home Meridian Int'l, Inc. v. United States, 925 F. Supp. 2d 1377 (Ct. Int'l Trade 2013) ("Home Meridian III") (JA00005).

In the Second Remand Redetermination, Commerce declined to reopen the record and valued the contested wood inputs using Huafeng's ME purchases. See Final Results of Redetermination Pursuant to Court Order in Home Meridian Int'l, Inc. v. United States, Consol. Ct. 11-00325, Slip Op. 13-81 (June 25, 2013) at 7-8, ECF No. 129, filed Aug. 26, 2013 ("Second Remand Redetermination") (JA1001157-58). Commerce recalculated Huafeng's rate to be 11.79 percent. Id. at 17 (JA1001167). The CIT affirmed the Second Remand Redetermination. See Home Meridian Int'l, Inc. v. United States, No. 11-00325, 2013 Ct. Int'l Trade LEXIS 144 (Ct. Int'l Trade Nov. 14, 2013) ("Home Meridian IV") (JA00003).

## SUMMARY OF ARGUMENT

Commerce's Second Remand Redetermination should be sustained, and the AFMC has provided no valid reason for this Court to disturb the CIT's decisions below. Following two years of litigation, the CIT properly determined that Commerce's decision in the Final Results and First Remand Redetermination using surrogate values rather than Huafeng's verified ME purchases of the key input

materials of plywood, pine lumber, poplar lumber, birch lumber and elm lumber and oak veneer was neither supported by substantial evidence nor in accordance with law because Commerce failed to use the "best information available" to determine normal value, as required by the statute.  In its Final Results and First Remand Redetermination, Commerce erroneously relied on its regulations to reject Huafeng's market economy purchase data solely on the basis that such purchases were made prior to the POR.  Nowhere do the regulations require that ME purchases be contemporaneous with the POR.  Because this restriction is not codified in the actual words of the regulation, this Court owes no deference to Commerce's interpretation where, as here, Commerce's extra-regulatory restriction arbitrarily eliminates from any consideration as "best information available" a whole class of data, contrary to the antidumping statute's overarching principle.

Commerce's determination in the Final Results and First Remand Redetermination also provide no basis for Commerce to value contemporaneity of ME purchases over all other factors.  During the administrative proceeding and the course of the litigation before the CIT, Huafeng through its counsel provided ample evidence that 100 percent of the inputs it consumed in producing the subject merchandise were from ME purchases.  The AFMC can point to no evidence to show that Huafeng's ME purchase data were unreliable and, in fact, any such

10

conclusion is directly contrary to Commerce's conclusion in the Second Remand Redetermination.

Finally, Commerce's reliance in the Final Results and First Remand Redetermination on surrogate values was not supported by substantial evidence or in accordance with law because the surrogate values are distorted, with little relation to Huafeng's actual inputs.  There is no reason to believe these inputs were any more reliable than Huafeng's own verified ME purchases made just prior to the POR.

## ARGUMENT

### I.    Standard of Review

This Court's standard of review in cases reviewing antidumping determinations has been articulated in varying ways in recent years.  What is evident from this Court's precedent is that the CIT's determination is due deference upon appellate review.  Although this Court generally reviews the CIT's decisions "de novo," Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1300 (Fed. Cir. 2013), there are additional aspects of the standard of review that this Court must consider.  As this Court recently explained in NSK Corp. v. United States, 716 F.3d 1352 (Fed. Cir. 2013), cert denied, 572 U.S. __ (2014), when the CIT orders the agency to take a particular action, this Court

> steps into the shoes of the trade court and conducts a de novo review of whether the {agency's} determinations are supported by substantial evidence. This court also reviews the {agency's} determinations for substantial evidence when the Court of International Trade "remand{s} to the {agency}, giving it two options on how to proceed. . . . By contrast, we review remand orders issued by the Court of International Trade for abuse of discretion when the trade court does not assess the sufficiency of the evidence supporting the {agency's} determinations or require additional investigation by the {agency}, but "merely remand{s} the matter for additional explanation that would clarify the {agency's} determination."

NSK, 716. F.3d at 1363 (internal citations omitted).

Despite the de novo standard of review this Court has recognized the specialized role of the CIT and "will not ignore the informed opinion of the Court of International Trade" on the basis that the CIT "review{s} the record in considerable detail." Suramerica De Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994). For that reason, the Court has emphasized that the CIT opinion in a case reviewing agency action "deserves due respect." Id. More recently, this Court has indicated that it must "give great weight to 'the informed opinion of the {CIT}.'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Suramerica, 44 F.3d at 983); see also Royal Thai Gov't v. United States, 436 F.3d 1330, 1335 (Fed. Cir. 2006) ("While we essentially step into the shoes of the Court of International Trade and duplicate its review . . . in doing so we do not altogether ignore its informed opinion."). In this

case, it is particularly important to give great weight to the CIT's opinion and not ignore its findings in light of the fact-specific nature of this case.

This Court should review the CIT's decision in <u>Home Meridian I</u> under the abuse of discretion standard because the CIT remanded the wood inputs issue for further explanation to reconsider or explain whether a surrogate value or ME purchases constitute the best available information for certain wood inputs. <u>See</u> <u>Home Meridian I</u>, 865 F. Supp. 2d at 1332 (JA000059). It should review the CIT's decisions in the remaining decisions below under the substantial evidence standard because the CIT gave Commerce two options as to how to proceed (reopen the record or use Huafeng's ME input data). Under these standards applied in this case, as discussed below, this Court should summarily affirm the CIT's decisions below.

In conducting its substantial evidence review, "{t}his court reviews the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" <u>Zhejiang Dunan Hetian Metal Co. v. United States</u>, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting <u>Atl. Sugar, Ltd. v. United States</u>, 744 F.2d 1556, 1562 (Fed. Cir. 1984))). Substantial evidence is "such relevant evidence as a reasonable mind

13

might accept as adequate to support a conclusion." <u>Consol. Edison Co. of N.Y. v. NLRB</u>, 305 U.S. 197, 229 (1938).

On questions of law, the Court follows the two-pronged framework established by <u>Chevron U.S.A. Inc. v. NRDC</u>, 467 U.S. 837 (1984). <u>See</u> <u>Agro Dutch Indus., Ltd. v. United States</u>, 508 F.3d 1024, 1029-30 (Fed. Cir. 2007). First, the Court must determine whether Congress' intent can be ascertained. If it can, the Court "must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43. Second, the Court must determine whether the agency's interpretation of the statute is reasonable. <u>See</u> <u>id.</u> In regard to regulations, Commerce's "construction of its own regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulation." <u>Am. Signature, Inc. v. United States</u>, 598 F.3d 816, 827 (Fed. Cir. 2010) (internal quotations omitted); <u>see also</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997) (articulating the "plainly erroneous" standard for agency's interpretation of its regulations).

The Commerce regulation at issue is silent as to any temporal requirement limiting use of market economy inputs. Commerce's extra-regulatory addition of such a requirement through an inconsistently applied "practice" constitutes circumvention rather than construction of a duly promulgated regulation and is

14

thus entitled to no deference, especially where, as here, the regulation as applied by Commerce operates arbitrarily to exclude data from consideration as "best information available," contrary to the statute and this Court's past decisions regarding the acceptability of market input values.

## II.    Commerce Erred in Rejecting Huafeng's ME Purchases Because They Were Not Purchased During the POR

In the Final Results and First Remand Redetermination, Commerce rejected Huafeng's ME purchases of plywood, pine lumber, poplar lumber, birch lumber and elm lumber and oak veneer – core, foundational inputs in the production of subject merchandise – on the grounds that they were not the best available information.    Commerce's decision to use surrogate values when Huafeng had provided ME purchase data for inputs actually consumed during the POR was not supported by substantial evidence or in accordance with law.    In the Final Results and First Remand Redetermination, Commerce insisted on using surrogate values because Huafeng did not make ME purchases of the wood inputs during the POR by citing the regulations, <u>Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments</u>, 71 Fed. Reg. 61,716 (Dep't Commerce Oct. 19, 2006) and its prior determinations.    <u>See</u> I&D Mem. at Cmt. 20 (JA1000910); First Remand Redetermination at 8 (JA1001021).    In reality, under the unique facts of this case,

15

the only reasonable methodology for valuing the wood inputs in question was for Commerce to use Huafeng's ME purchase information, as the CIT found in <u>Home Meridian II</u>. Commerce is not entitled to any deference whatsoever in adding additional requirements into a regulation that is plain on its face.

### A. There Is No Requirement That ME Purchases Be Made During the POR

The statute and judicial precedent undermine Commerce's decision in the Final Results and First Remand Redetermination to reject Huafeng's ME purchases on the basis that they were not purchased during the POR. The statute provides that "the valuation of the factors of production shall be based on the <u>best available information</u> regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1)(B) (emphasis supplied). The statute goes further to require Commerce to "determine the norma1value of the subject merchandise on the basis of the value of the factors of production <u>utilized</u> in producing the merchandise." <u>Id.</u> The statute makes no mention of the purchase date of factors of production ("FOP") inputs, but rather focuses on valuing the respondents' inputs "<u>utilized</u> in producing the merchandise." <u>Home Meridian II</u>, 922 F. Supp. 2d at 1370 (emphasis supplied) (JA000010). The courts have recognized that "using surrogate values when market-based values are available would, in fact, <u>be contrary to the</u>

16

intent of the law." Shakeproof, 268 F.3d at 1382 (citing Lasko, 43 F.3d at 1446) (emphasis in original).

In the Final Results, Commerce asserted that in "exercising its discretion {to interpret the statute}, {Commerce} has developed a practice of using, whenever possible, price data that are contemporaneous with the period under consideration to value FOPs because this is the time period for which the {normal value} of imports, and their dumping margin, must be determined" and further stated that "{t}he preference for using POR values is based on the overarching statutory mandate that {normal value} 'shall be the price . . . reasonably corresponding to the time of the sale used to determine the export price or constructed export price . . . .'" I&D Mem. at Cmt. 20 (JA1000910-11) (citing, without expressly specifying, 19 U.S.C. § 1677b(a)(1)(A)).  Even the provision cited by Commerce, however, does not require the use of POR purchases and is instead stated as a "preference." Commerce's distorted reading of the statute to elevate the significance of contemporaneity (i.e., purchase date alone) above other critical criteria fails the statutory mandate to calculate antidumping duty margins as accurately as possible using the best available information.  This Court owes no deference to Commerce's extra-regulatory interpretation that is clearly in error.

17

As the CIT observed, to account for the absence of direction in the statute on what method Commerce must use when a nonmarket economy ("NME") producer sources goods from an ME supplier, Commerce promulgated a regulation.  See Home Meridian II, 922 F. Supp. 2d at 1372 (JA000011).  Commerce's regulation on the issue provides that

> The Secretary normally will use publicly available information to value factors. However, where a factor is purchased from a market economy supplier and paid for in a market economy currency, the Secretary normally will use the price paid to the market economy supplier.  In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, the Secretary normally will value the factor using the price paid to the market economy supplier.

19 C.F.R. § 351.408(c)(1) (2012).  The regulation makes no mention whatsoever of any temporal or contemporaneity requirement.  Because the regulation itself does not include any requirement for the timing of the ME purchase, it is simply wrong for the AFMC to claim that "Commerce's regulation is clear" that "Commerce considers only whether the ME input was purchased during the POR, not whether it was consumed during the POR."  AFMC Br. at 37.  If the regulation were so clear, one would expect AFMC to quote it in its brief, which AFMC noticeably avoids.  It is plainly erroneous for Commerce to read a temporal requirement into the regulations where there is none.

18

According to Commerce and the AFMC, Commerce's decision to use surrogate values to value the lumber inputs was based on the properly implemented ME inputs methodology in 19 C.F.R. § 351.408(c)(1), as clarified in <u>Antidumping Methodologies</u>, which Commerce claims "makes clear that {it relies} on ME prices paid for inputs during the POR, rather than the price paid for inputs in inventory."    I&D Mem. at Cmt. 20 (JA1000911); AFMC Br. at 22-23. Commerce's initial interpretation in this regard to permit the use of ME inputs only where they are purchased during the POR, an interpretation shared by the AFMC, is not supported by the language of the regulations or the language of <u>Antidumping Methodologies</u>, as discussed below.  This plainly erroneous, strained interpretation would also operate here to disqualify market-sourced raw materials in this unusual and extreme case where those ME inputs comprised 100 percent of the inputs placed into production for plywood, pine, poplar birch and elm lumber and oak veneer.  That AFMC's (and initially, Commerce's) draconian view leads to absurd results is illustrated by the fact that, had those very same inputs been imported into the Philippines (a market economy country), rather than into China for use by the producer under review, Commerce would not have hesitated to use them and to inflate them as necessary to adjust for any timing differences between the importation and the period of review.  <u>See, e.g.</u>, <u>Certain Steel Threaded Rod From</u>

19

the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 76 Fed. Reg. 68,400 (Dep't Commerce Nov. 4, 2011), accompanying Issues and Dec. Mem. at Cmt. 4 ("{I}t is {Commerce's} practice to inflate all non-contemporaneous surrogate values to be contemporaneous with the POR.").

Although Antidumping Methodologies does have some discussion suggesting that Commerce focuses on purchases only during the period under review, that language was in the context of situations where a respondent had both ME and NME purchases during the period of investigation ("POI") or POR and the question was whether to use the ME purchase prices to value the entire input. That is not the situation presented in this case and the references in Antidumping Methodologies to purchases "during the period of review" in no way dictates the outcome here. As the CIT aptly noted, "{t}he AD Methodologies policy statement is not directly applicable here because it dealt with establishing the percentage of ME input purchases during the POR needed to allow Commerce to use those prices to value NME-sourced inputs." Home Meridian II, 922 F. Supp. 2d at 1373 n.6 (JA000011-12).

Moreover, there are other statements by Commerce in Antidumping Methodologies that suggest that whether an ME input was consumed during the

20

POR is factored into Commerce's analysis.   In particular, Commerce explained that its policy is to "disregard{} the prices of inputs that could not possibly <u>have been used</u> in the production of subject merchandise during the period of investigation or review." <u>Antidumping Methodologies</u>, 71 Fed. Reg. at 61,716 (emphasis supplied); <u>see also</u> <u>Home Meridian II</u>, 922 F. Supp. 2d at 1372 (citing same) (JA000011).  Language such as this suggests that Commerce was focused on consumption of the input during the POR.   In fact, the CIT has interpreted <u>Antidumping Methodologies</u> to mean that "Commerce's policy is to presume that market economy purchase prices are the best available information, and thus, where possible, to use them to value the total quantity of an input."   <u>Since Hardware (Guangzhou) Co. v. United States</u>, 2010 Ct. Int'l Trade LEXIS 119, at *8 (Ct. Int'l Trade Sept. 27, 2010).

In short, the regulation does not provide a basis to bar to Commerce's use of ME purchases made prior to the POR and <u>Antidumping Methodologies</u> does little to clarify Commerce's policy on the issue under the unique facts of this case. Commerce's reading of a temporal requirement into the regulations where there is no express language in either the regulations themselves or the agency's published methodology in support of such a reading is plainly erroneous, not reasonable and, therefore, not entitled to deference from this Court.

**B. Case Law Does Not Dictate the Outcome in the Final Results**

Nor does case law require Commerce to robotically reject ME purchase data on the basis of lack of contemporaneity.  Commerce in its Final Results and the AFMC in its brief also contend that the CIT has previously upheld Commerce's preference for contemporaneity in <u>Shakeproof Assembly Components v. United States</u>, 30 CIT 1173 (Ct. Int'l Trade 2006).  <u>See</u> I&D Mem. at Cmt. 20 (JA1000910).  As the CIT properly observed in its opinion in <u>Home Meridian II</u>, the facts of <u>Shakeproof</u> are distinguishable and make the <u>Shakeproof</u> court's statements on the value of contemporaneity inapplicable to the situation here.  <u>See</u> <u>Home Meridian II</u>, 922 F. Supp. 2d at 1379 (JA000016).

The CIT in <u>Shakeproof</u> noted that "Commerce must establish the value of a factor of production for a specific time period in order to calculate the normal value of imports (and, in turn, their dumping margin) within that time period as accurately as possible" and that "reliance on valuation information from within that specific time period is clearly an appropriate means of fulfilling this statutory directive."  <u>Shakeproof</u>, 30 CIT at 1178-79.  There, there was no issue of ME purchases but rather whether Commerce should have chosen a contemporaneous or non-contemporaneous price quote as a surrogate value.  <u>Id.</u> at 1177-80.  As the CIT in <u>Home Meridian II</u> properly noted, Commerce's "continued reliance on the

court's affirmation of {the preference for contemporaneity} in {Shakeproof} fails to recognize that such a preference may not be absolute" and that the preference "is permissible only when there is 'no dispute about the representativeness of Commerce's chosen surrogate value.'" Home Meridian II, 922 F. Supp. 2d at 1379 (JA000016). Unlike the situation underlying Shakeproof where Commerce was presented with two imperfect surrogate values, here Commerce was confronted with the choice between actual ME purchase data from the respondent under review made just prior to the POR and fictional contemporaneous surrogate values. The CIT's determination in Shakeproof is of no controlling weight.[2]

The AFMC's reference to other cases that they claim show that the CIT has previously "found Commerce's use of information that is contemporaneous with the period of investigation or review to be a reasonable exercise of its discretion" is misleading and provides no basis for disturbing the CIT's judgment below. AFMC Br. at 29. In particular, Globe Metallurgical, Inc. v. United States, 33 CIT 435 (Ct. Int'l Trade 2009), dealt with a situation where the CIT was reviewing Commerce's weighing of two different Indian surrogate values. Contemporaneity of either the

---

[2]   Furthermore, by adhering to an inflexible and extra-regulatory temporal restriction on the use of ME inputs in its original Final Results, Commerce did not actually consider ME inputs at all, and thus there was no actual weighing of the quality of one data source over another.

23

surrogate value or ME purchases was not at issue.    In Hebei Metals & Minerals Import & Export Corp. v. United States, 28 CIT 1185 (Ct. Int'l Trade 2004), the issue was whether Commerce properly used one of two surrogate values.  The CIT rejected plaintiff's proposed surrogate value on the basis that it appeared to pertain to an insufficiently broad category of the input in question.  See id. at 1193.  The CIT also noted that the surrogate value was "further flawed" because of lack of contemporaneity without further discussion.  Id.  Again the issue there was weighing of two surrogate values, and not weighing of the actual ME purchases used during the POR versus flawed surrogate values as is the case here.

In fact, the CIT has previously rejected Commerce's selection of one value over another based on contemporaneity alone.  In Yantai Oriental Juice Co. v. United States, 26 CIT 605 (Ct. Int'l Trade 2002), the CIT held that Commerce's use of imported steam coal data rather than prices from the Indian domestic market for purposes of selecting a surrogate value for steam coal on the basis that the imported value was "most contemporaneous" with the POR was not supported by substantial evidence.  The CIT found that Commerce had failed to show that the imported steam coal value was the "best available information," reasoning that "{w}hile the data relied upon by Commerce may be 'more contemporaneous' with the POR and not 'aberrational or unreliable,' these facts do not naturally lead to the

conclusion that such data is an accurate reflection of the price paid for coal by domestic Indian {apple juice concentrate} producers during the POR." Id. at 617. Commerce has previously been warned, therefore, that contemporaneity does not end the analysis when valuing factors of production. Regardless, Commerce's conclusions are subject at a bare minimum to a reasonableness test and there is no question that robotically excluding ME input data from consideration is unreasonable in this case where that data comprise the bulk of the raw materials consumed to produce the subject merchandise.

### C. Prior Commerce Cases Do Not Dictate the Outcome Here

The AFMC in its principal brief and Commerce in its Final Results also point to past administrative cases where they claim Commerce has rejected non-contemporaneous ME purchase data. See AFMC Br. at 27-30; I&D Mem. at Cmt. 20 & nn.131, 133 (JA1000911) (citing, e.g., Final Determination of Sales at Less than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006), accompanying Issues and Dec. Mem. at Cmt. 23 ("Diamond Sawblades I&D Mem."); Final Determination of Sales at Less Than Fair Value: Certain Automotive Replacement Glass Windshields From The People's Republic of China, 67 Fed. Reg. 6,482

(Dep't Commerce Feb. 12, 2002), accompanying Issues and Dec. Mem. at Cmt. 33)).    As the CIT properly observed "Commerce's determination in those proceedings {cited by Commerce and the AFMC} were never reviewed by the court with regard to market economy purchases." Home Meridian I, 865 F. Supp. 2d at 1317 n.5 (JA000048).

In addition, arguments pointing to Commerce's determination in Windshields are not persuasive to support the original Final Results or First Remand Redetermination in this particular case.    In Windshields, although Commerce did rely, in part, on the fact that the market economy inputs were purchased outside of the POI when choosing surrogates over ME purchases, it also examined the ME inputs in question to determine if the quantity of the input purchase was significant, in accordance with 19 C.F.R. § 351.408(c)(1).    Upon reviewing the evidence, Commerce found that "the amount of this reported market economy input is insignificant." Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Automotive Replacement Glass Windshields From the People's Republic of China, 66 Fed. Reg. 48,233, 48,241 (Dep't Commerce Sept. 19, 2001).    Unlike the respondent in the Windshields case, Huafeng has a significant quantity of ME purchases – 100 percent or almost 100 percent for all its lumber and veneer and plywood inputs – and thus, based on past practice,

26

Commerce should have examined the wood inputs and taken into account the significance of the quantity before reflexively rejecting the wood input data in its entirety.

Moreover, the "preference" Commerce expressed in the <u>Diamond Sawblades</u> case for contemporaneous data to value the factors of production does not override the statutory obligation to value factors of production using the best available information.    In <u>Diamond Sawblades</u>, Commerce disregarded pre-POI ME purchase data.   <u>See</u> Diamond Sawblades I&D Mem. at Cmt. 23.   There the respondent had three types of purchases: pre-POR ME, POR ME and POR NME, and it is reasonable to infer that the respondent used all three kinds of inputs in manufacturing the subject merchandise.   <u>See id.</u>   Commerce used a surrogate value for the input in question for the pre-period ME purchases but used ME purchase prices for the portion purchased during the POI.   <u>See id.</u>   Here, Huafeng had only pre-POR ME purchases for the inputs in question and 100 percent of Huafeng's plywood, pine, poplar, birch and elm lumber and oak veneer used to produce the subject merchandise during the POR were purchased from ME suppliers. Moreover, in <u>Diamond Sawblades</u>, unlike here, there was no showing that the alternate surrogate value data were distorted.   Commerce must act reasonably in making its valuation determinations based on the particular facts of each case.

27

Commerce was also wrong in its Final Results and First Remand Redetermination to rigidly exclude any inputs from outside of the POR when it regularly accepts pre-POR information within its antidumping methodology. For example, through the "90/60 day contemporaneity rule," found in 19 C.F.R. § 351.414(f)(2), (3), Commerce regularly uses home market sales from 90 days prior to and 60 days after the POR or investigation to broaden the pool of potentially matching sales when calculating a dumping margin in a market economy case. Thus, in a market economy situation, Commerce routinely goes outside the POR to find matching home market sales that establish normal value. In addition, where POR surrogate values are not reliable, Commerce regularly uses pre-POR values. See, e.g., Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Antidumping Admin. Review and New Shipper Review, 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009), accompanying Issues and Dec. Mem. at Cmt. 2., aff'd QVD Food Co., Ltd. v. United States, 721 F. Supp. 2d 1311, 1315-18 (Ct. Int'l Trade 2010).

Indeed, as in the Second Remand Redetermination, Commerce has previously accepted ME purchases made outside the period of examination, even where contemporaneous surrogate values were also available. For example, in Sichuan Changhong Electric Co. v. United States, 460 F. Supp. 2d 1338 (Ct. Int'l

Trade 2006), an appeal of the investigation of <u>Certain Color Television Receivers from the People's Republic of China</u>, the CIT reviewed Commerce's decision to use the respondent's ME purchases of one input, 29-inch curved TVs, made three weeks after the POI, rather than surrogate value data.  Commerce reasoned that the respondent's purchases of the input in question were from a ME supplier in significant quantities and were examined at verification.   See <u>Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China</u>, 69 Fed. Reg. 20,594 (Dep't Commerce Apr. 16, 2004), accompanying Issues and Dec. Mem. at Cmt. 12.  The CIT upheld Commerce's decision, noting that "while preferring information that is contemporaneous with the POI, Commerce also has a longstanding preference for using prices paid by NME producers for inputs purchased from a market economy country" and concluded that "no fault can be found with the Department's choice of market prices when valuing 29-inch CPTs.  Commerce properly preferred the post-POI, market economy purchases over NME import data within the POI. That these purchases were slightly outside the POI cannot be said to materially diminish their reliability." <u>Sichuan</u>, 460 F. Supp. 2d at 1364-65; <u>see also</u> <u>Certain Non-Frozen Apple Juice Concentrate From the People's Republic of China: Final Results of</u>

29

New Shipper Review, 68 Fed. Reg. 71,065, 71,066 (Dep't Commerce Dec. 22, 2003) (accepting an ME purchase made "slightly before the POR").

Whatever the applicability of Commerce's precedent may be with respect to rejecting pre-period market purchases, this case presents an extreme if not totally unique situation where the subject merchandise included wholly ME-purchased materials for the primary inputs. In the Final Results and First Remand Redetermination, Commerce disregarded verified market purchase prices of the actual raw materials consumed during the POR in favor of imports into the Philippines which crossed the Philippine border during the POR but for which the record lacks any information whatsoever as to when the underlying purchases were transacted. Imports into the Philippines during the beginning of the POR were surely "purchased" by Philippine buyers before the POR. The record is also devoid of any evidence that the importation of plywood, pine, poplar, birch and elm lumber and oak veneer into the Philippines was used in the production of furniture or that Philippine producers of furniture did not also produce wooden bedroom furniture using inputs purchased prior to the POR. Yet, Commerce favored all of the uncertainties and frailties of the import data over verified purchase information representing the exact inputs placed into production by Huafeng that were consumed during the POR. Commerce's chain of suppositions

30

does not pass the reasonableness test.   The CIT was proper to require more from Commerce.   Its decision to remand the Final Results in <u>Home Meridian I</u> to Commerce with instructions to explain its decision further was not an abuse of discretion and should be sustained.

## III.   Huafeng's ME Purchase Data Were Reliable

### A. The Record Evidence Does Not Support Commerce's Finding That ME Purchases Were Not Consumed During the POR

The AFMC contends that in the Final Results Commerce properly used surrogate values rather than Huafeng's ME purchase data on the basis that the ME purchase data were not reliable because, they allege, there is a question as to whether the subject merchandise Huafeng exported to the United States during the POR was actually made using only the ME purchases and not NME-purchased items.  <u>See</u> AFMC Br. at 33-37.   The AFMC had numerous opportunities during the original review to challenge Huafeng's ME purchase data on the basis of the amount consumed and did not do so in its case or rebuttal briefs before the agency or in its Rule 56.2 brief, response brief or reply briefs filed with the CIT.   In its case brief before Commerce, Huafeng affirmed that 100 percent of the inputs in question used to manufacture the subject merchandise were from ME suppliers citing its responses to Commerce's questionnaires.   <u>See</u> Revised Case Br. of Dalian Huafeng Furniture Group Co. Ltd.  at 11 (Mar. 11, 2011) ("Huafeng Case

Br.") (JA1000838).    "For the first time, at oral argument, AFMC and the Government contested Huafeng's allegations that 100% of relevant wood input for the subject merchandise during the POR was from these market economy purchases made during the prior calendar year." Home Meridian I, 865 F. Supp. 2d at 1318 (JA000049).  The AFMC, therefore, waived its arguments regarding the reliability of Huafeng's claims on ME input usage.

In any event, the AFMC is wrong.  In the Final Results, Commerce did not find that Huafeng's ME input purchase data were unreliable.  Instead, Commerce did not examine the reliability of Huafeng's ME inputs at all, explaining that it did not "address{} Petitioners' assertions regarding the reliability of Huafeng's ME purchases because {it was} not relying on these prices in the final results." I&D Mem. at Cmt. 20 (JA1000912).[3]  Commerce's initial rejection of Huafeng's ME purchases in the Final Results was based solely on the fact that they were not purchased during the POR.  See id. (JA1000911-12).

After the CIT remanded the issue to Commerce on the basis that "Commerce relied on contemporaneity to the exclusion of all other factors and failed to make necessary factual findings," Home Meridian I, 865 F. Supp. 2d at 1230

---

[3]  Here Commerce was referring to issues raised by the AFMC pertaining to illegal logging rather than reliability of the purchase data.  See I&D Mem. at Cmt. 20 (JA1000909).

(JA000050), Commerce again rejected the ME purchase data in the First Remand Redetermination, engaging in little more than speculation unsupported by the record evidence. The totality of Commerce's discussion on the reliability of the ME purchase data was as follows:

> {W}e examined the record and found that it does not demonstrate that the lumber purchased from ME suppliers was used to produce subject merchandise. In this case, there are six wood inputs (i.e., pine lumber, poplar lumber, birch lumber, elm lumber, oak veneer and plywood) for which Huafeng made ME purchases prior to the POR. Huafeng did not make any ME or NME purchases of these wood inputs during the POR. In the 13 months prior to the POR, Huafeng purchased pine, poplar, birch, and elm lumber inputs from both ME suppliers and NME suppliers. Thus, record evidence shows that only two of the six wood inputs in question were purchased entirely from ME suppliers. In addition, inventory records show that there was a sufficient quantity of wood in inventory before the ME purchases that could have covered all of the consumption of the lumber inputs for both 2008 and during the POR.

First Remand Redetermination at 7-8 (JA1001020-21) (internal record citations omitted). Mere speculation that some of the inputs in question "could have" been produced from NME inputs does not comply with the standard that Commerce "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfr.'s Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal quotations omitted).

33

Notably, and directly contrary to allegations made by the AFMC in its principal brief, AFMC Br. at 34, Commerce did not actually conclude that the ME purchases were unreliable.  To the contrary, after reviewing the record, in the Second Remand Redetermination, Commerce ultimately indicated that "{w}ith regard to whether the purchases that Huafeng reported for {pine, poplar, birch and elm lumber in addition to oak veneer and plywood} inputs are reliable for dumping margin calculations, <u>there is no information indicating that the purchases are unreliable.</u>"  Second Remand Redetermination at 12 (JA1001162) (emphasis supplied).  Commerce's ultimate conclusion on this issue was correct and the CIT properly affirmed the results based on substantial evidence on the record.

### 1. There Is No Question That 100 Percent of the Plywood and Oak Veneer Huafeng Used in Production During the POR Were Sourced From a ME Supplier

It is uncontroverted that for two of the inputs in question – plywood and oak veneer – the <u>only</u> purchases made were from ME suppliers in the 13 months preceding the POR.  <u>See</u> First Remand Redetermination at 8 (JA1001021); <u>see also</u> Oct. 12 Supp. Sect. D Resp. at Ex. S-40 (JA1000469).  Referring to plywood and oak veneer, Commerce found that "record evidence shows that . . . two of the six wood inputs in question were purchased entirely from ME suppliers."  First Remand Redetermination at 8 (JA1001021).  There is no reason to believe, nor is

34

there any evidence to suggest, that these two wood inputs did or could have come from NME sources.  In other words, it is without a doubt that no NME inputs of plywood and oak veneer were or could have been used to produce the subject merchandise.  Thus, the AFMC's arguments regarding the lack of evidence that the ME purchases were linked to the subject merchandise, AFMC Br. at 33-37, plainly are indefensible with respect to these two inputs.  No matter how many times the AFMC makes unsupported allegations that the subject merchandise <u>could</u> have included NME-purchased plywood and oak veneer, there can be simply no objection to the use of plywood and oak veneer ME purchase prices in the calculation of normal value.  AFMC posits no alternative source for the plywood and oak veneer that Huafeng consumed and relies, instead, on sheer speculation.

### 2. Commerce's Rejection of Huafeng's ME Purchases Lacked Substantial Evidence

There was also ample evidence on the record supporting the CIT's decision that the original Final Results and First Remand Redetermination lacked substantial evidence by rejecting Huafeng's ME purchases of all of the wood inputs in question (pine, poplar, birch and elm lumber in addition to oak veneer and plywood).  In the course of the proceedings at the CIT over the span of two years, the CIT reviewed the voluminous evidence on the record and concluded that "Commerce lacked substantial evidence to discredit Huafeng and HMI's claims

35

that 100 percent of the inputs used in production during the POR were purchased from an ME supplier." <u>Home Meridian II</u>, 922 F. Supp. 2d at 1376-77 (JA000014).  The CIT was correct.

Commerce cited no evidence to support its initial conclusion in the First Remand Redetermination that Huafeng used NME purchases of the relevant wood inputs during the POR.  The agency merely noted that "inventory records show that there was a sufficient quantity of wood in inventory before the ME purchases that could have covered all of the consumption of the lumber inputs for both 2008 and during the POR."  First Remand Redetermination at 8 (JA1001021) (citing basic inventory records in Oct. 12 Supp. Sect. D Resp. at Ex. S-41 (JA1000470-83)).  Commerce admitted it verified Huafeng's pre-POR purchases, but it said the verification was insufficient because Commerce only examined "whether these purchases accurately reflected the information from Huafeng's books and records that was reported to {Commerce} and did not address the reliability of using these purchases."  <u>Id.</u> at 42 (JA1001055).  Commerce's conclusory statements and cursory review does not provide a reasonable basis to reject Huafeng's statements regarding consumption of its ME purchases.

In reviewing Commerce's First Remand Redetermination in which Commerce continued to use surrogate values rather than Huafeng's ME purchases,

36

the CIT found that there was "zero evidence to the contrary, beyond mere speculation," to discredit Huafeng's claims that 100 percent of the wood inputs at issue that were used in production during the POR were purchased from an ME supplier, whereas Huafeng had provided substantial evidence to support that assertion. Home Meridian III, 925 F. Supp. 2d at 1376 (JA000014). The CIT then examined whether to sustain Commerce's determination that the surrogate values were the best information on the record if Huafeng's wood inputs were 100-percent sourced from MEs. See id. at 1377 (JA000014). The court found that Commerce "fail{ed} to provide any reasonable explanation of its preference for surrogate values." Id. at 1380 (JA000016). Finally, after reviewing all the record evidence in response to the CIT's decision in Home Meridian II, Commerce ultimately concluded that "there is no information on the record calling into question the reliability of the ME prices." Second Remand Redetermination at 12 (JA1001163). The record information to support this conclusion is abundant, as detailed below.

In its questionnaire responses, Huafeng established that 100 percent of its pine, poplar, birch and elm lumber and oak veneer used in the production of subject merchandise during the POR were supplied by a commercial enterprise in [      ], a market economy, and that plywood was sourced from a commercial

37

supplier [                    ].  See, e.g., Sect. D Resp. at Ex. D-5 (JA1000141); Oct. 12

Supp. Sect. D Resp. at Exs. S-39, S-40 (JA1000465-66, JA1000469).  In particular,

column H in Exhibit S-40 shows that, as a percent of the total quantity of the factor

entered into production during the POR, purchases of each of the four types of

lumber (pine, poplar, birch and elm) as well as plywood [


].  Id. at Ex.

S-40 (JA1000469).  This is fully consistent with Huafeng's statements that it used

100 percent ME purchases of the six wood inputs in its POR subject merchandise.[4]

In addition, Huafeng stated that there is no overlap of CONNUMs between

the workshops producing furniture for the U.S. market and the workshops for other

markets, lending further support to the company's ability to segregate production

data and thus make an informed statement regarding the inputs utilized.  See Letter

from Perkins Coie to Commerce re: Fifth Administrative Review Supp. Sect. D

Resp. at 7 (Oct. 18, 2010) (JA300014) (stating that only certain "workshops . . .

produce subject merchandise sold to the United States during POR.  Products

produced in other workshops are mainly sold to Japan and the domestic market and

---

[4]  With respect to [                    ] percent of Huafeng's consumption was from
ME purchases.  See Oct. 12 Supp. Sect. D Resp. at Ex. S-40 (JA1000469).

have different CONNUMs than the products sold to the United States."). Any conclusion to the contrary is based on pure speculation that flies in the face of this consistent evidence.

Beyond Huafeng's representations in its questionnaire responses, Commerce verified the accuracy of Huafeng's factor of production data. Commerce fully verified Huafeng's questionnaire responses on this issue without discrepancy. See Mem. from Jeff Pedersen to the File re: Verification at Dalian Huafeng Furniture Group Co., Ltd. at 29 (Jan. 31, 2011) ("Verification Report") (JA1000622). In particular, Commerce found that

- Huafeng's facility had separate workshops for furniture destined for the United States versus that destined for other countries. See id. at 5 (JA1000598).

- "{c}ompany officials demonstrated how they recorded costs and consumption quantities in their accounting and production records, providing records covering the period from the purchase of inputs to the entry of the finished good into the warehouse." Id. at 24 (JA1000617).

Commerce also

- reviewed "worksheets maintained by each workshop {that} record all inputs and outputs and are the basis for the reported FOB database." Id.

- "examined the . . . cost build up in company records for March and noted no discrepancies with the above description." Id. at 25 (JA1000618) (emphasis supplied).

- "reconciled the total costs listed in the factory overhead sub-ledger to the costs recorded as U.S. cost of production in the cost of production ledger and cost of production worksheet." Id.

39

- "{a}s a verification of the accuracy of inventory levels {Commerce} counted all poplar, elm, particle board, and plywood maintained in inventory and compared the counted amounts to inventory records." Id.

In short, the record at the administrative level and before the CIT was replete with evidence supporting the reliability of Huafeng's certified statements that 100 percent of the plywood and pine, poplar, birch and elm lumber it used were purchased from an ME supplier based on Commerce's own observations at verification. Any assertion to the contrary ignores the record before the agency and the CIT and cannot be sustained. The AFMC's suggestion that Huafeng's claims cannot be trusted lacks any evidentiary basis.

## B. Commerce Could Not Reasonably Question the Accuracy of the ME Purchases Data

There was no reasonable basis for Commerce in the Final Results or First Remand Redetermination to reject Huafeng's ME purchases data on the basis of lack of reliability. Commerce accepted Huafeng's 2009 ME purchases of [

]

of the pine, poplar, birch and elm lumber and oak veneer purchased in 2008. See Nov. 8 Supp. Sect. D Resp. at Ex. S-98 (JA1000521-25); see also Mem. from Rebecca Pandolph to the File re: Analysis Mem. for the Redetermination Pursuant to Court Remand in the 2009 Antidumping Duty Review of Wooden Bedroom

40

Furniture from the People's Republic of China at Attach. 2 (Dec. 26, 2012) ("Huafeng Draft Remand Analysis Mem.") (showing market economy inputs) (JA300564).[5]  There is, therefore, no legitimate issue as to the reliability of the transaction data from the ME vendor.  In addition, Commerce collected complete traces for samples of the 2008 ME data at verification.  See Huafeng Verification Report at 35 (JA1000628).  Commerce also examined the ME purchases during the review when it asked Huafeng for additional information regarding its 2008 ME purchases.  See, e.g., Nov. 8 Supp. Sect. D Resp. at 6 (JA1000508) (responding to Commerce's questions on certain ME purchases).  In short, the record supports the veracity of the pre-POR ME purchases data for the wood inputs in question.

### C. Commerce's Attempt to Justify Rejection of the ME Purchase Data Based on a Comparison to the 2008 Respondent Utterly Fails

In its First Remand Redetermination, which the AFMC requests that this Court reinstate, AFMC Br. at 45, Commerce attempted to avoid the use of Huafeng's ME purchases data by suggesting for the first time that Huafeng's ME purchases were aberrational.  Commerce claimed that "the prices paid by another respondent in 2008 were significantly higher than Huafeng's ME prices for the same wood types and more in line with the Philippine import values," and

---

[5]  Commerce adopted the draft analysis memorandum in its First Remand Redetermination.

reasoned that "{t}his further demonstrates that, while ME purchases may be more specific to the type of input used, they do not necessarily accurately value {sic} for the inputs at issue." First Remand Redetermination at 9 (JA1001022). Commerce cherry-picked the record from the prior year and failed to acknowledge that the other respondent (1) was located in an entirely different geographic region of China, (2) sourced its inputs from different countries than Huafeng and (3) operates in a different market segment than Huafeng – factors that make an apples-to-apples comparison impossible. The 2008 respondent, [

]. By contrast, Huafeng is located in the far North of China, in Dalian. The differing geographic locations of Huafeng and the 2008 respondent had a direct and logical influence on the source countries for the companies' market inputs. Specifically, [

42

].  Huafeng, on the other hand, made great use of [

].

See Oct. 12 Supp. Sect. D Resp. at Ex. S-39.2 (JA1000465).

In addition, although Commerce purported to compare Huafeng's ME inputs

generally to those of the 2008 respondent, in fact Commerce did so only with

respect to [     ] inputs, painting an incomplete picture of what the record actually

shows.  See Huafeng Draft Remand Analysis Mem. at 1 (JA300555).    There is

absolutely [                                                                    ] used by

Huafeng and the 2008 respondent.  [

].  Nov. 8

Supp. Sect. D Resp. at Ex. S-98, p. 3 (JA1000523); [

].  Even in the case of particleboard, an input for which Commerce did,

in fact, use Huafeng's market inputs because some purchases were in 2009, there is

[                                        ] between  Huafeng  and  the  2008  respondent.

43

Huafeng's ME purchase price of this input was [         ], whereas the 2008

respondent's was [         ]. Huafeng Draft Analysis Mem. at Attach. 1, p. 4,

Attach. 2 (JA300562, JA300564) (listing ME purchase prices for the inputs in

question). These price differences reasonably must be related to the fact that

Huafeng's purchases of particleboard came from [

                    ]. See Huafeng Draft Analysis Mem. at Attach. 1 & 2

(JA300558-65) (showing MEP for both Huafeng and the 2008 respondent);

[

                    ]. These additional comparisons of prices paid

by Huafeng and the 2008 respondent – comparisons Commerce did not make –

show that (1) Commerce had no problem with price differences with the 2008

respondent (albeit from the prior period) when it came to Huafeng's 2009 ME

inputs and (2) Huafeng's purchases were grounded in commercial reality, when

compared to the 2008 respondent for some inputs, and were not universally

aberrant, as suggested by Commerce.

It is neither proper nor correct for Commerce to use a comparison of

Huafeng's purchase data with limited data available for another respondent in a

separate review to dismiss the reliability of Huafeng's ME purchases data. The

CIT was not persuaded by Commerce's attempt to discredit Huafeng's ME

Nonconfidential - Confidential Material Deleted

purchases by comparison to another respondent.    Rightfully so, any such

comparison is woefully inadequate.[6]

## D. Huafeng Gave Legitimate Reasons for Purchasing ME Inputs Prior to the POR

The AFMC in its brief and Commerce in its First Remand Redetermination

pointed to Huafeng's statement that it [

] as a

further reason to reject the pre-POR ME purchases.    AFMC Br. at 35; First

Remand Redetermination at 8 (JA1001021).    Commerce did not explain why this

was a key fact in its analysis but the implication is that there is something wrong

with making such purchases or that purchasing [                    ] calls into question

the accuracy of the prices.    Commerce's citation to this statement alone paints an

incomplete picture.    Huafeng also said that it made those purchases because: [

---

[6]   The situation is, however, a mixed bag because the surrogate value for [
                        ] Huafeng's ME purchase price.    See Nov. 8 Supp. Sect. D
Resp. at Ex. S-98 (JA1000524); Huafeng Draft Analysis Mem. at Attach. 2
(JA300564).

45

]. Nov. 8 Supp. Sect. D Resp. at 6 (JA1000508).  Whether a company tries to predict the future (and whether it is right or wrong [

]) is not relevant to the actual costs of raw materials consumed to produce the subject merchandise exported to the United States.  Further, a decision to purchase an input [

].  Huafeng had legitimate business reasons for purchasing ME inputs.

The fact that Huafeng is located in a non-market economy is not license for Commerce to reject notions of rational business activity.  Indeed, if this were a market economy case, the normal value would be based on the company's sales price in the home market or a constructed value based on the cost of materials, of which raw material cost is an integral value that incorporates the cost of beginning inventory.  See 19 U.S.C. § 1677b(a)(1), (e).  In other words, normal value in a market economy case would include the cost of pre-POR raw material purchases.  Treating NME cases differently by focusing exclusively on when the inputs were purchased is arbitrary.  In its first two decisions, Commerce elevated the system of using surrogate values and its self-created tests and qualifications above the

46

fundamental objective "to determine the normal value of the subject merchandise on the basis of the value of the factors of production <u>utilized in producing the merchandise</u>." <u>Id.</u> § 1677b(c)(1)(B) (emphasis supplied). For these reasons, the CIT was correct to reject Commerce's determination in the Final Results and First Remand Redetermination to select surrogate values over actual ME purchase data.

## IV.    The CIT Gave Proper Deference to Commerce

The AFMC argues that the CIT "erred by rejecting Commerce's factual findings." AFMC Br. at 35. The AFMC further claims that the CIT improperly substituted its judgment for Commerce's in finding that the agency never "pointed to substantial evidence on the record to demonstrate that Huafeng's input purchases are unreliable or aberrant." <u>Home Meridian II</u>, 922 F. Supp. 2d at 1378 (JA000015); AFMC Br. at 32. This is not a case of the lower court reaching a different factual conclusion than Commerce. The CIT's determination did not constitute an improper level of deference. Rather, after reviewing the record in light of the statutory requirement to use the "best information available," the CIT found that Commerce's determination to use surrogate values in lieu of actual ME purchases lacked the substantial evidence required of Commerce's determinations, concluding that Commerce "fail{ed} to provide any reasonable explanation of its

47

preference for surrogate values on these facts." <u>Home Meridian II</u>, 922 F. Supp.

2d at 1380 (JA000016).

Certified statements on the record by Huafeng's counsel, relied upon by

the CIT, include the following statements:

- "All lumber and veneer used to produce the subject merchandise during the period of review was purchased from a single market economy supplier and payment was made in U.S. dollars." Huafeng Case Br. at 11 (JA1000838) (submitted in administrative proceeding).

- "The subject merchandise was produced during the period of review using the relevant inputs taken from Huafeng's inventory that were purchased from market economy suppliers during the period December 2007- December 2008." Mem. of Points and Authorities in Support of Consol. Pl. Dalian Huafeng Furniture Grp.'s 56.2 Mot. for J. on Agency R. at 2, Home Meridian Int'l Inc. v. United States, No. 11-00325 (Feb. 24, 2012), ECF No. 35-1 (JA1000937).

- "All lumber and oak veneer and plywood inputs used to produce the subject merchandise during the period of review were purchased from a single market country supplier in a market economy country and all plywood inputs used to produce the subject merchandise during the period of review were purchased from a single market economy supplier located in another market economy country." <u>Id.</u> at 6 (JA1000941).

- "Since the date of oral argument, Counsel has re-confirmed with Huafeng that during the period of review, all lumber, veneer and plywood inputs used to produce the subject merchandise . . . originated from market economy countries." Supp. Resp. of Consolidated Pl. Huafeng at 3, Home Meridian Int'l Inc. v. United States, No. 11-00325 (Aug. 31, 2012), ECF No. 86 (JA302643).

The AFMC contends that "Huafeng never certified" to these facts and that

statements on the record regarding Huafeng's use of solely ME lumber and veneer

48

to produce the subject merchandise are without factual certification and based solely on assertions by counsel.  See AFMC Br. at 40.  The AFMC's argument lacks any basis.  There is no valid reason to question the accuracy of statements made by Huafeng's counsel in case briefs before the agency and repeated before the CIT.  Under U.S. Court of International Trade Rule 11,

> By presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after any inquiry reasonable under the circumstances: . . . the factual contentions have evidentiary support . . . .

USCIT R. 11(b)(3).  Thus, under the CIT's rules, Huafeng's counsel did indeed certify to the accuracy of all factual assertions in its brief before this Court and the Court should disregard all of the AFMC's comments to the contrary.  Although the AFMC undoubtedly does not like the facts, that does not make them untrustworthy.  In reality, the AFMC spends most of its argument on claims, raised for the first time at oral argument at the CIT, decrying the veracity of Huafeng's statements without setting forth any facts of its own that actually call Huafeng's statements and verified information into question.  The certified statements of Huafeng's counsel indeed comport with the evidence submitted by Huafeng during the course of the investigation.  See Nov. 8 Supp. Sect. D Resp. at Ex. S-98 (JA1000521-25).

49

The CIT in <u>Home Meridian II</u> went to great lengths to show the reasons for its conclusion that Commerce's decision in the Final Remand Redetermination as to what constituted the "best available information" was not a reasonable interpretation in line with determining margins as accurately as possible.  The CIT pointed, for example, to the following in determining that Commerce's conclusion that the ME data should not be used was not a reasonable outcome:

- "Commerce's conclusion that its fictional surrogate values better reflect the actual experience of the producer, especially in light of the imprecision of surrogate values generally, <u>is unsustainable</u>."  <u>Home Meridian II</u>, 922 F. Supp. 2d at 1379 (JA000016) (emphasis supplied).

- "Commerce {} <u>failed to explain</u> its departure from {its} practice of focusing on when the inputs were used in production, especially where here 100 percent of the inputs were purchased from an ME supplier. . . ."  <u>Id.</u> (emphasis supplied).

- "Commerce <u>fails to recognize</u> that its proposed valuation methodology, applied to the facts of this case, is far less reflective of Huafeng's actual experience because it pretends that Huafeng purchased all of its inputs during the POR at the estimated surrogate values."  <u>Id.</u> at 1380 (emphasis supplied).

- Commerce failed "<u>to provide any reasonable explanation</u> of its preference for surrogate values on {the} facts."  <u>Id.</u> (emphasis supplied).

It is wrong to claim that the CIT should have afforded deference to these failures by Commerce to reasonably examine the record before it.  <u>Chevron</u> deference has a limit.  Where, as here, Commerce's decisions were not reasonable, it is not owed deference.  Through a reasoned analysis the CIT found that

Commerce's factual and legal determinations to continue to use surrogate values over verified ME purchases data were not reasonable.  The CIT was correct to reach this conclusion based on the record and the law.

Though invited by the CIT to do so, Commerce decided not to reopen the record to examine further Huafeng's ME purchases data.  See Home Meridian II, 922 F. Supp. 2d at 1382 (JA000018); Second Remand Redetermination at 12 (JA1001162).  Commerce reasoned that "it would not be helpful to reopen the record to examine consumption and purchases" based on the CIT's conclusions in Home Meridian II and "there is no information on the record calling into question the reliability of the ME prices."  Second Remand Redetermination at 13 (JA1001163).  In addition, Commerce did not support the AFMC's motion for reconsideration filed following Home Meridian II.  See Home Meridian III, 925 F. Supp. 2d at 1380 (JA000007).  Nor did Commerce file its own appeal to challenge the CIT's determination.  Thus, Commerce stood by its ultimate determination that Huafeng's ME purchases were reliable.  The CIT's affirmance of that decision was supported by substantial evidence and in accordance with law.  There is no reason under the statute, case law or logic for this Court to disturb that determination.

**V.    Commerce's Determination That Surrogate Values Were the Best Available Information Was Not Supported by Substantial Evidence or in Accordance with Law**

Not only are Huafeng's ME purchase data reliable and appropriate, but the alternative surrogate values are far from the best available information for valuing these crucial wood inputs.  "Informing {Commerce's} exercise of discretion to select the 'best available information' pursuant to 19 U.S.C. § 1677b(c)(1) is the broader purpose of the antidumping law 'to calculate dumping margins as accurately as possible.'"  Jinan Yipin Corp. v. United States, 637 F. Supp. 2d 1183, 1187 (Ct. Int'l Trade 2009) (internal citations omitted).  In this case, the statutory mandate to calculate accurate dumping margins supports Commerce's Second Remand Redetermination in which it used Huafeng's ME purchase data.  By contrast, Commerce's use of surrogate values in the Final Results and First Remand Redetermination failed the statute's requirement.

The accuracy of any surrogate value is always questionable and surrogate values should only be used as a secondary estimate when an actual market economy purchase has not been made.  See Lasko, 43 F.3d at 1445.  Commerce has acknowledged that "{a}t best, this surrogate value represents only an estimate of what {a non-market economy} producer might pay for the factor in question if it were operating in a market economy setting."  Shakeproof, 268 F.3d at 1380.

52

"{A}n actual, market economy price" paid for the input is, however, "an actual price determined by market economy forces which has been paid to the market economy supplier by the respondent in convertible currency. Thus, the actual market economy price is both reliable and accurate." Id.

When the respondent has ME purchases of inputs, Commerce routinely holds that such inputs are the "best available information" as compared to surrogate values. Commerce itself has concluded that it does "not believe that substituting a surrogate value for the price a NME producer actually paid to a market economy supplier for an input actually used to produce the merchandise being sold to the United States could meet the best available information standard imposed by the statute." Certain Helical Spring Washers From the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 65 Fed. Reg. 31,143 (Dep't Commerce May 16, 2000), accompanying Issues and Dec. Mem. at Cmt. 1; see also Oscillating Fans and Ceiling Fans from the People's Republic of China: Final Determination, 56 Fed. Reg. 55,271, 55,275 (Dep't Commerce Oct. 25, 1991) (stating that "where we can determine that a NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the

53

intent of the intent of the law").

As the CIT aptly concluded after reviewing the record evidence and arguments of the parties, the surrogate values Commerce used in the Final Results are rife with flaws.  See Home Meridian I, 865 F. Supp. 2d at 1318-19 (JA000049).  These flaws highlight that the surrogate values do not constitute the best available information.  As the CIT observed, flaws with the surrogate values included that (1) the Philippine HTS subheadings 4407.10.90 (used to value pine lumber), 4407.99.90 (used to value poplar, birch and elm lumber) and 4408.90.90 (used to value oak veneer) "show a significant and unexplained increase over the market economy purchases made during the immediate prior calendar year" and (2) that Commerce used a basket category (HTS 4407.90.90) that included lumber not even used by Huafeng to value Huafeng's poplar, birch and elm.  Id.  Further, "{u}sing the actual inputs, if available and where they yield reliable values, would seem to promote accuracy more than does using flawed surrogate values."  Id. at 1319 (JA000049).  Here, the surrogate values used for Huafeng's lumber inputs do not yield reliable values and, thus, are not the "best available information" on the record.  Notably, and fatally, Commerce conducted no weighing of the quality of the surrogate data versus Huafeng's ME purchases in the original Final Results,

relying instead on its "practice" of robotically ignoring data that fails to meet temporal requirements not in the statute or Commerce's own regulation.

## A. Commerce Did Not Adequately Explain Why the HTS Data Are Significantly Higher Than ME Purchases

The first flaw in the surrogate values (derived from the import statistics for Philippine HTS subheadings 4407.10.90 and 4407.99.90) that Commerce used in the Final Results and First Remand Redetermination is that they are significantly higher than Huafeng's actual ME purchases data. The surrogate value for the lumber inputs (pine, poplar, birch and elm) is nearly [          ] the ME purchase price. In the case of pine lumber alone, the surrogate values applied by Commerce represents a nearly [                    ] over Huafeng's actual market economy purchase price. Huafeng reported its actual purchase price for these wood inputs with the average U.S. dollar per cubic meter cost being around [     ], as compared to a range of $372-378/m$^3$ for the surrogate value data, as summarized in the following chart:

| Input | Quantity Purchased (Cubic Meters) | Unit Price (USD/Cubic Meter) | Surrogate Value Applied by Commerce (USD/Cubic Meter) | Philippine HTS Code Used to Value Input |
|-------|-----------------------------------|------------------------------|-------------------------------------------------------|------------------------------------------|
| Pine Lumber | [ | ] | 378.2342 | 44071090 |
| Poplar Lumber | [ | ] | 372.5504 | 44079990 |
| Birch Lumber | [ | ] | 372.5504 | 44079990 |
| Elm Lumber | [ | ] | 372.5504 | 44079990 |
| Oak Veneer | [ | ] | 0.1221 | 44089090 |
| Plywood | [ | ] | $1,463.70[7] | 44121310 |

Source: Nov. 8 Supp. Sect. D Resp. at Ex. S-98 (JA1000523-24); Huafeng Draft Analysis Mem. at Attach II (JA300564).

The surrogate value for plywood (i.e., $1,463.70/m$^3$) is more than [

] than the ME purchase price (i.e., [        ]).   Not only that, but the surrogate value for plywood is actually many times higher than the surrogate value of any of the other wood inputs for which Commerce used surrogate values. As the chart shows, the plywood surrogate value is roughly four times higher, moreover, than the surrogate values for any other kind of lumber.

Commerce failed to address the significant differences in the ME purchase data and surrogate value in the Final Results.   In the First Remand

---

[7]  This surrogate value has been converted to cubic meters for purposes of this analysis.

56

Redetermination, Commerce attempted to address the increase by noting that "this is an increase between prices from two different sources."  First Remand Redetermination at 8 (JA1001021).  Restating the obvious does not address the core of the problem – the vast differences between these values.  Commerce also contends that "the prices Huafeng paid in 2008 for its ME purchases of lumber were particular to that time period and <u>may not</u> be at all reflective of prices during the POR." <u>Id.</u> (emphasis supplied).  Again, the fact that the purchases were made just prior to the POR, cannot be the cause of the difference.  The ME purchases are in fact closely aligned with the POR, with some purchases pre-dating the POR by [                                    ]. <u>See</u> Nov. 8 Supp. Sect. D Resp. at Ex. S-98, p. 1-4 (JA1000521-24).

The supposition by Commerce that the prices paid by Huafeng "may not" be reflective of prices during the POR is nothing more that speculation, and is not supported by substantial evidence, or any evidence at all.  Commerce never pointed to rising raw material costs from the beginning to end of the POR, for example, that would justify rejecting Huafeng's ME purchases from immediately before the review period on the basis that such ME purchase prices did not capture price increases during the POR.  Considering the timing of the global financial crisis, speculation that such costs <u>rose</u> would be exceedingly reckless.  Moreover,

the AFMC's insistence on a rigid rule that the ME purchases must be made during the POR results in the exclusion of purchases that in fact predated the POR by days or weeks. As the CIT observed, for example, [          ] of Huafeng's pine lumber purchases and [            ] of its poplar purchases were made between [                          ].  See <u>Home Meridian II</u>, slip op. at 18 n.13 (Confidential Version) (JA000036).   Thus, several key wood inputs were [                          ].  Commerce replaced verified market purchase prices of the actual raw materials consumed during the POR with imports into the Philippines which crossed the Philippine border during the POR but for which the record lacks any information as to when the underlying purchases were transacted. Thus, Commerce's use of surrogate values in the Final Results and First Remand Redetermination because they are contemporaneous with the POR lacks any basis in the record evidence or logic given that pre-POR purchases are undoubtedly included in the surrogate value data as well.

### B. The HTS Classifications Are Overly Broad And Inaccurate

The CIT below properly identified the flaw in Commerce's surrogate values. <u>See</u> <u>Home Meridian I</u>, 865 F. Supp. 2d at 1318-19 (JA000049).  The Philippine tariff schedule does not have different categories for poplar, birch or elm lumber and Commerce use a broad, unspecific basket category, HTS 4407.99.90, for the

58

surrogate value.  See First Remand Redetermination at 9 (JA1001022).  Commerce

utterly failed to address this lack of specificity at all in the Final Results.  In the

First Remand Redetermination Commerce finally acknowledged that this HTS

category "is not specific to each type of wood species" but nevertheless claimed

that the lack of specificity in the surrogate value "does not weigh in favor of using

pre-POR ME prices instead of surrogate values and abandoning {Commerce's}

practice of using only ME prices when they directly reflect the respondent's

purchasing experience during the POR - which occurs when the ME purchases

were made during the POR," further speculating that it "is not necessarily the case"

that "pre-POR ME prices are preferable to POR surrogate values."  Id.  Again,

Commerce cannot make contemporaneity paramount to all other factors and use

speculation to reject record evidence.  It was unreasonable for Commerce to reject

Huafeng's reliable market purchases for the precise and major inputs used to

produce the subject merchandise in favor of less specific baskets of unknown

lumber imported into the Philippines from third countries.  As the CIT observed,

"accuracy is important."  Home Meridian I, 865 F. Supp. 2d at 1319 (JA000049).

The Final Results and First Remand Redetermination failed to properly recognize

this importance, failing to devote any analysis or discussion to the inaccuracies in

the surrogate values themselves, instead resorting to supposition about the use of

pre-POR ME purchases generally.

In addition, the surrogate value for plywood suffers from the same infirmities as the other HTS categories for lumber because the surrogate value for plywood (HTS 4412.13.10 (plywood with at least one outer ply of tropical wood, with each ply not exceeding 6 mm in thickness)) broadly covers imports of plywood of various species and unspecified total board thicknesses whereas Huafeng's ME purchases of plywood are, by definition, the most specific data available because they represent the actual raw materials Huafeng purchased to produce the subject merchandise.  See I&D Mem. at Cmt. 7 (JA1000876).

For all these reasons, Commerce's determination in the Final Results and First Remand Redetermination to rely on surrogate values was not reasonable. Because substantial evidence did not support Commerce's use of surrogate values in the Final Results and First Remand Redetermination, the CIT was proper in Home Meridian II to direct Commerce to use Huafeng's reliable ME purchase data rather than the inaccurate surrogate values.

## VI.    The AFMC Has Provided No Valid Reason for Ignoring the Second Remand

AFMC's brief is devoid of any analysis as to why Commerce's Second Remand Redetermination is unlawful.  AFMC makes only a single passing reference to the Second Remand Redetermination asserting that "if Commerce had

used Huafeng's purchase prices rather than contemporaneous surrogate values to value wood inputs, Commerce would have been subject to challenge for being inconsistent with its regulations and for ignoring its long-standing practice regarding ME purchases." AFMC Br. at 30. This hypothetical scenario is precisely what Commerce did in the Second Remand Redetermination. AFMC has failed to argue or explain how Commerce's Second Remand Redetermination conflicts with the statute or Commerce's regulations. The reason for this glaring omission is that neither the statute nor regulations prohibit Commerce from using non-contemporaneous ME purchases. Nor is it the case that using non-contemporaneous ME purchases conflicts with "long-standing practice" as claimed by AFMC. See supra Section I.C. (citing cases where Commerce used non-contemporaneous ME inputs). Finally, while the United States made the Second Remand Redetermination "under protest," Commerce has not appeared before this Court to defend its earlier decisions. This Court should not disturb Commerce's last findings or upend the result of the lengthy proceedings below where neither the AFMC nor Defendant United States disputes the legality of the Second Remand Redetermination.

## CONCLUSION

The AFMC has provided no reason for this Court to reverse the CIT's decisions below.  For the foregoing reasons, the judgment of the CIT in <u>Home Meridian IV</u> sustaining Commerce's Second Remand Redetermination should be affirmed.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Kristin H. Mowry
Kristin H. Mowry
Jeffrey S. Grimson
Jill A. Cramer
Sarah M. Wyss
Daniel R. Wilson*
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel for Home Meridian International, Inc., DBA Samuel Lawrence Furniture Co., DBA Pulaski Furniture Company*
 *Admitted only in Maryland. Practice directly supervised by principals of the firm admitted to the D.C. Bar

</div>

June 6, 2014

# CERTICATE OF SERVICE

I hereby certify that on this 10th day of June 2014, I have caused a copy of the foregoing **CORRECTED NONCONFIDENTIAL RESPONSE BRIEF OF PLAINTIFFS-APPELLEES HOME MERIDIAN INTERNATIONAL, INC., DBA SAMUEL LAWRENCE FURNITURE CO., AND PULASKI FURNITURE COMPANY; GREAT RICH (HK) ENTERPRISES CO., LTD. AND DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY** to be served upon the following parties via the method indicated below:

**VIA CM/ECF ELECTRONIC SERVICE:**

Joseph Dorn
**King & Spalding, LLP**
1700 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 737-0500
jdorn@kslaw.com

Lizbeth Robin Levinson
**Kutak Rock**
Suite 1000
1101 Connecticut Ave., N.W.
Washington, DC 22205
liz.levinson@kutakrock.com

Bruce M. Mitchell
**Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP**
25th Floor
399 Park Avenue
New York, NY 10022
bmitchell@gdlsk.com

Stephen Carl Tosini
**U.S. Department of Justice**
Commercial Litigation Branch, Civil Division
P.O. Box 480 (Fed Ex delivery 1100 L Street, NW)
Ben Franklin Station
Washington, DC 20044
stephen.tosini@usdoj.gov

June 10, 2014

/s/ Kristin H. Mowry
Kristin H. Mowry
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel for Home Meridian International, Inc., DBA Samuel Lawrence Furniture Co., DBA Pulaski Furniture Company*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

   ✓ The brief contains 13,709 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

   ☐ The brief uses a monospaced typeface and contains [state the number] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   ✓ The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman typeface.

   ☐ The brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

/s/ Kristin H. Mowry
Signature of Attorney

Kristin H. Mowry
Name of Attorney

Appellee
State whether representing appellant, appellee, etc.

June 6, 2014
Date